**KOBAYASHI, SUGITA & GODA, LLP**
LEX R. SMITH          3485-0
First Hawaiian Center
999 Bishop Street, Suite 2600
Honolulu, Hawaii 96813
Tel: (808) 535-5700
Fax: (808) 535-5799
Email: lrs@ksglaw.com

Attorney for Appellant
SANDWICH ISLES COMMUNICATIONS, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SANDWICH ISLES COMMUNICATIONS, INC. <br><br> Appellant, <br><br> vs. <br><br> HAWAIIAN TELCOM, INC., <br><br> Appellee, | ) CASE NO. 22-00426 JAO-KJM <br> ) (Bankruptcy Appeal) <br> ) <br> ) <br> ) **APPELLANT SANDWICH ISLES** <br> ) **COMMUNICATIONS, INC.'S** <br> ) **OPENING BRIEF; CERTIFICATE** <br> ) **OF SERVICE** <br> ) <br> ) <br> ) <br> ) <br> ) |

## CORPORATE DISCLOSURE STATEMENT UNDER FED R. BANKR. 8012

Appellant, Sandwich Isles Communications ("SIC") is a privately owned Hawaii corporation, whose stock is 100% owned by Waimana Enterprises Inc. ("WEI"), also a privately held native Hawaiian Hawaii corporation. No public corporation owns any of SIC's stock.

DATED: Honolulu, Hawaii, March 20, 2023.

/s/ Lex R. Smith
Lex R. Smith
Kobayashi Sugita & Goda,LLP

Attorney for Appellant
SANDWICH ISLES COMMUNICATIONS, INC.

# TABLE OF CONTENTS

Page

Table of Contents .......................................................................................................... i

Table of Authorities ..................................................................................................... ii

JURISDICTIONAL STATEMENT ...............................................................................1

STANDARD OF REVIEW ............................................................................................2

STATEMENT OF THE CASE........................................................................................ 2

SUMMARY OF ARGUMENT ...................................................................................... 7

ARGUMENT .................................................................................................................. 8

    A.    The Trustee Never Owned 372, So He Could Not (and did not) Transfer 372 to HAWEL ........................................................................ 8

    B.    Under the Hawaiian Homes Commission Act, Which Is Part of the Hawaii State Constitution, 372 Could Not Have Been The Subject Of The Trustee's Writ of Execution ........................................................ 11

    C.    Even If License 372 Could Have Been Executed Upon, And Even If The Trustee Had Gone Through The Steps Necessary To Executed On It, License 372 Could Only Have Been Sold to A Native Hawaiian or Native Hawaiin-Owned Entity ............................... 14

        1.    An Important Purpose Underlying The Act Is Making The HHL Available To Beneficiaries For Business ..................................18

    D.    The Fact That DHHL Supported HAWTEL's Effort To Get HHL From The Bankruptcy Court, Is Not A Reason For The Court To Side With HAWTEL. It Is Another Example, In A Long Line Of Examples, of DHHL's Violation Of Its Fiduciary Duties To Its Beneficiaries ................................................................................ 19

    E.    The Court Cannot Transfer Hawaiian Home Lands to HAWTEL "Free And Clear" of The Terms of The License Itself ............................. 21

CONCLUSION ............................................................................................................ 24

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

Butner v. United States,
    440 U.S. 48 (1979)........................................................................................15

Cedar Point Nursery v. Hassid,
    141 S. Ct. 2063 (2021)..............................................................................7, 10

In re Kimura,
    969 F.2d 806 (9th Cir.1992) ...........................................................................2

In re Maunakea,
    448 B.R. 252 (D. Hawaii 2011) ..........................................................14, 17, 22

Raleigh v Illinois Dep't of Revenue,
    530 US 15, 120 S.Ct 1951, 147 L.Ed.2d 13 (2000)......................................23

In re U.S. Airways Group, Inc.,
    303 B.R. 784 (Bankr. E.D. Va. 2003)...........................................................23

In re US Airways Group Inc.,
    287 B.R. 643 (E.D. Va. 2002)......................................................................23

**State Cases**

Aged Hawaiians v Hawaiian Homes Commission
    78 Haw 192. 891 P.2d 279 (Haw 1995)....................................................19, 20

Ahuna v Department of Hawaiian Home Lands
    64 Haw 327. 640 P.2d 1161 (Haw 1982)..............................................19, 20, 21

Kalima v State of Hawaii,
    Civil No. 99-4771-12 ...............................................................................20, 21

Keahole Defense Coalition v BLNR
    110 HAW. 433 (Haw. 2006)..........................................................................23

Nelson v Hawaiian Homes Commission,
    127 Haw 185 (Haw 2012)....................................................17, 19, 20, 21

**Federal Statutes**

28 U.S.C. 1334(b) ...............................................................................................1

28 U.S.C. § 158....................................................................................................1

11 United States Code ................................................................................................................1

Hawaii's Constitution in the Admissions Act ...........................................................................15

Hawaiian Homelands Commission Act § 207(c)(1)(A) ...........................................................23

Hawaiian Homes Commission Act .................................................................................... *passim*

Hawaiian Homes Commission Act § 101(b) ............................................................................13

Hawaiian Homes Commission Act § 204(2) ............................................................................19

Hawaiian Homes Commission Act § 207 ...........................................................................12, 13

