This case addresses the appeal of (1) the *Order Granting Final Relief in Connection with Motion by Hawaiian Telcom, Inc. Enforcing the Court's Sale Order* (the "Final Enforcement Order"), and (2) the *Order Denying Waimana Enterprises Inc.'s Motion for Reconsideration of Findings of Fact* in the Final Enforcement Order (the "Reconsideration Order").[1] These orders were entered at ECF 729 and 784, respectively, in the bankruptcy case of Paniolo Cable Company, LLC ("Paniolo"), Bankr. No. 18-01319 (the "Paniolo Bankruptcy").[2]

## JURISDICTIONAL STATEMENT

The Bankruptcy Court had jurisdiction to enter the appealed orders under 28 U.S.C. § 1334. The sale of a debtor's assets is a core proceeding under 28 U.S.C. § 157(b)(2)(a), (n), and (o), and the enforcement and interpretation of orders issued in core proceedings are also core proceedings. *See, e.g., Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 153-55 (2009) (the "bankruptcy court plainly had jurisdiction to interpret and enforce its own prior orders . . . ."). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158.

The Final Enforcement Order was entered on May 17, 2022. Waimana Enterprises Inc. ("Waimana"), an affiliate of Appellant Sandwich Isles Communications, Inc. ("SIC"), sought reconsideration of the Final Enforcement

---

[1] The orders have been appealed to this Court in three separate actions by related parties: Case Nos. 22-426, 22-427, and 22-428. These appeals are also linked to three additional appeals filed by related parties pending in this Court at Case Nos. 22-434, 22-435, and 22-441.

[2] All citations herein listed as "Bankr. ECF" are citations to the Paniolo Bankruptcy docket.

Order on May 27, 2022, and the resulting Reconsideration Order was entered on August 17, 2022. SIC did not seek reconsideration but proceeded to file this appeal of both orders on August 25, 2022.

## INTRODUCTION AND SUMMARY OF ARGUMENT

SIC, Waimana, and their affiliates (collectively, the "SIC Parties") are all parties under common control. They have filed multiple appeals of multiple orders of the Bankruptcy Court that all stem from the same core dispute – seriatim attempts (through self-help actions, motion practice and the commencement of various lawsuits) to collaterally attack final sale orders entered by the Bankruptcy Court that resulted in the transfer of substantially all of Paniolo's assets to Appellee Hawaiian Telcom Inc. ("HTI"). A consolidated summary timeline of the various proceedings, motions and orders relevant to these appeals and setting forth the various related ways that the SIC Parties have sought to collaterally attack the Bankruptcy Court's orders is set forth in **Exhibit A** attached to this pleading.

The first of the Bankruptcy Court's final sale orders that the SIC Parties seek to collaterally attack relates to a sale of certain assets that had been executed and levied by the U.S. Marshals Service, and purchased by the court-appointed trustee of the Paniolo bankruptcy estate through a public auction conducted by the U.S. Marshal (the "Marshal Sale Order"). The second of the Bankruptcy Court's final sale orders that the SIC Parties seek to collaterally attack is the Bankruptcy Court's

order approving an arm's-length free-and-clear sale, by the Paniolo trustee to HTI, of substantially all of Paniolo's assets, including the assets the trustee purchased through the U.S. Marshal's sale, pursuant to Section 363 of the Bankruptcy Code (the "363 Sale Order," and together with the Marshal Sale Order, the "Sale Orders"). The SIC Parties appeared and participated in both of the sale proceedings, and had a full and fair opportunity to object and raise any arguments against the entry of the Sale Orders. But the SIC Parties chose not to challenge the Sale Orders on the grounds they now raise on appeal, and also chose not to appeal the Sale Orders on any grounds. Accordingly, the two Sale Orders were entered, were not stayed or appealed, and became final.

After the closing of the 363 Sale, good-faith purchaser HTI then sought to use the assets it had just purchased, including certain buildings and premises tied to Paniolo's telecommunications cable network. In response, and in an attempt to regain dead-hand control of those assets, the SIC Parties began to wage their collateral attack against the Sale Orders. The first front of this attack was an attempt to use "self-help" to nullify the Sale Orders, including by replacing HTI's locks on gates, destroying HTI's property, and otherwise physically barring HTI from accessing and using the assets it purchased. This forced HTI to file motions in the Bankruptcy Court seeking to enforce the Sale Orders. In response, the SIC Parties opened a second front for their collateral attack, by opposing the enforcement of the

Sale Orders based upon arguments that the sales themselves were improper, or that those sales failed to include certain assets. No doubt anticipating that their efforts to collaterally attack the Sale Orders would not be well received by the very court that entered those orders, the SIC Parties also opened a third front of collateral attack, outside the Bankruptcy Court, by filing an action in Hawaii state court asserting that HTI's use and occupation of the assets it had purchased in the bankruptcy sale constituted trespass or was otherwise illegal under Hawaii law. HTI removed that proceeding to the Bankruptcy Court, where it was promptly dismissed.[3]

