**KOBAYASHI SUGITA & GODA, LLP**
LEX R. SMITH             3485-0
First Hawaiian Center
999 Bishop Street, Suite 2600
Honolulu, Hawaii 96813
Tel: 808-535-5700
Fax: 808-535-5799
Email: lrs@ksglaw.com

Attorney for Appellant
SANDWICH ISLES COMMUNICATIONS, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SANDWICH ISLES COMMUNICATIONS, INC.<br><br>Appellant,<br><br>vs.<br><br>HAWAIIAN TELCOM, INC.,<br><br>Appellee. | CASE NO. 22-00426 JAO-KJM<br>(Bankruptcy Appeal)<br><br>**APPELLANT SANDWICH ISLES COMMUNICATIONS, INC.'S REPLY BRIEF; CERTIFICATE OF COMPLIANCE; CERTIFICATE OF SERVICE** |

1944198v1

# **TABLE OF CONTENTS**

Page(s)

I. The Bankruptcy Court's Order under Section 363 did not, and could not, transfer to Hawaiian Telcom ("HT") assets that the Trustee did not own .................................................................................................. 1

II. Paniolo's (and hence the Trustee's) only right to locate Paniolo's pre-bankruptcy assets on lands granted to Sandwich Isles under SIC's interest in License 372 was the result of the JUA. The Trustee himself terminated the JUA, thus ending any right Paniolo or the Trustee had to maintain its pre-bankruptcy assets on Sandwich Isles' property ..................................................................................................... 4

III. The Trustee knew he needed the land rights for the A1 and A2 facilities on HHL .................................................................................................... 6

  a. SIC's license is non-assignable ........................................................ 6

  b. The Bankruptcy Court Does Not Have the Power To Invent A New Way To Accomplish An Execution Sale Foreign to Established Hawaii Law .......................................................... 7

  c. DHL Admitted HT Did Not Get The License When They Told The Bankruptcy Court HT Needed A License, Which HT Has Never Gotten ............................................................................. 10

IV. Each Right Under License 372 Could Not Be Separately Transferred From The Other Rights Under The License, As Well As The Burdens Of The License ............................................................................. 10

V. The Bankruptcy Court's Attempt to Give Sandwich Isles' property To HT "Free and Clear of Encumbrances" Violates The Hawaii State Constitution and The Hawaiian Homes Commission Act ..................... 12

CONCLUSION ................................................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Cedar Point Nursery v. Hassid,
  141 S. Ct. 2063 (2021) .................................................................................. 14

In re Maunakea,
  448 B.R. 252 (D. Hawaii 2011) ..................................................................... 13

**Statutes**

Haw. Rev. Stat. §636-3 .......................................................................................... 7

Haw. Rev. Stat. Section 651-42 ............................................................................ 8

**Other Authorities**

State Constitution and The Hawaiian Homes Commission Act ........................ 12

Rule 9019 ................................................................................................................ 7

## SANDWICH ISLES COMMUNICATIONS' REPLY BRIEF

I. **The Bankruptcy Court's Order under Section 363 did not, and could not, transfer to Hawaiian Telcom ("HT") assets that the Trustee did not own.**

It is fundamental that the Trustee could not, and did not, sell what he did not own. There is no magical bankruptcy power that gives the Trustee the ability to give (or sell) to Hawaiian Telcom ("HT") assets that the Trustee owned no interest in. Nothing the Bankruptcy Court could have put in a 363 Order changes that simple fact. The Trustee knew he did not own Sandwich Isles Communications Inc.'s ("SIC") interest in License 372, because:

> (1) The Trustee never levied against any of the real estate licensed by the Department of Hawaiian Homelands ("DHHL") to SIC;
>
> (2) Paniolo's only right to have **any** of its pre-bankruptcy assets (the "A1 Assets") on Hawaiian Home Lands ("HHL") was under a Joint Use Agreement ("JUA") between Paniolo and SIC, which the Trustee terminated and replaced with Master Relationship Agreement ("MRA"), which HT expressly rejected.
>
> (3) Before the execution sale even took place, the Trustee entered a Settlement Agreement with SIC agreeing to the MRA which expressly provided that the Trustee did not acquire License 372. After the execution sale, the Trustee signed the MRA, confirming that he had not acquired SIC's interest in License 372
>
> (4) The Trustee did not attempt to execute on SIC's interest in License 372 because he knew it was questionable whether he could acquire SIC's interest in the license, particularly the benefits of the license without the burdens. So Instead, he chose to acquire the necessary land rights thru the Settlement Agreement and MRA.