Hawaiian Homes Commission Act § 208 ..................................................................................13

Hawaiian Homes Commission Act § 208(5) ............................................................................13

Hawaiian Homes Commission Act § 212 ..................................................................................13

**State Statutes**

Hawaii Revised Statutes Chapter 171 .......................................................................................19

**Rules**

Fed. R. Bankr. P. 8002(b)(1)(B) ................................................................................................1

Hawaii Administrative Rules § 10-4-21 ...................................................................................23

Hawaii Administravtive Rule § 10-4-21(e)(3) ...........................................................................3

**Constitutional Provisions**

Hawaii State Constitution ................................................................................................ *passim*

## JURISDICTIONAL STATEMENT

This case involves a dispute between two nondebtors, Hawaiian Telcom ("HAWTEL") and SIC, about a matter that has no effect whatsoever on the debtor's Paniolo Cable Company llc. ("Paniolo") estate. The Bankruptcy Court did not have jurisdiction to enter the orders that are the subject of this appeal. The justification that the court is "enforcing" its prior order is incorrect because the Court's prior order did not, and could not, award to HAWTEL assets that the Trustee never owned.

The Bankruptcy Court's jurisdiction over the Paniolo Bankruptcy arises under Title 11 United States Code. The Bankruptcy Court's jurisdiction to hear a non-bankruptcy dispute is under 28 U.S.C. 1334(b). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158.

The Bankruptcy Court's Order Granting Final Relief in Connection with Motion by Hawaiian Telcom, Inc. Enforcing the Court's Sale Order was entered on May 17, 2022 (dkt 729; Appx 870). Waimana ("WEI") timely moved, pursuant to LBR 9024-1, for reconsideration on May 27, 2022 (dkt 740). WEI's motion for reconsideration was denied by order entered August 17, 2022 (dkt 784). Therefore, under Fed. R. Bankr. P. 8002(b)(1)(B) the deadline to file a notice of appeal was fourteen (14) days after August 17, 2022. SIC's Notice of Appeal was timely filed on August 25, 2022. (dkt 790; Appx. 870)

## ISSUES PRESENTED

1. Whether the Bankruptcy Court exceeded its authority by awarding to HAWTEL assets that the Trustee never owned: assets of a non-debtor companies, SIC and WEI.

2. Whether the Bankruptcy Court Violated the Hawaii State Constitution By Holding That The Chapter 11 Trustee Transferred SIC's Interest in Department of Hawaiian Home Lands ("DHHL") License 372 ("372") to Non-Hawaiian, HAWTEL.

3. Whether the Bankruptcy Court erred in finding that the Chapter 11 Trustee obtained (and transferred to HAWTEL) SIC's interest in DHHL 372.

4. Whether the Bankruptcy Court erred in holding that the Chapter 11 Trustee obtained (and transferred to HAWTEL) SIC's interest in DHHL 372, when the Trustee did not follow any of the procedures for execution on recorded real estate interests respecting 372.

## STANDARD OF REVIEW

Each of the issues presented by this appeal are questions of law. The standard of review is therefore de novo. In re Kimura, 969 F.2d 806, 810 (9th Cir.1992).

## STATEMENT OF THE CASE

The subject of this appeal is 372 approved by the Hawaiian Homes Commission ("Commission") and issued by the DHHL to WEI (Dkt 639-1; Appx 407). WEI is not a debtor in bankruptcy and none of WEI's assets are subject to the Bankruptcy Court's jurisdiction. 372 is a beneficiary benefit license which

means the license and the Hawaiian Home Lands ("HHL") acquired thru the license can only be used to benefit native Hawaiian beneficiaries[1].

DHHL placed onerous requirements in 372, including building all infrastructure necessary to provide modern telecommunications service to all beneficiaries of the HHL at no cost, other than a monthly charge comparable to the charge paid by residents of urban Honolulu. For example, Section 2 of 372 requires the Licensee to:

> "Construct and install all telecommunications infrastructure on LICENSOR'S lands at LICENSEE'S cost"

and Section 6 limits what the Licensee can charge to:

> "a cost less than or equal to the cost for comparable services being provided in adjacent areas not subject to this License."

(Apx 408-409)

In 1996, WEI partially assigned 372 to SIC ("SIC's license"), limited to the provision of voice services only and inclusive of all requirements in 372. (Dkt 639-2; Appx 420-21). The debtor in this bankruptcy case, Paniolo, owned an undersea cable between five islands. The undersea cable was connected to assets owned by SIC which leased the entire cable. Those SIC-assets are located on HHL

---

[1] A non-beneficiary benefit license allows the licensee to use HHL to benefit non-beneficiaries. A beneficiary benefit license has a nominal rent. HAR §10-4-21(e)(3)

pursuant to SIC's license for voice (not data or wireless) services only and the HHL under SIC's assets. Paniolo's only right to use SIC's assets located on HHL was through a Joint Use Agreement ("JUA") which was part of the lease.[2] (Dkt 668-6; Appx. 598). Paniolo knew the undersea cable was of questionable value without the right to use certain SIC's assets and the HHL on which those assets are located. The SIC assets connected the undersea cable to the infrastructure on land. SIC's license and the HHL on which those assets are located limited the use of the cable to only serving native Hawaiian beneficiaries.