The two orders appealed herein are (1) the order granting HTI's motion to enforce the Bankruptcy Court's prior sale order (the Final Enforcement Order), and (2) the order denying Waimana's motion to reconsider that order (the Reconsideration Order). These orders confirmed that, through the sales approved by the Bankruptcy Court, HTI had purchased all assets necessary to use and occupy the Paniolo buildings and premises and to operate Paniolo's cable network, including SIC's interest in a certain telecommunications license issued by the Department of the Hawaiian Homelands, License Agreement No. 372. These orders barred the SIC Parties from continuing their "self-help" attempts to thwart the Bankruptcy Court's Sale Orders.

---

[3] The SIC Parties have appealed the dismissal of this adversary proceeding, the resulting judgment, as well as the Bankruptcy Court's denial of its motion to remand, to this Court at Case Nos. 22-434, 22-435, and 22-436. *See supra,* fn. 1.

These appeals are the next step in the SIC Parties' attempt to collaterally attack the Sale Orders, by arguing that SIC's interest in License 372 could not have been transferred to HTI. Despite the express inclusion of SIC's interest in License 372 on the list of assets levied and executed upon by the U.S. Marshal, and the clear and unequivocal language in the Bankruptcy Court's order eliminating SIC's interest in those executed assets, SIC's appeal first attempts to show that this asset was never sold by looking to documents outside the Sale Orders, and then asserts that License 372 could not have been sold due to restrictions imposed by Hawaii law. Both of these arguments are unmeritorious and tardy. Not only do SIC's arguments go directly against the plain language of the Bankruptcy Court's orders and the relevant state law statutes, but SIC's failure to appeal the two Sale Orders wholly precludes SIC from now collaterally attacking the validity of those sales.

## STATEMENT OF THE CASE

### I. The Marshal Sale Order

On June 24, 2019, Michael Katzenstein, the trustee for the Paniolo estate (the "Trustee"), filed an adversary proceeding (Adv. Pro. 19-90022, the "Trustee's AP") against SIC seeking judgment for amounts due and owing under a lease agreement between Paniolo and SIC. Trustee's AP, ECF 1. On December 17, 2019, the Bankruptcy Court entered a judgment exceeding $256 million in favor of the Trustee. Trustee's AP, ECF 28. To satisfy this judgment, the U.S. Marshal for the

District of Hawaii (the "U.S. Marshal") executed and levied upon certain SIC assets listed in an exhibit to the U.S. Marshal's *Certificate of Execution* (the "Marshal Sale Assets"). Trustee's AP, ECF 37. This exhibit included a description of certain real property, as well as a schedule of assets titled "Schedule A.2 Assets." *Id.,* Exh. B. The Schedule A.2 Assets included, under the section heading of "Licenses," the following:

- **All licenses necessary** to build, construct, repair, maintain and operate the Schedule A.2 assets, **including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands.**
- All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets.

*Id.* at 15 (emphasis added).

By way of background, License Agreement No. 372 ("License 372") was issued by the Department of Hawaiian Home Lands (the "DHHL") to Waimana on May 9, 1995, and granted Waimana the right and privilege to build, maintain, and operate a broad band telecommunications network over a certain area on the Hawaiian Home Lands (the "HHL"). *See* Bankr. ECF 639, Exh. M-1. On January 15, 1996, Waimana assigned to SIC a portion of License 372 (the "SIC Partial Assignment"), pursuant to which certain portions of Paniolo's network were constructed on the HHL. While Waimana later assigned different portions of

License 372 to its other affiliates Pa Makani LLC ("Pa Makani") and Clearcom, Inc. ("Clearcom"), *see id*., Exhs. M-3, M-4, the U.S. Marshals' Certificate of Execution expressly included only SIC's interest in License 372 within the scope of the Marshal Sale Assets, and not any other assigned interests in License 372, *see* Trustee's AP, ECF 37 at 15.

SIC sought to quash the U.S. Marshal's writ of execution (Trustee's AP, ECF 33) on the grounds that the levy and execution of its assets was improper and against state law, but its motion was denied by the Bankruptcy Court on February 24, 2020 after full briefing from both sides (Trustee's AP, ECF 45). Waimana, Clearcom, Pa Makani, and Ho'opa'a Insurance Inc. also informally challenged the U.S. Marshal's execution via a filed letter, but did not seek any actual relief. Trustee's AP, ECF 52.