>    (5) The Hawaiian Homes Commission Act precludes an execution sale (that is, where there is no mortgage or other lien) against Hawaiian Home Lands leased to a native Hawaiian owned company

The Trustee entered the MRA so he would be able to sell the Paniolo assets together with the rights under License 372. HT rejected the MRA because DHHL[1] told them the same thing they told the bankruptcy court, that HT would get a new license. To take care of the period before they got a new license, DHHL granted HT a limited "Right of Entry" to access the buildings they purchased on HHL licensed to SIC. (Dkt 639-24 and 639-25; Appx. 513 through 529). HT knew they did not acquire SIC's interest in License 372. If they believed they owned License 372, a Right of Entry would have been unnecessary. HT also applied to the DHHL for a new license (which was never granted). If HT had honestly believed the Trustee conveyed License 372 to them, a new license would have been unnecessary.

Only after HT found out they couldn't get a new license[2], they fired the Hawaii lawyers who represented them in the 363 sale and adopted a new strategy: pretend the Bankruptcy Court already granted the Trustee SIC's rights under License 372, despite the clear record showing this was untrue.

---

[1] After all, DHHL and the Trustee both filed statements in the court saying DHHL would grant a new license: "DHHL confirms what is noted by the Trustee in the Motion to Approve Sale – that the Buyer [HT] will need to acquire a new license for the use of Hawaiian Home Lands" (Dkt 341 page 4 of 5; Appx 61).
[2] HT needed a new license for the land under the buildings they purchased that was licensed under License 372. License 372 does not provide for its lands to be licensed to another party. DHHL could only grant HT a license for other HHL. HT would have to move their buildings and facilities.

The Bankruptcy Court went along with this charade because the Bankruptcy Court erroneously viewed SIC as a company, hopelessly in debt, even though it was not in bankruptcy. The Bankruptcy Court first acknowledged that it lacked a basis to rule on the issues of real property ownership. The Bankruptcy Court's November 19, 2021, the Bankruptcy Court's order stated:

> Hawaiian Telcom claims that the [363] order requires SIC to deliver to Hawaiian Telcom certain information, spare parts, and equipment, and to remove its property from **premises claimed by Hawaiian Telcom. SIC disagrees. I will GRANT the motion with respect to the spare parts and equipment and DENY it in all other respects, without prejudice**.

Appx 64. This Court's obligation is to follow the law. HT did not acquire any interest in License 372 because the Trustee did not have such an interest to convey. As the Bankruptcy Court acknowledged:

> The trustee then entered into a settlement with SIC and other affiliates. The court approved the settlement (ECF 271). Pursuant to the settlement, the trustee and SIC entered into a Master Relationship Agreement which restructured the relationship between Paniolo and SIC and facilitated an orderly disposition of Paniolo's assets

Appx 65. That settlement, which was filed and approved together with the MRA and its attachments, was approved by the court and binding on the Trustee long before the sale to HT was negotiated. It expressly confirmed that the Trustee had no interest in License 372. Appx 645; Section 2.3. The Bankruptcy Court had no power to ignore the Trustee's express, binding agreement about what he had and

3

what he did not have, solely because he did not like SIC; or questioned SIC's motives. Applying the law to this case calls for reversal of his order.

II. **Paniolo's (and hence the Trustee's) only right to locate Paniolo's pre-bankruptcy assets on lands granted to Sandwich Isles under SIC's interest in License 372 was the result of the JUA. The Trustee himself terminated the JUA, thus ending any right Paniolo or the Trustee had to maintain its pre-bankruptcy assets on Sandwich Isles' property.**

At the time of Paniolo's bankruptcy petition, Paniolo owned certain assets that were located on Hawaiian Home Lands ("HHL"). The assets Paniolo owned pre-bankruptcy are herein referred to as the "**A1 Assets**."[3]

The only right Paniolo ever had, to locate its **A1 Assets** on HHL was License 372 under the Joint Use Agreement ("JUA"). (Dkt 668-6; Appx. 598). The Trustee terminated the JUA and replaced it with the MRA (Appx 006[4]) to insure the A1 assets could continue to be located on HHL. When HT rejected the MRA as part of their purchase, they no longer had a basis for the **A1 Assets** to be allowed on HHL.