The Trustee obtained a money judgment against SIC and a writ of execution against certain specifically identified assets owned by SIC. (Dkt 668-11; Appx 698). Although the list of assets executed upon, made references to SIC's license, the execution sale did not include SIC's license nor the HHL owned by SIC pursuant to the license. (Dkt 668-9; Dkt 668-10; Dkt 668-13; Appx. 685 through 696 and 717 through 745).

One SIC-owned parcel of real estate not located on HHL, was included in the execution sale. The Trustee followed the ordinary procedures for Hawaii real estate, recording the writ of execution against SIC's title. (Dkt 668-9; Dkt 668-10;

---

[2] The lease and JUA were cancelled and replaced by the Settlement Agreement and Master Relationship Agreement the Trustee entered with SIC.

4

Dkt 668-13; Appx 685 through 696 and 717 through 745). The Trustee never levied, executed or recorded against any HHL or SIC's license.

Before, the execution sale took place, the Trustee negotiated with SIC a Rule 9019 Settlement Agreement, cancelling the Paniolo-SIC lease and Joint Use Agreement: "For the avoidance of doubt, the Master Relationship Agreement and the Schedule A.2 IRU shall replace the JUA and the SIC lease," (Dkt 271; page 6 of 16, paragraph G; Appx 6) and replacing them with a Master Relationship Agreement ("MRA") and exhibits. (Dkt 668-7; Appx 617 et seq). SIC agreed to allow the use of its interests in SIC's license[3] in exchange for consideration from the Trustee and the buyer of the Trustee's assets necessary for continued; uninterrupted voice service to HHL and continued fulfillment of burdens of 372. The MRA expressly confirms that the Trustee had not executed on, and did not own, SIC's license. (Dkt 668-7 page 30 of 67, Section 2.3; Appx 645).

The Trustee entered a contract to sell its remaining assets to HAWTEL. HAWTEL rejected the MRA at closing. Following announcement of the sale, DHHL and the Trustee both stated: "**DHHL confirms what is noted by the Trustee in the Motion to Approve Sale – that the Buyer will need to acquire a new license for the use of Hawaiian Home Lands**" (Dkt 341 page 4 of 5; Appx

---

[3] SIC's rights under License 372 are limited to providing voice services only. SIC cannot give the rights to use HHL for other than the delivery of voice services. The use of HHL acquired under License 372 for all telecommunications services was not included in SIC's partial assignment from Waimana.

61). HAWTEL intended to use the Paniolo assets to expand and improve their service to non-beneficiaries[4]. HAWTEL has 3 leases and 1 license on HHL which allow them to use the facilities built on HAWTEL leased/licensed HHL to serve non-beneficiaries. HAWTEL also has 60 licenses to only serve beneficiaries[5].

DHHL issued a limited "Right of Entry" to HAWTEL instead of a license to access the buildings they purchased on HHL owned by SIC. (Dkt 639-24 and 639-25; Appx. 513 through 529). The Right of Entry confirms that DHHL and HAWTEL knew HAWTEL did not purchase or have the right to use SIC's license or the HHL SIC owned.

HAWTEL sought a new license from the Commission, again confirming SIC's license and the SIC owned HHL was not included in the purchase. After months of trying, HAWTEL stopped pursuing a new license.[6]

SIC was willing to grant HAWTEL the right to use its license and the HHL SIC owned. But HAWTEL needed a license to use the HHL under the buildings it purchased for the provision of all types of telecommunications services, not just voice, to non-beneficiaries. Neither WEI or SIC owned a non-beneficiary benefit license. HAWTEL had to come up with a new strategy to obtain the HHL under

---

[4] HAWTEL began their current 'fioptics" promotion shortly after closing the purchase.
[5] 60 licenses are for easements in perpetuity with no annual rent. 3 leases and 1 license each of which have a fixed term and annual rent.
[6] The Commission can grant HAWTEL a license to provide all types of telecommunications services, however, that license cannot include the property already licensed under Waimana's License 372 while 372 remains in force, the Commission would have to justify not including the same onerous conditions included in 372 and the issuance of a non-beneficiary benefit use of HHL..

their buildings and use the HHL for the provision of all telecommunications services to non-beneficiaries ideally without the onerous requirement to build infrastructure throughout HHL to serve beneficiaries.

HAWTEL's new strategy was to pretend they purchased the HHL under their buildings without restrictions, fee or time limit. HAWTEL filed a motion in the Bankruptcy Court asking the Court to adopt this new theory even though it contradicted everything the Trustee had said and done throughout the Paniolo bankruptcy. (Dkt 637; Appx. 75)

The Bankruptcy Court granted HAWTEL's motion, effectively transferring SIC owned HHL to HAWTEL, free and clear of the limitations and obligations of 372 to use SIC owned HHL to serve non-beneficiaries in perpetuity without compensation. This is an unconstitutional taking of SIC's property[7]. This appeal challenges the Bankruptcy Court's holding that it transferred; SIC's license, the SIC owned HHL; the Court's authority to transfer SIC owned HHL regardless of Hawaii law; expand the use of HHL beyond SIC's license and 372; all of which resulted in the alienation of HHL thus violating Hawaii's Constitution and effecting an unconstitutional taking. (Dkt 729; Appx 870).