Both the levy and execution of assets, including the Schedule A.2 Assets, and the intent to conduct a public sale of the Marshal Sale Assets, were properly noticed, and well publicized. Trustee's AP, ECF 36, 38. On March 6, 2020, the U.S. Marshal conducted a public auction sale of the Marshal Sale Assets (the "Marshal Sale") in accordance with Hawaii Revised Statutes Chapter 651. Trustee's AP, ECF 57-6, ¶ 3. The Marshal Sale Assets expressly included SIC's interest in License 372. At the public sale, the Trustee's credit bid was found to be the highest bid for the Marshal Sale Assets. *Id*., ¶¶ 5, 6. Post-sale, the Bankruptcy Court ratified, approved, and confirmed the sale of the Marshal Sale Assets to the Trustee through an order

entered on March 16, 2020 (the "Marshal Sale Order").  Trustee's AP, ECF 65.  The
Marshal Sale Order held that SIC, and all persons claiming any interest in the
Marshal Sale Assets by or through the SIC's interests therein, were "forever barred
and foreclosed of and from all right, title and interest, and claims at law or in equity
in and to the [Marshal Sale Assets] and every part thereof," and that any and all other
encumbrances affecting the Marshal Sale Assets or any part thereof were
"perpetually barred of and from any and all right, title and interest, and claims at law
or in equity, in the [Marshal Sale Assets] or any part thereof."  *Id.* ¶¶ 6-7.  The
Trustee also filed a notice of confirmation of sale, which confirmed that the Marshal
Sale Assets included SIC's interest in License 372.  Trustee's AP, ECF 57-2 at ¶ 7
and Exh. A.

Neither the Marshal Sale Order nor the Trustee's underlying $256 million
judgment against SIC were appealed on any grounds at any time.

## II.    The 363 Sale Order and the Final Enforcement Order

The Trustee retained investment bank Ducera Partners LLC to market
Paniolo's assets to as many prospective buyers as possible – over 110 parties were
approached, and around 20 parties signed non-disclosure agreements and performed
due diligence.  ECF 313-3 at 4-5, 9.  Ducera worked with the Trustee to provide
detailed information about the Paniolo assets that were available for sale, "including
information about the A.2 Assets that were acquired from SIC" through the Marshal

Sale. *Id.* at 8; ECF 313 at 5. After extensive negotiations with multiple parties, HTI's offer was found to be the highest and best bid for the assets. ECF 313-3 at 8-10.

After negotiating and finalizing the terms of an asset purchase agreement with HTI (the "APA"), the Trustee filed a motion pursuant to section 363 of the Bankruptcy Code seeking approval of the sale of the Paniolo assets to HTI (the "363 Sale," and together with the Marshal Sale, the "Sales"). Bankr. ECF 313. The APA was publicly filed as an exhibit to the sale motion. *Id.,* Exh. 4. In response, SIC filed a *Statement of Concerns* informing the Bankruptcy Court of its issues with the 363 Sale and APA. Bankr. ECF 328. On December 28, 2020, after full briefing and a hearing with SIC's participation, the Bankruptcy Court entered an order approving the 363 Sale (the "363 Sale Order," and together with the Marshal Sale Order, the "Sale Orders"). Bankr. ECF 366. The 363 Sale Order specifically found that (i) all interested parties, including all parties with rights, liens, claims or encumbrances upon any of the purchased assets, had received timely, fair, equitable, and reasonable notice of the 363 Sale, the sale hearing, and the opportunity to object thereto (*id.* ¶¶ F, G, K, 2); (ii) the 363 Sale had been negotiated and entered into from arm's-length bargaining positions without collusion or fraud (*id.* ¶¶ AA-DD, 13-15); (iii) HTI was a good-faith purchaser (*id.*); (iv) all objections or responses to the 363 Sale that were not withdrawn, waived, or resolved were overruled on the merits (*id.* ¶ 2); and (v)

any party who did not object to the 363 Sale was deemed to have consented to the 363 Sale under the terms of the Bankruptcy Code (*id.*).

The assets purchased by HTI (the "Transferred Assets") comprised both the Marshal Sale Assets and other assets directly owned by Paniolo, and covered all assets necessary for HTI to continue the operations of Paniolo's telecommunications cable network (the "Paniolo Network"). *Id.* at ¶¶ v, P. The 363 Sale Order confirmed that the assets sold to the Trustee through the Marshal Sale were "free and clear of any continuing right, title, lien or encumbrance on the part of SIC or anyone claiming by and through SIC." *Id.* at 2. The 363 Sale Order also confirmed that Paniolo owned "all right, title, and interest in the Transferred Assets" and declared that the Transferred Assets would be transferred "free and clear of all Interests or Claims . . . that existed prior to the Closing."[4] *Id.* ¶¶ HH, 7. No party appealed the 363 Sale Order.