The execution sale did not transfer any License 372 rights to HT with respect to the **A1 Assets**. The exhibit to the writ of execution only talks about rights to locate the **A2 assets**:

---

[3] In contrast, the **A2 assets** were owned by SIC at the time the Paniolo bankruptcy petition was filed. Post-petition, Paniolo obtained a money judgment against SIC and held an Execution Sale regarding the A2 assets.
[4] "For the avoidance of doubt, the Master Relationship Agreement and the Schedule A.2 IRU shall replace the JUA and the SIC lease, and shall include (a) a lease to SIC of a maximum of two (2) fiber pairs on the Paniolo Cable System (the "Initially Leased Fiber") at no cost (other than charges for space and power)."

4

> -All licenses **necessary to build, construct, repair, maintain and operate the Schedule A.2 assets**, including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands.
>
> -All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of interest**, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets**.

(Appx 711). This is simple English language. The execution sale did not transfer to the Trustee (and hence the Trustee could not have transferred to HT) any rights relating to the **A1 Assets** on HHL. Schedule A2 clearly only refers to the A2 Assets.

The only right the Paniolo Trustee had to place the **A1 Assets** on HHL came from the JUA, which the Trustee terminated, and the MRA, which HT rejected. HT never acquired any land rights underlying the **A1 Assets**. Those rights continue to belong only to SIC, pursuant to License 372.

If it was even possible to transfer License 372 to a non-Hawaiian company (which SIC denies) and break License 372 up into innumerable separately transferrable rights and obligations (which SIC denies) the execution sale still, by its own terms, only relates to what was "necessary to build, construct, repair, maintain and operate **the Schedule A.2 assets**", not the A1 assets.

5

HT stresses that the description of each building listed in Exhibit A2 says the "access rights to the land on which the [Paniolo Buildings] reside[]." But even if that language were sufficient to transfer an interest in real estate (which SIC denies) the only buildings listed are the Schedule A2 buildings, not the **A1 buildings and infrastructure** that Paniolo already owned and therefore were not the subject of the execution proceedings. Paniolo's only right to land underlying those assets and infrastructure came from the JUA **that the Trustee expressly terminated and "replaced" with the MRA, that HT expressly rejected**.

### III. The Trustee knew he needed the land rights for the A1 and A2 facilities on HHL.

#### a.  SIC's license is non-assignable.

The HHC needed to approve Waimana's partial assignment of the voice only portion of License 372 to SIC. The HHC approved the partial assignment with the condition that SIC could not then assign its rights. That condition required SIC and Paniolo (pre-bankruptcy) to execute the JUA for the land under the A1 assets and allowed Paniolo's equipment to be installed in the SIC's existing facilities which are the A2 assets. The JUA allowed Paniolo to use SIC's HHL without incurring the obligations contained in SIC's partial assignment. Knowing this, the Trustee chose to use the Settlement Agreement and the MRA to replace the JUA and specifically stated he was not acquiring SIC's license.

6

### b. The Bankruptcy Court Does Not Have the Power To Invent A New Way To Accomplish An Execution Sale Foreign to Established Hawaii Law

Under Hawaii law, a judgment-creditor creates a lien against the judgment-debtor's real property by recording the judgment in the Bureau of Conveyances. Haw. Rev. Stat. §636-3. Creating a lien by recording the judgment **does not** transfer ownership of any property.[5] The Trustee only levied and executed on a specific subset of the assets it recorded its judgment lien against. Those specific assets are identified in the Writ of Execution. Appx 698.

The Writ of Execution identifies only one interest in real estate: Appx 700-701. The trustee levied against that single interest in real estate as required by Hawaii law: Appx 686-688.

Pursuant to the Rule 9019 Settlement Agreement, after the execution sale, the Trustee assigned his right title and interest in the judgment to Pau Loa ventures, transferring to Pau Loa Ventures, the Trustee's lien rights over all SIC assets that had not been levied and executed upon. See Assignment of Judgment and Judgment Lien recorded in the Bureau of Conveyances of the State of Hawaii as Document No. A75620107.

---

[5] After the execution sale was completed, the Trustee assigned all of his right title and interest in the Judgment **and Judgment Lien to Pau Loa Ventures,** pursuant to the Rule 9019 Settlement Agreement. Appx. 007. Pau Loa Ventures owns the judgment and the lien against everything the Trustee did not execute against. A copy of the **Assignment of Judgment and Judgment Lien** is in the public record, recorded in the Bureau of Conveyances of the State of Hawaii on September 14, 2020 as Document No. A75620107.