## SUMMARY OF ARGUMENT

---

[7] In Cedar Point Nursery v. Hassid, 141 S. Ct. 2063 (2021), the Court, in overturning the Ninth Circuit's decision allowing just a temporary use of property without compensation and over the objection of the land owner was an unconstitutional taking without regard to how that land was owned.

The Trustee never owned SIC's interest in 372; hence he could not have sold any interest in 372 to HAWTEL. The Trustee did not execute on SIC's interest in 372, so he never acquired it. The Hawaii Constitution precludes the Trustee from executing on HHL, including 372. Most significantly, before the Marshal's execution sale ever took place, the Trustee expressly signed and agreed in writing with SIC that he did not own, and never acquired, SIC's interest in 372. That agreement was binding on the Trustee; it was in force when the execution sale took place; it was in force when HAWTEL negotiated its purchase agreement with the Trustee; it was in force when the Bankruptcy Court approved the sale. The Trustee, by its own express Agreement, confirmed by the Trustee's conduct, did not have any interest in 372. Accordingly, the Bankruptcy Court's "363 Order" did not, and could not have, transferred any interest in 372 to HAWTEL. The Rule 9019 Settlement Agreement prohibited SIC from appealing the 363 Order, but SIC had no reason to appeal: the Trustee had already confirmed that he did not have, had never acquired, and hence could not sell any interest in 372. Paniolo's only right ever to use SIC's facilities on HHL was through the JUA, which was expressly terminated by the Rule 9019 Settlement Agreement and MRA, which HAWTEL rejected and has no rights under.

## ARGUMENT

### A. The Trustee Never Owned 372, So He Could Not (and did not) Transfer 372 to HAWTEL

SIC is not a debtor in bankruptcy. The Bankruptcy Court has no "special bankruptcy powers" respecting SIC's assets.

The Paniolo Trustee filed an adversary proceeding against SIC, where the Bankruptcy Court's only power is the same as the State Circuit Court would have. The Trustee obtained a judgment against SIC and, under Hawaii law, levied and executed on certain specifically identified SIC-owned assets.[8] (Dkt 668-11; Appx. 698). The Paniolo Trustee only held one single execution sale, and levied on only one parcel of real estate. (Dkt 668-9; 668-10; 668-11; 668-13; Appx. 685 through 696 and 717 through 745).

Only one real estate interest transferred to the Trustee in the execution sale. (Dkt 668-10; Appx 690-696). The Trustee levied and executed on that single interest in real estate by recording the writ of execution at the Bureau of Conveyances against the land identified by Certificate of Title 600,112. (Dkt 668-9 Appx. 688) and the Marshal conveyed that single interest in real property. (Dkt 668-10; Appx 691). Trustee did not execute on any other real estate, confirming he never obtained any other interest in real estate. The Trustee knew the SIC assets would be nearly worthless without a right to the HHL upon which the assets

---

[8] The Paniolo-SIC JUA allowed Paniolo to use lands licensed to SIC under 372. The Rule 9019 Settlement Agreement (Appx 4) abolished the JUA and replaced it with the MRA (Appx 5: "replacement of the SIC Lease and the JUA as set forth in the Master Relationship Agreement" and Appx 6: "the Master Relationship Agreement and the Schedule A.2 IRU shall replace the JUA and the SIC lease"). Thus, any claim that the Trustee executed on the right to access the buildings is nonsense, because the JUA that provided that prior right of access and been terminated and replaced by the MRA.

were located, so he negotiated the Rule 9019 Settlement Agreement (Appx. 01-17) and the MRA (Appx 617).[9]

Before the execution sale was completed, the Trustee entered a Rule 9019 Settlement Agreement with SIC. The MRA replaced the rights previously held under the JUA. The Trustee expressly confirmed in MRA that he never acquired SIC's license and SIC only granted use of its license for a specific period of time.

> For the avoidance of doubt, **the Parties acknowledge and agree that DHHL License will not be assigned by SIC to Paniolo**, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term.

(Dkt 668-7 page 30 of 67 Section 2.3; Appx. 645 Emphasis added).

The Trustee did not acquire, nor did he intend to acquire, SIC's HHL real estate. Not only did the Trustee not take the steps necessary to execute on it, he signed the Rule 9019 Agreement confirming he never had it.

SIC agreed to the MRA to: obtain use of certain Paniolo assets necessary for continued voice service on HHL; transfer the burdens of the SIC license to Paniolo; and limit the time the Trustee would have use of the SIC license.[10] The MRA continued in force for nine months after which HAWTEL rejected it and the Bankruptcy Court agreed over the objections of SIC.[11] During that nine month

---

[9] This is the reason Deutsch Bank, Paniolo's lender agreed to the onerous default provisions in the lease.l
[10] These are basically the same rights in the JUA
[11] After the Bankruptcy Court held HAWTEL had rejected (and therefore was not bound by) the MRA, Waimana exercised its property right to exclude HAWTEL. "...right to exclude "falls within [the] category of interests that the Government cannot take without compensation. Cedar Point Nursery v. Hassid, 141 S. Ct. 2063, 2073 (2021)'

period, the Trustee never claimed he owned the SIC license or the HHL SIC owned.