The 363 Sale closed on August 31, 2021. Thereafter, the SIC Parties begin their collateral attacks on the Sale Orders by engaging in "self-help" to deny HTI access to the assets it had purchased. *See* Bankr. ECF 425. This forced HTI to file a motion seeking to enforce the 363 Sale Order (the "Initial Motion to Enforce"),

---

[4] The term "Interests or Claims" was broadly defined in the 363 Sale Order to include, *inter alia,* "any and all liens, encumbrances, claims . . . encumbrances, easements, servitudes, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions . . . all debts, liabilities, obligations, contractual rights and claims . . . of the Debtor, SIC, SIC's Affiliates or any of the Debtor's, SIC's, or SIC's Affiliates, or SIC's predecessors or affiliates, claims." *Id.* § S.

which sought the turnover by SIC to HTI of certain information, spare parts, and equipment, and the removal of certain SIC assets from buildings purchased by HTI in the 363 Sale. Bankr. ECF 459. On November 19, 2021, the Bankruptcy Court granted the Initial Motion to Enforce with respect to HTI's request for the turnover of certain spare parts and equipment, but denied the remainder of the relief without prejudice (the "Initial Enforcement Order"). Bankr. ECF 537.

The SIC Parties' destructive self-help tactics to collaterally attack the Sale Orders continued. SIC began removing and destroying HTI locks on fencing around buildings purchased by HTI, and SIC made multiple false police reports alleging trespass by HTI. Bankr. ECF 638, ¶ 3. SIC began installing their own locks on fencing and doors, welding doors shut, barricading interior doors, and more in an effort to regain control of the buildings that had been expressly transferred to HTI through the Sales. *Id.* As a result, on March 29, 2022, HTI filed a second motion to enforce the 363 Sale Order (the "Main Motion to Enforce"), to confirm the scope of the assets it purchased and to prevent the SIC Parties from engaging in further misconduct surrounding those purchased assets. Bankr. ECF 637.

After multiple rounds of briefing and two hearings, the Bankruptcy Court granted the Main Motion to Enforce by issuing the Final Enforcement Order.[5]

---

[5] Prior to the entry of the Final Enforcement Order, the Bankruptcy Court had issued an interim order in connection with the Main Motion to Enforce on April 22, 2022 at ECF 696 (the "Interim Order").

Bankr. ECF 729. The Final Enforcement Order confirmed, *inter alia,* that: (i) all interested parties, including the SIC Parties, had received timely and proper notice of the Main Motion to Enforce (*id.* ¶ D); (ii) that HTI had acquired the assets that "permit operation of the Paniolo Network," including "those certain portions of the 372 License pertaining to the Paniolo Network . . . that were formerly held by SIC" (*id.* ¶ G); and (iii) the SIC Parties were to refrain from impeding HTI's access to the Paniolo Network and the assets it purchased (*id.* ¶ 3). The Bankruptcy Court subsequently entered the Reconsideration Order denying Waimana's motion to reconsider the Final Enforcement Order, and these appeals followed. *See* Bankr. ECF 784.

## STANDARD OF REVIEW

The Final Enforcement Order is an order addressing the Bankruptcy Court's interpretation of its own prior Sale Orders. A court's interpretation of its own orders is accorded "substantial deference" and will not be overturned unless the reviewing court is convinced it amounts to an abuse of discretion. *In re Wallace,* 490 B.R. 898, 906 (B.A.P. 9th Cir. 2013); *In re USA Com. Mortg. Co.,* 452 F. App'x 715, 720 (9th Cir. 2011). A denial of a motion for reconsideration is similarly reviewed for an abuse of discretion. *In re Donovan,* 871 F.2d 807, 808 (9th Cir. 1989); *In re Weiner*, 161 F.3d 1216, 1217 (9th Cir. 1998); *In re Cerchion*e, 414 B.R. 540, 545 (B.A.P. 9th Cir. 2009).

# ARGUMENT

**A.  Each of the issues raised by SIC are impermissible, belated collateral attacks on the Bankruptcy Court's Sale Orders.**

Each of the arguments presented by SIC in opposition to entry of the Final Enforcement Order assert purported deficiencies or errors with the Sale Orders.  SIC focuses chiefly on its position that SIC's interest in License 372 was improperly transferred through the Sales.  These arguments, however, are nothing more than an impermissible collateral attack of the Sale Orders, which are final because they were not appealed.  *See In re Grantham Bros.*, 922 F.2d 1438, 1440 (9th Cir. 1991) (failure to timely seek reconsideration, stay, or appeal of earlier order barred a later collateral attack on the validity of the original order).[6]