7

To levy and execute on real estate, Hawaii law requires that the judgment-creditor, through the sheriff (or in this case the Marshal) must (a) levy and (b) execute on the specific assets the judgment-creditor has chosen to sell at an execution sale. There is a process the sheriff (or Marshal) is required to follow in order to levy and execute on assets. This is not something that is accomplished just by assuming the Trustee, current owner of the assets and potential buyer(s) of the assets will all agree. The Trustee knew this, and with respect to the one interest in real estate the Trustee was levying and executing against, he levied correctly, by recording the writ of execution against the title to the real estate they were levying and executing against Appx 686-688.

The Trustee knew how to levy and execute against real estate; the trustee and the Marshal followed that process with respect to the real estate they levied and executed against. This satisfied Hawaii law's requirement that:

> **Every** levy by an officer, in pursuance of a writ of execution issued by any court or judge, shall be made by taking the property levied upon **into the officer's possession**, care, and guardianship, and at the officer's option, by removal of the same to some place of security. The officer shall make an inventory of the property levied upon.

Haw. Rev. Stat. Section 651-42.

For real property, the sheriff takes control of the property by recording the writ of execution against the title to the property, as was done in this case

respecting the one parcel of property the Marshal executed against. The Trustee knew this, and followed this procedure with respect to the only real property the Trustee intended to sell at the execution sale. Appx 686-688.

No other real property was executed upon, because the Trustee did not follow the procedure for execution on real property with respect to any other real property. The fact that the Trustee chose not to levy or execute on SIC's other interests in real estate is consistent with the fact that the Trustee had entered a settlement agreement with SIC; the settlement agreement provided that SIC would enter the MRA, and the MRA (Appx 617) confirmed that the Trustee had not acquired any interest in License 372:

> For the avoidance of doubt, the parties acknowledge and agree that DHHL License will not be assigned by SIC to Paniolo, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL

Appx 645; Section 2.3.

The Court should not allow HT's attempt to re-write history by claiming the Trustee acquired something (License 372) he quite clearly, by both his words and deeds, never acquired.

HT gambled on the expectation that they would get the real estate under the buildings and infrastructure they purchased thru a new license from DHHL. HT was confident that even if they did not get a new license for the land under the

9

facilities they purchased, they would be able to acquire the land thru eminent domain.[6] However, HHL is a trust not subject to eminent domain.[7] The fact that they gambled wrong is the reason for HT's attempt to rewrite the record, but that would be contrary to the clear record in this case.

### c. DHHL Admitted HT Did Not Get The License When They Told The Bankruptcy Court HT Needed A License, Which HT Has Never Gotten

As the DHHL itself said to the Bankruptcy Court "DHHL confirms what is noted by the Trustee in the Motion to Approve Sale – the Buyer will need to acquire a new license for the use of Hawaiian Home Lands upon which certain A.2 Assets are located." Appx 61-62. HT believed it could get a new license from DHHL. However, only Waimana can assign interest in License 372, leaving HT's assets on land it has no right to occupy. The new theory (erroneously adopted by the bankruptcy court) that they acquired License 372 has no basis and should be reversed.

### IV. Each Right Under License 372 Could Not Be Separately Transferred From The Other Rights Under The License, As Well As The Burdens Of The License

---

[6] HT would normally petition the Hawaii Public Utilities Commission to exercise its power of eminent domain to acquire the land under its facilities.
[7] It was only after Waimana offered to lease the land under its facilities that HT filed this complaint.

License 372 places very substantial responsibilities on the Licensee. Among other things, it obligates the Licensee to build (at no cost to DHHL) all infrastructure necessary to provide modern telecommunications service to the HHL:

> LICENSEE agrees to construct and install all telecommunications infrastructure on LICENSOR's lands at LICENSEE'S cost for all new construction to include but not limited to residential, agricultural, pastoral, commercial and/or industrial subdivisions developed after January 1, 1996 in the LICENSEE area at LICENSEE's cost.

Appx. 408-9.

The license requires the Licensor to do certain things and in exchange it requires the Licensee to do certain things. The Trustee did not want the obligations, License 372 placed on the Licensee. The Trustee's solution was to enter the MRA (Appx 617), under which "the DHHL License will not be assigned by SIC to Paniolo, but that SIC shall and hereby does grant to Paniolo the full benefit and use of the DHHL License ..." thus giving the Trustee the benefits of the License without having to perform the burdens that would have been imposed if SIC's interest in License 372 had been levied against and sold at execution sale to the Trustee.

HT, thinking they would obtain the real estate necessary from the HHC, rejected the MRA. The Court cannot now just chop up the license, giving some of

11

the rights under License 372 to HT while leaving others (and all of the burdens) with SIC.