In further confirmation that HAWTEL had not purchased the HHL SIC obtained thru the SIC license, HAWTEL obtained from DHHL, a twelve month Right of Entry to the facilities located on HHL it purchased. (Dkt 639-24 and 639-25; Appx 513). It is seriously questionable whether DHHL could grant HAWTEL a non-beneficiary benefit license for the same property already licensed under 372.[12] Obviously, if HAWTEL thought they already owned 372 they would not have asked for (and they would not have needed) any right of entry.

Despite the clear evidence that the Paniolo Trustee did not execute on the SIC license or SIC owned HHL, the Bankruptcy Court nevertheless gave all of SIC owned HHL and WEI's right to provide all types of telecommunications to HAWTEL, and held that HAWTEL's rights are "free and clear" of the onerous requirements imposed on the Licensee in 372. The Bankruptcy Court exceeded its authority in doing so and should be reversed.

**B. Under the Hawaiian Homes Commission Act, Which Is Part of the Hawaii State Constitution, 372 Could Not Have Been The Subject Of The Trustee's Writ Of Execution**

---

[12] The FCC order negating the 'exclusivity' clause in 372 specifically references the 'exclusivity' clause prevents other carriers from building their own infrastructure and only DHHL and the Commission can grant a license for HHL.

372 was issued based on the finding by the Hawaiian Homes Commissions that: �050

> LICENSOR believes and intends that the issuance of this Exclusive "Benefit" LICENSE will also **fufill the purpose of advancing the rehabilitation and welfare of native Hawaiians** (Dkt 639-1 page 3 of 13; Appx 408)

License 372 is a "beneficiary benefit" license that advances the rehabilitation of WEI and beneficiaries on HHL. 372 was issued to WEI, a native Hawaiian owned corporation, pursuant to Section 207 of the Hawaiian Homes Commission Act ("Act"). (Dkt 639-1 page 2 of 13; Appx 407). It was issued pursuant to the Commission's mandate to use the land for the rehabilitation and welfare of native Hawaiians, and the Commission expressly stated in 372 that granting the license to Waimana would advance that purpose. (Dkt 639-1 page 3 of 13; Appx 408).

The Act contains only two ways that the Commission shall grant real property rights to use HHL, via lease or license.

> Sec. 207. LEASES TO HAWAIIANS, LICENSES.
> (c)(1) The department is authorized to grant licenses as easements for railroads, telephone lines, electric power and light lines, gas mains, and the like.
>
> (B) ...other mercantile establishments (all of which shall be owned by native Hawaiians or by organizations formed and controlled by native Hawaiians....

(2) The department is also authorized to grant licenses to the United States ...

Section 208(5) provides that a lease of Hawaiian Home Lands granted under Section 207 cannot be levied or executed upon:

> **Such interest shall not ... be subject to attachment, levy or sale upon court process.**

372 is an interest in land granted under Section 207 to a native Hawaiian corporation. Section 208's prohibition on "court process" to dispossess native Hawaiians of HHL applies to HHL issued to beneficiaries whether obtained by license or lease.

The use of the word "lease" in Section 208 was not intended to exclude licenses. This is consistent with the rest of the Act. For example, Section 212 provides that the rent may be a nominal amount, where there is:

> "leasing of Hawaiian home lands by the board to a public utility or other governmental agency where such use directly benefits the department of Hawaiian home lands or the homestead lessees"

This interpretation is necessary in order to be consistent with the purposes of the Act as set forth in Section 101(b):

> (1) Establishing a permanent land base for the benefit and use of native Hawaiians upon which they may live, farm, ranch, and otherwise **engage in commercial, or industrial or any other activities** as authorized by this Act

(2) … assuring long-term tenancy to **beneficiaries of this Act and their successors**

(3) **Preventing alienation** of the fee title to the lands set aside under this Act so that these lands will always be held in trust for continued use by native Hawaiians in perpetuity

The bankruptcy court's ruling violated the purposes of the Act and the taking clause of the Constitution by transferring HHL from a beneficiary of the Act to a non-beneficiary, in perpetuity, without compensation. Under the Act, 372 could not be levied nor executed upon and the bankruptcy court erred in holding to the contrary.

### C. Even If License 372 Could Have Been Executed Upon, And Even If The Trustee Had Gone Through The Steps Necessary To Execute On It, License 372 Could Only Have Been Sold to A Native Hawaiian or Native Hawaiian-Owned Entity

As the U.S. District Court for the District of Hawaii confirmed, in <u>In re Maunakea</u>, 448 B.R. 252 (D. Hawaii 2011) "[t]he trustee, standing in the shoes of the debtor, would simply effectuate a transfer of the leasehold *to another native Hawaiian*." 448 B.R. at 266. Because HAWTEL is not a native Hawaiian owned company, even if the license had been properly executed upon, it could only have been sold to a beneficiary, not to HAWTEL.

372 and SIC's license are in perpetuity. The Bankruptcy Court's transfer of the HHL associated with 372 from a beneficiary of the Act to HAWTEL without restricting its use to only beneficiaries "alienates" HHL. The application of Hawaii

Statutes in bankruptcy cases must be done in a way that does not violate the Act which is part of Hawaii's Constitution[13]. "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." Butner v. United States, 440 U.S. 48, 54 (1979).