Entry of the Final Enforcement Order was not an abuse of discretion by the Bankruptcy Court, because it merely enforced the Sale Orders as written, and rejected SIC's belated collateral attacks on those orders.  *See* Tr. Hr'g (May 16, 2022) at 15:15-22 ("[The 363 Sale Order] is no longer appealable and there's no basis on which to change or modify it.  So I'm not going to consider any arguments that would say that the Court essentially shouldn't have approved the sale or didn't have the power to approve the sale in the first place.")  *See, e.g., In re Lehman Bros.*

---

[6] *Accord In re Machuca,* 483 B.R. 726, 733 (B.A.P. 9th Cir. 2012); *In re Alakozai*, 499 B.R. 698 (B.A.P. 9th Cir. 2013); *In re AVI, Inc.,* 389 B.R. 721, 731 (B.A.P. 9th Cir. 2008); *Davis v. Cnty. of Maui,* Case No. 10-00070, 2010 WL 11531281, at *7 (D. Haw. May 4, 2010), *aff'd,* 454 F. App'x 582 (9th Cir. 2011).

*Holdings Inc.,* 526 B.R. 481, 494 (S.D.N.Y. 2014), *as corrected* (Dec. 29, 2014), *aff'd sub nom. In re Lehman Bros. Holdings, Inc.*, 645 F. App'x 6 (2d Cir. 2016) (because no party successfully appealed the sale order, the court was "bound to apply the Sale Order as written"); *In re Besset,* Case No. 12-1062, 2012 WL 6554706, at *4 (B.A.P. 9th Cir. Dec. 14, 2012) (as the appellant had failed to appeal the sale order, the order became final and could not be further reviewed). Further, HTI, as the purchaser of the Transferred Assets in good faith and at arm's length, was rightfully permitted to rely on the plain terms of those Sale Orders.

The cases of *In re Colarusso* and *Spitfire Energy Group v. Presidio Petroleum* are instructive, as each involve a disgruntled party seeking to collaterally attack bankruptcy sale orders by belatedly asserting an ownership interest in the assets that were transferred, like SIC is doing here. In *Colarusso*, a trustee sold property in a court-approved sale to certain buyers free and clear. 280 B.R. 548, 549 (Bankr. D. Mass. 2002), *aff'd,* 295 B.R. 166 (B.A.P. 1st Cir. 2003), *aff'd,* 382 F.3d 51 (1st Cir. 2004). A third-party defendant then claimed rights over a parcel of the sold property through a state law claim of adverse possession, and asserted that because she had acquired title to this parcel, it could not have been included in the bankruptcy sale. *Id. at 557.* The buyer moved to enforce the sale order, seeking confirmation that the defendant's asserted rights in the property were extinguished by the bankruptcy sale. The bankruptcy court granted the motion on the basis that the sale documents had

expressly included her allegedly-owned parcel, and she had participated in the sale proceedings. *Id.* at 557-8. The bankruptcy court held that the defendant could not attempt to "alter the terms of the sale of the Property by belatedly claiming that the sale could not have included the Adversely Acquired Parcel." *Id.* at 558.

Similarly, in *Spitfire*, the plaintiff brought claims in state court against a buyer of assets in bankruptcy, asserting that the plaintiff had retained real property covenants that burdened the property sold, and seeking damages as the result of the buyer's use of those assets. Case No. 20-11442, 2022 WL 951553 at *4-7 (D. Del. Mar. 30, 2022). The buyer removed the state court action to the bankruptcy court and filed a motion seeking to enforce the sale order. *Id.* at *4-5. The bankruptcy court found that the provisions in the sale order approving the sale "free and clear" barred the plaintiff's claims, regardless of whether those claims arose out of alleged real property rights. *Id.* The district court affirmed, holding that the plaintiff's assertion of continuing rights in the sold property was "foreclosed by the fact that [it] had notice and an opportunity to object to the otherwise unambiguous terms of the Sale Order – which transferred the assets free and clear of any such covenant." *Id.* at *6. Because the sale order had not been appealed, the order was a final order that foreclosed the plaintiff's claims. *Id.*

**B.  Even if SIC's arguments against the Sale Orders were timely, they are without merit.**

   *i.   SIC's interest in License 372 was expressly included in the Marshal Sale Assets.*