### V. The Bankruptcy Court's Attempt to Give Sandwich Isles' property To HT "Free and Clear of Encumbrances" Violates The Hawaii State Constitution and The Hawaiian Homes Commission Act

The substance of the bankruptcy court's ruling is that its order accomplished a fee simple transfer of the lands licensed to SIC. It awarded to HT benefits under License 372 "free and clear" of any obligations. The HHCA prohibits "alienation of the fee title to the lands set aside under this Act" (HHCA Section 101(b)(3) and provides that "the department may not sell or dispose of such lands in fee simple" (HHCA Section 204(a)(2). Yet, this is what the court did by severing, and awarding to HT, in perpetuity, benefits of License 372, "free and clear" of any of the obligations spelled out in License 372. HT is now using HHL to serve its customers statewide.

Under Hawaii Law, any utility can petition the Hawaii Public Utilities Commission to acquire thru eminent domain any land that it needs to provide service to the public. That land would be acquired in fee simple and "free and clear" of any obligations. Eminent Domain violates the HHCA. This transaction should be reversed as it violates federal law and the Hawaii State Constitution.

Similarly, under HHCA Section 208, License 372 was issued to a native Hawaiian-owned company upon a finding by the HHC that:

12

>issuance of this Exclusive "Benefit" LICENSE will also **fufill the purpose of advancing the rehabilitation and welfare of native Hawaiians** (Dkt 639-1 page 3 of 13; Appx 408)

License 372 is a right to build telecommunications infrastructure on HHL that will be used to only benefit native Hawaiians on HHL in perpetuity. License 372 was not mortgaged or pledged to the Trustee or his predecessor, Paniolo. License 372 should be treated the same as a lease that HHC enters for the "rehabilitation and welfare of native Hawaiians." Any sale of it must also go to a native Hawaiian owned company. In re Maunakea, 448 B.R. 252 (D. Hawaii 2011) "[t]he trustee, standing in the shoes of the debtor, would simply effectuate a transfer of the leasehold to another native Hawaiian." 448 B.R. at 266.

For the same reason, the "beneficiary benefit" license – issued under HHCA Section 207 – is entitled to protections of Section 208(5) prohibiting "attachment, levy, or sale upon court process." Although Section 208 refers to leases under 207, the identical policy reasons apply to "beneficiary benefit" licenses. At a minimum, this important question of Hawaiian sovereignty over the Hawaiian Home Lands should be certified to the Hawaii Supreme Court for consideration.

## CONCLUSION

HT, with the advice of its previous counsel, made a bet that they were going to get the HHL it needed via a new License from DHHL, and based on that bet

rejected the MRA. HT's bet did not pay off, as they have not received a new license from the HHC, despite repeated attempts.

HT's effort to get the Court to award it SIC's interest in License 372 should be rejected because the record is clear the Trustee never had an interest in License 372. The Trustee never took any of the steps necessary to levy and execute on SIC's real estate interests under License 372, because the Settlement Agreement and MRA gave the Trustee all he wanted. The Trustee entered, and the Bankruptcy Court approved, a Settlement Agreement clearly providing that the Trustee had no rights in License 372 except through the MRA. The Trustee himself admitted, in writing, in the MRA that he had no interest in License 372, many months before HT contracted to buy the Trustee's assets. There simply is no basis to claim that HT bought something that was never the Trustee's to sell.

The net effect of the Bankruptcy Court's order is to effect an unconstitutional taking of SIC's property (via the license) without due process and without compensation. See e.g. Cedar Point Nursery v. Hassid, 141 S. Ct. 2063 (2021). The Bankruptcy Court should be reversed.

DATED: Honolulu, Hawaii, May 24, 2023.

/s/ Lex R. Smith
LEX R. SMITH
Kobayashi Sugita & Goda, LLP
Attorney for Appellant
SANDWICH ISLES COMMUNICATIONS, INC.

14

# CERTIFICATE OF COMPLIANCE PURSUANT TO RULE 8015

Lex R. Smith hereby certifies that the Microsoft Word Count shows that this brief (exclusive of the case caption, table of contents, table of authorities and this certificate of counsel) contains 3279 words.

DATED: Honolulu, Hawaii, May 24, 2023.

/s/ Lex R. Smith
LEX R. SMITH
Kobayashi Sugita & Goda, LLP

Attorney for Appellant
SANDWICH ISLES COMMUNICATIONS, INC.

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 24, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Hawaii by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Lex R. Smith
LEX R. SMITH
Kobayashi Sugita & Goda, LLP

Attorney for Appellant
SANDWICH ISLES COMMUNICATIONS, INC.