The Act was enacted by the Congress in the 1920s, and incorporated into the Hawaii Constitution at Statehood. Under the Act,[14] the courts' role is to insure that HHL are kept in the use and occupancy of native Hawaiian beneficiaries. DHHL granted HHL to a native Hawaiian owned entity in perpetuity through 372. The Trustee understood this and clearly agreed in the court-approved MRA that the **"DHHL License will not be assigned by SIC to Paniolo[15] "** and limited the use of the license to **"the IRU Term.[16]"**

372 grants use and occupancy of certain parcels of HHL to Waimana in perpetuity, which Waimana partially assigned to SIC, limited to the provision of voice services. Obtaining SIC's parcels of HHL would require the Trustee to execute on the SIC license, which the Trustee deliberately did not do because it is impermissible under the Act, and which the Trustee confirmed in the MRA that he

---

[14]State laws may result in the application of a Federal law having different results in each State. See. n.2. Congress required the Act be made a part of Hawaii's Constitution in the Admissions Act. This insured the Act would continue to have the significance of a Federal law requiring the Act be considered in the application of all Federal and State laws.

[15] While Paniolo is a native Hawaiian corporation, the Trustee intended to sell the assets and did not want to be limited to only selling to native Hawaiian beneficiaries.

[16] By limiting the term, the sale of the HHL associated with the license benefits could not be considered 'alienation' of HHL.

did not do. Had the Trustee executed on SIC's license, the transfer would have been void for violating the Act, and hence, the State Constitution by alienating HHL to a non-beneficiary.

> Reverend Akaiko Akana testifying in support of the bill which would become the Hawaiian Homes Commission Act; ... Mr. Kalanianaole [Delegate to Congress]; To retard this great decrease of my people, it is provided in this bill that certain lands be set apart for the use of the [native] Hawaiians in order to insure their rehabilitation, that these lands can not [sic] be ***alienated***, and that those who take tracts be financed in order that their holdings may be made profitable ..." Hawaiian Homes Commission Act; emphasis added.

> Hearings before the Committee on Territories, US Senate Sixty-Six Congress on H.R. 13500, December 14, 1920. Pg. 48-49, 70-71.

> A debate of the **alienation** clause between Chairman New, Senator Smoot and Mr. McClellan, an opponent of the bill, provides the following testimony: Mr. MClellan; "... Hawaiians have been steadily leaving their lands for over 50 years ... which they already own ... [for] the lure of town life..." Chairman New; "What disposition has been made of these lands ..." Mr. McClellan: "they naturally tend to be bought by the adjoining owners." Senator Smoot; "This is how it is, Senator, they have little kuleanas... Those kuleanas have been purchased by the cane people ..." Chairman New; "I asked that question in order that I might determine whether the Hawaiian has quit the lands from actual choice or whether he has been induced to sell by the white man ...without a realization on his part of the real value of what he was giving up, the way it has been with the Indian in this country." Mr. McClellan; "The Delegate [Kalanianaole] intimated yesterday, Mr. Chairman, "...if someone had had the foresight at the time of the Great Mahele to have provided that all those kuleanas should be conveyed, with the right of occupation and without the power of ***alienation***, it would be a great boon to the Hawaiians." Mr. McClellan; "It is perfectly well know, Mr. Chairman ... that Hawaiians, by their lack of provisions for the future, which has not been instilled in them like it has been in the Anglo-Saxon, will sometimes mortgage a home to give a luau ..."

> Id. December 24, 1920. Emphasis added. Id. pg. 105, 106.

DHHL issued 372 to a native Hawaiian beneficiary promoting his rehabilitation and the rehabilitation of all native Hawaiian beneficiaries living on HHL by providing telecommunications. These rights cannot be alienated by giving them to HAWTEL, a non-beneficiary which immediately after the purchase, threatened to cut off service to beneficiaries.

> "Your committee is, however, of the opinion that (1) the Hawaiian must be placed upon the land in order to insure his rehabilitation; (2) **alienation** of such land must, not only in the immediate future but also for many years to come, be made impossible; ..." [emphasis added]

H.R. Report 839 April 15, 1920 pg. 7.

Congress required that HHL be kept for the use and occupancy of native Hawaiian beneficiaries. The Bankruptcy Court lacked the power to transfer HHL to a non-beneficiary. As the Maunakea case confirms, in that instance the lease must be transferred to another native Hawaiian beneficiary. There is nothing specific in the Act to **transfer** the use and occupancy of HHL for other than residential use. The Act limits the non-residential uses of HHL by non-native Hawaiians in scope and term after it is offered to a native Hawaiian beneficiary and then only as an original disposition. See Ahia; Nelson v Hawaiian Homes Commission, 127 Haw 185 (Haw 2012).

The Bankruptcy Court violated the expressed intent of the Act and took away HHL that a native Hawaiian corporation has a valid license[17] to, and forever gave the land to a foreign-owned, non-Hawaiian, corporation.

### 1. An Important Purpose Underlying The Act Is Making The HHL Available To Beneficiaries For Business

The important purposes of the Act, include making the HHL available to Beneficiaries for business purposes. There exists misinformation that the rehabilitation of native Hawaiians under the Act includes only homesteading. Congress believed an important part of rehabilitation was beneficiaries conducting business on HHL.