SIC's first collateral attack on the Sale Orders asserts that the Trustee never obtained License 372 through the Marshal Sale, because it failed to levy and execute on the license as an "interest in real estate." Opening Br. at 9. This argument is simply an attempt to improperly re-litigate an issue that SIC has previously raised and lost. In early 2020, prior to entry of the Marshal Sale Order, SIC filed a motion to quash the U.S. Marshal's writ of execution asserting the same argument it makes now: that the U.S. Marshal failed to comply with proper levying procedures. Trustee's AP, ECF 42 at 3-6. SIC's motion to quash was denied. Trustee's AP, ECF 45. In the Marshal Sale Order, the Bankruptcy Court determined, with finality, that the Schedule A.2 assets, including SIC's interest in License 372, constituted personalty, not realty – and thus there was no need for the U.S. Marshal to comply with any real property levying procedures. *See* Trustee's AP, ECF 65 (Marshal Sale Order) at 2-3 (describing that the real property in Mililani was sold to the Trustee for two million dollars, and separately that the Schedule A.2 assets, described as "certain **personal property assets** of [SIC]" were sold to the Trustee for five

hundred thousand dollars) (emphasis added).[7]

SIC never appealed Marshal Sale Order, nor did it seek to appeal the denial of its motion to quash. SIC cannot now assert these same arguments through its appeal of two subsequent post-sale enforcement orders. *See, e.g., In re Imperial Corp. of Am.,* 92 F. App'x 469, 470 (9th Cir. 2004) (failure to appeal decided issue bars relitigation thereof). *See also RMA Ventures California v. SunAmerica Life Ins. Co.,* 576 F.3d 1070, 1076 (10th Cir. 2009) (declining to consider arguments attacking the lawfulness of an execution sale, due to failure to appeal the denial of the motion to stay/quash execution).

SIC also attempts to muddle the distinction between the entirety of License 372 and SIC's assigned interest in License 372 – only the latter was included in the list of Marshal Sale Assets in the U.S. Marshal's Certificate of Execution, and HTI has never taken the position that it purchased the entirety of License 372. The Certificate of Execution confirmed that all right, title, and interest of the listed assets in Exhibit B thereto had been executed upon. *See* Trustee's AP, ECF 65. The listed assets included, in Schedule A.2, "[a]ll licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, **including** without limitation **SIC's interest in License Agreement No. 372 issued by the State of Hawaii**

---

[7] The treatment of SIC's interest in License 372 as personalty comports with Hawaii law with respect to execution and levy by a marshal. *Murphy v. Hitchcock*, 22 Haw. 665, 669 (1915) (discussing levy of chattels).

**Department of Hawaiian Home Lands**." *Id.* at 15 (emphasis added).

SIC points to two documents outside of the Sale Orders to show that the Bankruptcy Court abused its discretion in finding that the Sale Orders transferred its interest in License 372. First, SIC attempts to rely upon a separate settlement agreement between the SIC Parties, the Trustee, and certain of Paniolo's creditors (the "Settlement Agreement"). Bankr. ECF 252-3. Among other items, the Settlement Agreement put in place a temporary *Master Relationship Agreement* (the "MRA") between the parties. SIC points to language used in the Assets IRU, an exhibit to the MRA, as showing that License 372 was not included in the Marshal Sale Order. Opening Br. at 10. As an initial matter, this language contained within a consensual agreement between the Trustee and SIC cannot alter express language in the Certificate of Execution or the Marshal Sale Order, nor can it alter language in the 363 Sale Order transferring Paniolo's assets to HTI. The plain language of the Marshal Sale Order definitively eliminated all remaining ownership rights held by SIC in the Marshal Sale Assets, including License 372. *See* Trustee's AP, ECF 65 (Marshal Sale Order) ¶ 6 ("[SIC] and all persons claiming any interest in the [Marshal Sale Assets], by or through the [SIC]'s interest in the Property, are forever barred and foreclosed of and from all right, title and interest, and claims at law or in equity in and to the [Marshal Sale Assets].")

In any event, the language in the Settlement Agreement itself directly

contradicts SIC's arguments.  In Section 3(d), the SIC Parties "**expressly confirm that all of the A.2 Assets** are present in the locations set forth **on the list of Schedule A.2 Assets attached to the Notice of Execution** filed with the Bankruptcy Court for the purposes of confirming the inventory prepared by the Substitute Custodian." *See* Bankr. ECF 252-3 (emphasis added).[8]  The language quoted by SIC from the Assets IRU uses the term "DHHL License," which is defined within that same provision only as "that certain Department of Hawaiian Home Lands License Agreement No. 372."  Bankr. ECF 668-7 at § 2.3.  The quoted language can be read to recognize that the Trustee never obtained the entirety of License 372; it only obtained SIC's interest in License 372, as certified by the U.S. Marshal.  Certainly, this language in a subsequent, separate agreement does not show that the Bankruptcy Court abused its discretion when it found, upon reviewing its own prior orders, that SIC's interest in License 372 had been transferred to HTI through the Sales.