> Mr. McClellan: "Mr. Chairman, I have only one main proposition to lay down before this committee ... Congress legislating for Hawaii, ought to proceed on the basis and principle of America first ... This measure purports to be an attempt to do a thing which has never been accomplished in the history of the world, viz, to materially reconstruct and reinstate a primitive people who are dying out as a separate people. ... Mr. McClellan: "In every position where they are directed they are excellent workers; but you can put it down that when you go over the entire Territory you do not find one Hawaiian running any sort of ***business*** of his own. .... Senator Smoot "There is no doubt about it that the ***business*** qualifications of the Hawaiian are not developed. Mr. McClellan: Something was said here by Mr. Akana [Rev. Akaiko Akana] about the Hawaiians not having the opportunity...The Hawaiian has the difficulty of his own particular qualifications. ... Senator Smoot: I do feel that if we can do anything to rehabilitate the Hawaiian people, and put them on the lands and allow them to make a living there ... it will be a mighty good thing."

---

[17] In an email dated after DHHL declared HAWTEL needed a license, DHHL confirmed 372 was valid (Dkt 668-8; Appn. 684)

Id. December 24, 1920 at 109, 110, 112.

> "The Hawaiians are not *business* men and have shown themselves unable to meet competitive conditions unaided."

H.R. Report No. 839 April 15, 1920, pg. 6.

Congress in passing the Act not only included business but also a preferential treatment for native Hawaiians using HHL for business purposes. The applicable §204(2) reads:

> "... provided further that the department is expressly authorized to negotiate, **prior to negotiations with the general public, the disposition of Hawaiian home lands or any improvement thereon** *to a native Hawaiian, or organization or associations owned or controlled by native Hawaiians,* **for** *commercial industrial or other business purposes,* in accordance with the procedures set forth in chapter 171, Hawaii revised Statutes." [emphasis added]

**D. The Fact That DHHL Supported HAWTEL's Effort To Get HHL From The Bankruptcy Court, Is Not A Reason For The Court To Side With HAWTEL. It Is Another Example, In A Long Line Of Examples, of DHHL's Violation Of Its Fiduciary Duties To Its Beneficiaries.**

The fact that DHHL is supporting this unconstitutional action is no surprise, given the many violations of the Act and the trust fiduciary duty DHHL and the Commission has been caught supporting in the past. See. Aged Hawaiians v Hawaiian Homes Commission 78 Haw 192. 891 P.2d 279 (Haw 1995); Ahuna v Department of Hawaiian Home Lands 64 Haw 327. 640 P.2d 1161 (Haw 1982); Nelson v Hawaiian Homes Commission 127 Haw 185. 277 P.3d 279 (Haw 2012);

19

<u>Kalima v State of Hawaii</u>, Civil No. 99-4771-12. In <u>Nelson:</u> the Hawaii Supreme

Court stated:

> Instead of obtaining necessary funds from the Legislature, **the Hawaiian Homes Commission and the Department of Hawaiian Home Lands have continued to offer commercial leases to non-Hawaiian entities in order to raise revenue. This removal of Hawaiian Home Lands from use by beneficiaries of the Hawaiian Home Lands Trust, and the failure to seek sufficient funds[,] are breaches of the State Constitution and the trust**.

127 Haw. at 190, 277 P.3d at 284.

Here, DHHL supports the Bankruptcy Court's Order giving HAWTEL HHL does

**not** raise revenues nor result in beneficiaries getting more benefits. Since 1996,

372 has resulted in over $400M of telecommunications infrastructure being built

for the beneficiaries of HHL. HHL cannot be taken away from a beneficiary who

is using HHL to serve native Hawaiians exclusively, and give them to a foreign-

owned company who threatens to cutoff service to those same native Hawaiians,

while using HHL to make tens of millions in profits annually serving non-

Hawaiians.

DHHL and the Commission have an enforceable trust responsibility to

native Hawaiian beneficiaries. <u>Aged Hawaiians v. Hawaiian Homes Comm'n</u>, 78

Haw. 192, 205-6, 891 P.2d 279, 292-3 (1995). <u>Ahuna v DHHL</u> 64 Haw. 327, 640

P.22d 1161 (1982) involved DHHL's duties as trustee of HHL.

> "We conclude from this history that the Hawaiian Homes Commission, which oversees the Department, is the specific state entity obliged to implement the

fiduciary duty under the HHCA on behalf of eligible native Hawaiians. [The Commission] must adhere to high fiduciary duties normally owed by a trustee to its beneficiaries…. <u>One specific trust duty is the obligation to administer the trust solely in the interest of the beneficiary</u>. A second fundamental trust obligation is to use reasonable skill and care to make trust property productive" [emphasis added]

<u>Ahuna</u> at 338, 340

372 was issued to Waimana, which was originally owned by a single native Hawaiian beneficiary. It is now owned and controlled by three native Hawaiian beneficiaries, and continues to benefit all native Hawaiian beneficiaries currently and who will live on HHL in perpetuity.

The HHC and DHHL are violating their fiduciary duties in their support of HAWTEL's motion. The Court should take judicial notice of the recently announced $328M settlement for previous breaches of its fiduciary duty in <u>Kalima v State of Hawaii</u>. The Court should disregard DHHL's support for the Bankruptcy Court's incorrect and unconstitutional action. The Bankruptcy Court lacks authority to transfer HHL in violation of the Hawaii Constitution, and DHHL's support will not change that.