Second, SIC points to HTI's procurement of its own Right of Entry from the DHHL as an indication that HTI did not acquire SIC's interest in License 372. Opening Br. at 11.  HTI's Right of Entry, granted by the DHHL in September 2021, is not relevant to what was acquired by the Trustee through the Marshal Sale in March 2020, nor does it indicate that HTI did not acquire SIC's interest in License

---

[8] Long after the Settlement Agreement was entered, SIC filed a *Statement of Concerns* in connection with the 363 Sale, in which SIC unequivocally stated that "the Trustee became the owner of the Schedule A2 assets" after the Marshal Sale.  Bankr. ECF 348.

372 through the 363 Sale. *See* Bankr. ECF 639, Exh. M-24. The belt-and-suspenders approach taken by HTI regarding access to the HHL is only evidence of a multi-layered approach towards minimizing the risk of its investment in the Paniolo Network.[9] It is also a logical approach for HTI to take, given SIC's continued attempts to relitigate the Bankruptcy Court's confirmation that the Trustee, and HTI, had properly acquired SIC's interest in License 372.

The Marshal Sale Order explicitly holds that SIC, and "all persons claiming any interest in the Property by or through [SIC's] interest . . . are forever barred and foreclosed of and from all right, title and interest, and claims at law or in equity in and to the Property and every part thereof." Trustee's AP, ECF 65 (Marshal Sale Order) ¶ 6. *See also id.* ¶¶ 5-6 (defining "Property" to include the assets expressly listed on Schedule A.2). SIC thus no longer holds any "right, title, and interest" to the assigned portion of License 372 it formerly held, notwithstanding whether the property was realty or personalty. The Bankruptcy Court did not abuse its discretion in finding that the Sale Orders transferred SIC's interest in License 372 first to the Trustee and then to HTI.

---

[9] Notably, the geographical scope of the Right of Entry actually expands past the regions covered by SIC's (former) interest in License 372.

*ii.    SIC's interpretation of the Hawaiian Homes Commission Act is contrived and unsupported by the plain language of the legislation.*

In yet another belated attempt to collaterally attack the Sale Orders, SIC challenges the transfer of its interest in License 372 as being made in violation of the Hawaiian Homes Commission Act (the "HHCA").   None of SIC's arguments in connection with the HHCA hold any merit.

SIC equates License 372 to a "lease" under the HHCA[10]  and asserts that HHCA leases cannot be levied or executed upon.  Opening Br. at 12-13.  While the HHCA imposes certain restrictions on levying homestead leases under HHCA § 208(5), the same does not apply to licenses.  There exists no support in the HHCA or the implementing Hawaii Administrative Rules ("HAR"), for treating leases and licenses as interchangeable.  SIC relies on Section 212 for this notion, *see* Opening Br. at 13, but this section only governs instances where the Hawaiian Homes Commission has returned land back to the State of Hawaii Board of Land and Natural Resources ("BLNR"), and BLNR is then permitted to enter into a lease.  *See* HHCA § 212 ("The department may return any Hawaiian home lands not leased as authorized by the provisions of section 207 of this Act to the control of the board of land and natural resources. Any Hawaiian home lands so returned shall . . . resume

---

[10] The SIC Parties have asserted this same argument in a suit against the DHHL.  In that action, the Circuit Court of the First Circuit in the State of Hawaii has held that License 372 is "neither a conveyance of a fee simple interest nor a lease."  *See* Case No. 1CCV-22-0000617, ECF 75, at ¶¶ 10-11.  The SIC Parties' appeal of this decision is currently being briefed.

and maintain the status of public lands . . . **provided that such lands may not be sold, leased,** set aside, used, transferred or otherwise disposed of **except under a general lease only.**") No licenses are permitted under this section. *See id.* The term "license" is not even found within this provision.

In actuality, the HHCA makes a clear distinction between homestead leases issued to beneficiaries under Section 207(a), and licenses issued for utilities and other purposes under Section 207(c). *Compare* HHCA § 207(a) ("The department is authorized to **lease to native Hawaiians** the right to use and occupancy of a tract….") (emphasis added) with *id.* § 207(c)(1) ("The department is authorized to grant **licenses** as easements for railroads, telephone lines, electric power and light lines, gas mains, and the like….") (emphasis added).

SIC also asserts that its interest in License 372 could only have been transferred to a Native Hawaiian or a native Hawaiian-owned company as a "beneficiary" under the HHCA. Opening Br. at 13-15. Lacking any statutory language, case law, or administrative rule to support its flawed theory, SIC largely relies on the legislative history regarding the intent of the HHCA generally with respect to anti-alienation.[11] *Id.* at 15-19.

The HHCA's anti-alienation prohibitions, however, are express, not implied.

---

[11] SIC also relies on the case of *In re Maunakea*, which is inapposite. Opening Br. 14, 17. *Maunakea* deals only with real property leasehold interests, not licenses. *See* 448 B.R. at 260.