### E. The Court Cannot Transfer Hawaiian Home Lands to HAWTEL "Free And Clear" of The Terms of The License Itself

Most egregious of the Bankruptcy Court's ruling is that the licensed lands were transferred to HAWTEL free and clear of the obligations in 372. <u>Nelson v Hawaiian Homes Commission 127 Haw 185 (Haw 2012),</u> confirms that any use of

HHL, by lease, license or revocable permit, must conform to the Act. 372 fulfills the Act by giving use and occupancy of HHL to a native Hawaiian-owned company for commercial/business purposes. Its encumbrances fulfill the Act by requiring the "construction, operation and maintenance" of telecommunications infrastructure throughout HHL in perpetuity regardless of the cost thereby making HHL now and in the future more valuable. 372 fulfills the Act by improving the living conditions of beneficiaries by making it possible for them to get medical, cultural, education and social benefits from their homesteads.

In contrast, any transfer to HAWTEL without SIC's agreement violates the Act and Hawaii's Constitution. HAWTEL is not a native Hawaiian beneficiary of the Act.[18] HAWTEL's assets are on HHL that was obtained by 372. HAWTEL has not assumed the obligation to build, operate and maintain telecommunications infrastructure throughout HHL in perpetuity contained in 372. HAWTEL would not improve the living conditions of native Hawaiians. Instead HAWTEL, within hours after closing its purchase from the Trustee, threatened to use its newly acquired facilities on HHL to deny service to native Hawaiians thus devaluing HHL and lowering the standard of living. Hawaii's Constitution requires the usage of HHL for the benefit of native Hawaiians. This requirement cannot be

---

[18] The transfer of a residential home on HHL requires the transfer of encumbrances on the use of the land, by transferring to another native Hawaiian Beneficiary. See. In re: Manuakea 448 B.R. 252 (D. Haw 2011)

extinguished even IF (which it did not) this transfer occurred under Bankruptcy Law, "Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." Raleigh v Illinois Dep't of Revenue, 530 US 15, 20, 120 S.Ct 1951, 147 L.Ed.2d 13 (2000).

Courts have recognized many times that "[a]n unexpired lease is fundamentally an asset coupled with a liability." In re US Airways Group Inc., 287 B.R. 643, 645 (E.D. Va. 2002). The same is also true of an unexpired license when that license grants the same benefits of a lease, conditioned on performance of extensive duties on the part of the Licensee.[19] One cannot take the benefits of the license (use and occupancy of HHL) without also being tasked with the burdens: "to obtain the benefit, the trustee or debtor in possession must perform all the obligations." Id. In US Airways, the issue was the bankruptcy court's ability to use its equitable powers to ignore an Act of Congress. ("The distinction here is that the court is not simply valuing a contingent future loss. Rather, Congress, by statute, has expressly given the PBGC a *present* right to recover an amount determined in accordance with the valuation regulation. "). In re U.S. Airways

---

[19] Keahole Defense Coalition v BLNR 110 HAW. 433 (Haw. 2006) recognized the licensee's responsibilities under 372: Appellee DHHL issued the license pursuant to §207(c)(1)(A) of the Hawaiian Homelands Commission Act and [Hawai`i Administrative Rules (HAR)] § 10-4-21.. In the lease, DHHL ("Leasor") stated that the Lessor "believes and intends that the issuance of this Exclusive Benefit license will also fulfill the purpose of advancing the rehabilitation and the welfare of native Hawaiians." ... [Licensee] has both a statutory entitlement and obligation to provide these services to all DHHL land, including DHHL-held at Keahole.

<u>Group, Inc.,</u> 303 B.R. 784, 793 (Bankr. E.D. Va. 2003). Here Congress enacted the Act which limited the use of HHL and required the Act be part of Hawaii's Constitution. HAWTEL's counsel's repeated statements that HAWTEL owns the land licensed to SIC "free and clear of all encumbrances as bankruptcy courts do," should be an outrage to DHHL and the Court. They reflect a foreign owned company's extreme lack of respect for the Hawaiian Home Lands Trust and Hawaii's Constitution. It is unconstitutional and cannot be sustained.

## <u>CONCLUSION</u>

The Bankruptcy Court had no basis to hold that HAWTEL owns 372. The Trustee never owned 372, so he could not have transferred it to HAWTEL. More egregiously, the Bankruptcy Court had no basis to hold that HAWTEL owns the HHL covered by 372 "free and clear" of the obligations of 372. The Court should reverse.

DATED: Honolulu, Hawaii, March 20, 2023.

/s/ Lex R. Smith
Lex R. Smith
Kobayashi Sugita & Goda,LLP

Attorney for Appellant
SANDWICH ISLES COMMUNICATIONS, INC.

## CERTIFICATE OF COMPLIANCE PURSUANT TO RULE 8015

Lex Smith hereby certifies that the Microsoft Word Count shows that this brief (exclusive of the case caption, table of contents, table of authorities and this certificate of counsel) contains 6,247 words.

DATED: Honolulu, Hawaii, March 20, 2023.

/s/ Lex R. Smith
Lex R. Smith
Kobayashi Sugita & Goda,LLP

Attorney for Appellant
SANDWICH ISLES COMMUNICATIONS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Hawaii by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Lex R. Smith
Lex R. Smith
Kobayashi Sugita & Goda,LLP

Attorney for Appellant
SANDWICH ISLES COMMUNICATIONS, INC.