Section 208(5), for instance, notes that <u>leases</u> issued under Section 207 of the HHCA shall not be transferred to, or held for the benefit of, any person, group or organization "except a native Hawaiian or Hawaiians," regardless of whether such provision is written in the lease. Section 207(c)(1)(B) further provides that <u>licenses</u> for "theaters, garages, service stations, markets, stores, and other mercantile establishments" shall be owned only by "native Hawaiians or organization formed and controlled by native Hawaiians."[12]

In contrast, License 372 is a utility license issued pursuant to Section 207(c)(1), which imposes no requirement for native Hawaiian ownership. *See* HHCA § 207(c)(1) ("The department is authorized to grant licenses as easements for railroads, telephone lines, electric power and light lines, gas mains, and the like. The department is also authorized…"); HAR § 10-4-22. *See also* Bankr. ECF 639, Exh. M-1 (License 372) (specifically referencing these two provisions). While the HHCA limits the issuance and transfer of leasehold interests, theatrical licenses, and mercantile licenses to native Hawaiians at Sections 208(5) and 207(c)(1)(B), it expressly did not do so for utility licenses like License 372 under Section 207(c)(1). *Bittner v. United States,* 143 S. Ct. 713, 714 (2023) (if a statute includes particular language in one section and omits it from a neighbor, the difference in language is

---

[12] *See also* HAR § 10-4-24.

to convey a difference in meaning).[13]

## C. SIC's remaining arguments are equally without merit.

Section D of SIC's brief sets off on a meaningless tangent, criticizing and alleging fiduciary duty violations by the DHHL and the Hawaiian Homes Commission. Opening Br. at 19-21. The DHHL's conduct, however, has no bearing on the terms of the Sale Orders, and is also not at issue in the two appealed orders.

SIC also notes that it was "egregious" of the Bankruptcy Court to transfer SIC's former interest in License 372 to HTI "free and clear of the obligations in 372," but does not actually refer to any specific obligations in License 372. Opening Br. at 21-22. SIC further argues that "any transfer to [HTI] without SIC's agreement violates the [HHCA] and Hawaii's Constitution." Opening Br. at 22. HTI is unaware of any Hawaii law or regulation that would require SIC's consent to a transfer of its assigned interest in a license, and SIC has not cited any law thereto.

SIC proceeds to falsely allege that HTI, "hours after closing its purchase from the Trustee, threatened to use its newly acquired facilities on HHL to deny service to native Hawaiians." Opening Br. at 22. This attempt by SIC to poison the well is simply untrue. HTI has continually offered, and will continue to offer, access to the

---

[13] SIC briefly notes that the passing of the HHCA included "preferential treatment for native Hawaiians using HHL for business purposes," citing to Section 204(2) of the HHCA. Opening Br. at 19. This argument makes no sense. License 372 was not issued pursuant to Section 204(2), and in any event, this section expressly provides that the DHHL may dispose of any such lands or improvements "to the public." HHCA § 204(2).

Paniolo Network to all carriers (including the SIC Parties) on a non-discriminatory basis, per its obligations under federal telecommunications law. HTI's commitment was memorialized in the 363 Sale Order and has also been publicly confirmed numerous times. Bankr. ECF 366 at ¶ N; ECF 359 at 2; ECF 637-1 at 20 n. 10.

The penultimate paragraph in SIC's brief appears to be a final maelstrom of disorganized thoughts. SIC's attempt to characterize itself as a disgruntled victim of the Marshal Sale, however, holds no weight: its assets were properly executed upon to satisfy its $256 million judgment owed to the Trustee. To the extent it was displeased with that judgment, or the conduct of the U.S. Marshals Service, SIC was required to appeal those findings in a timely manner, not years later.

Finally, SIC notes that HTI's reference to the "free and clear" nature of bankruptcy sales that occur pursuant to Section 363 of the Bankruptcy Code demonstrates an "extreme lack of respect" for the HHL Trust and the Hawaii Constitution. Opening Br. at 24. But, as noted above, the Sales did not violate any state laws. The fact that assets properly acquired by the Trustee were later sold to HTI through a free-and-clear sale under Section 363 of the Bankruptcy Code, cannot reasonably be an actionable violation of the HHCA or the Hawaii Constitution.

## CONCLUSION

For the foregoing reasons, HTI respectfully requests that the Court affirm the Final Enforcement Order and the Reconsideration Order.

DATED: Honolulu, Hawaii, April 24, 2023.

                    PETTIT LAW HAWAI'I LLLC

                    _____/s/ Ted N. Pettit_____
                    TED N. PETTIT
                    and
                    MORGAN, LEWIS & BOCKIUS LLP
                    ANDREW J. GALLO
                    MELISSA Y. BOEY

                    Attorneys for HAWAIIAN TELCOM, INC.