IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SANDWICH ISLES COMMUNICATIONS, INC. | CIV. NO. 22-00426 JAO-KJM |
| Appellant, | BANKR. NO. 18-01319 |
| vs. | |
| HAWAIIAN TELCOM, INC., | |
| Appellee. | |

| | |
|---|---|
| WAIMANA ENTERPRISES, INC., | CIV. NO. 22-00427 JAO-KJM |
| Appellant, | BANKR. NO. 18-01319 |
| vs. | |
| HAWAIIAN TELCOM, INC., | |
| Appellee. | |

| | |
|---|---|
| CLEARCOM, INC., | CIV. NO. 22-00428 JAO-KJM |
| Appellant, | BANKR. NO. 18-01319 |
| vs. | |
| HAWAIIAN TELCOM, INC., | |
| Appellee. | |

| | |
|---|---|
| WAIMANA ENTERPRISES, INC., ET AL., | CIV. NO. 22-00434 JAO-KJM |
| Appellants, | BANKR. NO. 18-01319 ADV. NO. 22-90008 |
| vs. | |
| HAWAIIAN TELCOM, INC., | |
| Appellee. | |

| | |
|---|---|
| WAIMANA ENTERPRISES, INC., ET AL., | CIV. NO. 22-00435 JAO-KJM |
| Appellants, | BANKR. NO. 18-01319 ADV. NO. 22-90008 |
| vs. | |
| HAWAIIAN TELCOM, INC., | |
| Appellee. | |

| | |
|---|---|
| WAIMANA ENTERPRISES, INC., ET AL., | CIV. NO. 22-00441 JAO-KJM |
| Appellants, | BANKR. NO. 18-01319 ADV. NO. 22-90008 |
| vs. | |
| HAWAIIAN TELCOM, INC., | ORDER DENYING MOTION TO DISMISS AND AFFIRMING ORDERS OF THE BANKRUPTCY COURT |
| Appellee. | |

2

## ORDER DENYING MOTION TO DISMISS AND AFFIRMING ORDERS OF THE BANKRUPTCY COURT

Before the Court are six appeals stemming from the involuntary bankruptcy of Paniolo Cable Company, LLC ("Paniolo").[1]  Paniolo owned a network of submarine cables used to provide telecommunications services to Hawaiian Home Lands ("HHL").  Despite the complex issues the Bankruptcy Court had to address below, including concerns about the continued provision of those critical services to HHL, the central question in most of these appeals—none of which involve the debtor, Paniolo—is simple:  did the Bankruptcy Court correctly determine that a specific asset was part of Paniolo's estate and then sold "free and clear" to Hawaiian Telcom, Inc. pursuant to 11 U.S.C. § 363?  Because the answer is "yes," the Court affirms.

Specifically, the Court affirms each appeal taken in the main bankruptcy case because the conclusion that Hawaiian Telcom acquired that asset—an interest in a license authorizing it to construct, operate, and maintain telecommunications

---

[1] The six appeals are:  (1) *Sandwich Isles Commc'ns, Inc. v. Hawaiian Telcom, Inc.*, CV No. 22-00426 JAO-KJM; (2) *Waimana Enterprises, Inc. v. Hawaiian Telcom, Inc.*, CV No. 22-00427 JAO-KJM; (3) *ClearCom, Inc. v. Hawaiian Telcom, Inc.*, CV No. 22-00428 JAO-KJM; (4) *Waimana Enterprises, Inc., et al. v. Hawaiian Telcom, Inc.*, CV No. 22-00434 JAO-KJM; (5) *Waimana Enterprises, Inc., et al. v. Hawaiian Telcom, Inc.*, CV No. 22-00435 JAO-KJM; and (6) *Waimana Enterprises, Inc., et al. v. Hawaiian Telcom, Inc.*, CV No. 22-00441 JAO-KJM.

equipment and facilities on HHL—is dispositive.  *See Sandwich Isles Communications, Inc. v. Hawaiian Telcom, Inc.*, CV No. 22-00426 JAO-KJM; *Waimana Enterprises, Inc. v. Hawaiian Telcom, Inc.*, CV No. 22-00427 JAO-KJM; *ClearCom, Inc. v. Hawaiian Telcom, Inc.*, CV No. 22-00428 JAO-KJM (collectively, the "Main Bankruptcy Appeals").  And largely because it affirms the Main Bankruptcy Appeals, the Court also affirms the appeals in a separate adversary proceeding where the Bankruptcy Court concluded that its prior orders addressing that and other assets precluded the claims in that adversary proceeding.  *See Waimana Enterprises, Inc., et al. v. Hawaiian Telcom, Inc.*, CV No. 22-00434 JAO-KJM; *Waimana Enterprises, Inc., et al. v. Hawaiian Telcom, Inc.*, CV No. 22-00435 JAO-KJM; *Waimana Enterprises, Inc., et al. v. Hawaiian Telcom, Inc.*, CV No. 22-00441 JAO-KJM (collectively, the "Adversary Proceeding Appeals").

    Explaining how the Court has reached these answers is not brief.  This is in large part because Appellants have taken a "spaghetti approach" to briefing, i.e., "heav[ing] the entire contents of a pot against the wall in the hopes that something would stick."  *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).  The Court will begin with an overview of what led to the present disputes before addressing the issues raised in these appeals.

    Yet, even before doing that, the Court finds it necessary to consolidate these appeals pursuant to Federal Rule of Civil Procedure 42(a).  *See Inv. Res. Co. v.*

*U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 877 F.2d 777, 777 (9th Cir. 1989).

Although the Appellee in each appeal, Hawaiian Telcom, sought to consolidate the six appeals from the outset, CV No. 22-426, ECF No. 5,[2] one Appellant, Sandwich Isles Communications, Inc. ("SIC"), opposed that request, *see id.*, ECF No. 18, and ultimately they were not consolidated for purposes of briefing, *see id.*, ECF No. 19.

Now that the Court has the benefit of the (hundreds of pages of) briefing and already held, effectively, a consolidated Oral Argument, it is apparent that consolidation will promote judicial efficiency and lessen the chance for confusion. The parties, and particularly Appellants, often make similar arguments, or wholly incorporate each other's arguments.  Issuing a single order in these now consolidated appeals will allow the Court to address similar arguments together without requiring it to repeat its reasoning across six orders or write six orders with potentially confusing cross references.  This consolidated action will now be referenced by the lowest-numbered case, *Sandwich Isles Communications, Inc. v. Hawaiian Telcom, Inc.*, CV No. 22-00426 JAO-KJM, and to the extent any future filings are necessary, they should be made in that case only.  With that in mind, the Court turns to the factual and procedural history.

---

[2]  Going forward, the Court will cite docket entries from each of the six appeals before it with an identifying prefix, e.g., "CV No. 22-426, ECF No. 1" to refer to the first docket entry in *Sandwich Isles Communications, Inc. v. Hawaiian Telcom, Inc.*, CV No. 22-00426 JAO-KJM.

# I.   BACKGROUND

## A.   Factual History

### 1.   Relevant Players

Paniolo, the debtor in this involuntary chapter 11 bankruptcy case, owned a network of inter-island submarine cables and related equipment that connected to SIC's land-based system, which in turn provided telecommunications services to subscribers residing on HHL.  Bk. ECF No. 537 at 2; Bk. ECF No. 271 at 4–5.[3]  So Paniolo was the "middle-mile" provider, carrying transmissions to and from points where its network connected to "last-mile" carriers, like SIC, who provide the services that physically reach the people residing on HHL.  *See* CV No. 22-435, ECF No. 20-3 at 20–21.

HHL consist of about 200,000 acres of land across Hawai'i administered by the Department of Hawaiian Home Lands ("DHHL") and set aside for the benefit of native Hawaiians pursuant to the Hawaiian Homes Commission Act ("HHCA"). *See generally Nelson v. Hawaiian Homes Comm'n*, 127 Hawai'i 185, 188–89, 277 P.3d 279, 282–83 (2012); *Arakaki v. Lingle*, 477 F.3d 1048, 1053–56 (9th Cir. 2007).  More context is provided on the HHCA below.  For now, it is relevant that, pursuant to the HHCA, DHHL could "grant licenses as easements for railroads,

---

[3]  The Court will refer to filings in the main bankruptcy case, *In re Paniolo Cable Company, LLC*, Bk. No. 18-01319, with the prefix "Bk."

telephone lines, electric power and light lines, gas mains, and the like."  HHCA §

207(c)(1).

In 1995, and pursuant to that authority, DHHL issued "License Agreement

No. 372" ("License 372") to Waimana Enterprises, Inc. ("Waimana").  Bk. ECF

No. 639-1.  In it, DHHL states that License 372 is "essential in order to provide

broad band telecommunication services of all types . . . to [HHL] in a timely

manner[.]"  Bk. ECF No. 639-1 at 2.  HHL "are primarily located in rural or more

remote areas, and because of the remote and non-contiguous nature of the [HHL]

the cost to provide infrastructure to these areas is very high."  *United States v.*

*Sandwich Isles Commc'ns, Inc.*, 398 F. Supp. 3d 757, 763 (D. Haw. 2019)

(citation, alteration, and internal quotation marks omitted).  License 372 therefore

granted Waimana the

> right and privilege to build, construct, repair, maintain and
> operate a broad band telecommunications network . . . over,
> across, under and throughout all lands under [DHHL's]
> administration and jurisdiction . . . including . . . the right of entry
> upon the easement area and adjoining land of [DHHL] for the
> construction, maintenance, operation and removal of
> LICENSEE's line and appurtenances over, across and under the
> LICENSE area.

Bk. ECF No. 639-1 at 3.  License 372 provides that "[a]ll buildings or structures or

other major improvements of whatever kind that LICENSEE constructs or erects

on the premises shall remain the property of LICENSEE," where "premises"

means "the lands described above and improvements whenever and wherever

7

erected or placed thereon."  Bk. ECF No. 639-1 at 6, 7.  License 372 also imposed certain obligations, e.g., that "LICENSEE agrees to offer employment opportunities to qualified beneficiaries of LICENSOR," and to spend a certain percentage of its net profit on training or educational opportunities "for beneficiaries of LICENSOR each year."  Bk. ECF No. 639-1 at 4–5.

In 1996, Waimana assigned part of License 372 to SIC, specifically "those certain rights, title and interest necessary to provide IntraLata and Instrastate telecommunication services."  Bk. ECF No. 639-2 at 3.  SIC's interest in License 372 is at the heart of these appeals.

In 2011, Waimana also assigned part of License 372 to Pa Makani LLC ("Pa Makani"),[4] specifically "those certain rights, title and interest necessary to provide wireless communications services of all types, including but not limited to the construction and operation of all necessary wireless communications infrastructure."  Bk. ECF No. 639-3 at 2.  And in 2014, Waimana assigned part of License 372 to Clearcom, Inc. ("Clearcom"), specifically "those certain rights, title and interest necessary to provide broadband services of all types, including but not limited to the construction and operation of all necessary broadband infrastructure."  Bk. ECF No. 639-4 at 2.

---

[4]  In the briefing, counsel for Pa Makani refers to that entity as "Pa Makana."  *See, e.g.*, CV No. 22-434, ECF No. 20.  At Oral Arguments, counsel confirmed that was an error.

According to Appellants, Waimana owns SIC, Clearcom, and Pa Makani, and Waimana is itself owned by a native Hawaiian. *See, e.g.*, CV No. 22-435, ECF No. 20 at 2. For more context on the relationships among these parties with interests in License 372, all of whom are Appellants here, it is worth noting that:

> Albert S.N. Hee ("Hee") has been Sandwich Isles' president and secretary, and one of its directors. . . . Sandwich Isles is a wholly-owned subsidiary of [] Waimana Enterprises, Inc. ("Waimana"), which is a Hawaii corporation. Before December 2012, Hee was the sole owner of Waimana. After December 2012, Hee owned 10% of Waimana, with the other 90% owned by trusts benefitting Hee's children. The directors of Waimana . . . have been Hee, his wife, and their children. In addition to Sandwich Isles, Waimana wholly owns as subsidiaries [] ClearCom, Inc. and Hoʻopaʻa Insurance Corp. [] Paniolo Cable Company, LLC and Pa Makani LLC are owned indirectly by trusts benefitting Hee's children.

*Sandwich Isles Commc'ns, Inc.*, 398 F. Supp. at 763–64 (citations omitted).

After Paniolo's creditors filed an involuntary chapter 11 petition against it in November 2018, the Bankruptcy Court entered an order for relief and directed the appointment of a trustee, Michael Katzenstein ("Trustee"). Bk. ECF Nos. 1, 48, 49, 66.

Not surprisingly, considering the telecommunications issues at stake, the federal government was involved in the bankruptcy proceedings. For the purposes of these appeals, it is sufficient to say there will be brief references to the Rural Utilities Service ("RUS"), an agency that helps provide telephone services to rural communities. Bk. ECF No. 673 at 5. Because SIC had defaulted on certain loans

from RUS, some of its personal property was subject to a lien, so the United States participated, among other reasons, to protect its interest in RUS's lien. *See, e.g.*, Bk. ECF No. 673.

This is, necessarily, an abridged discussion of the relevant parties and their interests in these proceedings. More background will be provided as necessary to discuss the Bankruptcy Court's orders relevant to these appeals.

### 2.    The Marshal Sale Order

Turning to the first such order requires moving from the main bankruptcy case to an adversary proceeding the Trustee filed in June 2019 against SIC because SIC owed Paniolo a significant amount of money. *Katzenstein v. Sandwich Isles Commc'ns, Inc.*, Adv. Pro. 19-90002, ECF No. 1.[5] In December 2019, the Bankruptcy Court entered a judgment against SIC for over $256 million. Trustee AP, ECF No. 28. To satisfy this judgment, the U.S. Marshal for the District of Hawaii ("Marshal") executed and levied on some of SIC's assets. Trustee AP, ECF No. 37. An exhibit to the Marshal's Certificate of Execution identifies what assets those were, including real property located in Mililani and the "Schedule A.2 Assets." Trustee AP, ECF No. 37. The Schedule A.2 Assets are detailed in a ten-page list of tangible assets, e.g., structures, central offices and terminal

---

[5] Going forward, the Court will refer to the filings in that adversary proceeding as, e.g., "Trustee AP, ECF No. 1."

buildings (as well as the keys to access those buildings and any fences around them, and "access rights to the land" on which those buildings and offices reside), equipment, fiber cables, and the like—all organized by island.  Trustee AP, ECF No. 37.  Relevant here, it also lists, under "Licenses":

> All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, *including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands*.

> All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets.

*Id.* at 15 (emphasis added).  SIC tried, unsuccessfully, to quash the Writ of Execution on various grounds.  Trustee AP, ECF Nos. 33, 45.  Waimana, Clearcom, Pa Makani, and another entity filed a letter saying they owned certain equipment in the buildings listed, but did not formally move for any relief.  Trustee AP, ECF No. 52.   So on March 6, 2020, the Marshal sold SIC's assets at a public sale where the Trustee was the highest bidder.  Trustee AP, ECF No. 57-6.  The Bankruptcy Court then approved and confirmed the sale of SIC's assets to the Trustee ("Marshal Sale Order") on March 16, 2020.  Trustee AP, ECF No. 65.

The Marshal Sale Order states that SIC and anyone else claiming any interest in the assets sold at the Marshal Sale by or through SIC, are "forever

barred and foreclosed of and from all right, title and interest, and claims at law or in equity in and to the Property [which included the "A.2. Assets"] and every part thereof," and that "[a]ny and all other encumbrances affecting the Property, or any part thereof [were] perpetually barred of and from any and all right, title and interest, and claims at law or in equity, in the Property or any part thereof." Trustee AP, ECF No. 65 at 2, 4.

No part of the Trustee Adversary Proceeding was appealed.

### 3.    Settlement Agreement and the Master Relationship Agreement

The Trustee entered a settlement agreement with, among others, SIC, Waimana, Clearcom, and Pa Makani (the "Settlement Agreement").  Bk. ECF No. 271 at 4–5.  The Settlement Agreement states it is effective March 6, 2020 (i.e., the same day as the public sale), although the Bankruptcy Court did not approve it until June 2020 (i.e., over  two months after the Marshal Sale Order).  Bk. ECF No. 271 at 1, 4.

The Settlement Agreement put in place a Master Relationship Agreement ("MRA").  Bk. ECF No. 271 at 5-7.  The MRA "restructured the relationship between Paniolo and SIC and facilitated an orderly disposition of Paniolo's assets."  Bk. ECF No. 537 at 3.  The Settlement Agreement states that any purchaser would "be bound by the terms of the [MRA]."  Bk. ECF No. 271 at 9.  And the MRA mentions License 372, specifically that it would "not be assigned by

12

SIC to Paniolo."  CV No. 22-426, ECF No. 39 at 29.  Appellants contend this language in the MRA proves the Trustee never acquired any interest in License 372, but the Court will take up this issue later.

### 4.     363 Sale Order

In December 2020, the Bankruptcy Court entered an order approving the sale of some of Paniolo's assets to Hawaiian Telcom pursuant to 11 U.S.C. § 363 ("363 Sale Order").  Bk. ECF No. 366.  The 363 Sale Order, and the Asset Purchase Agreement ("APA") attached to it, lay out what assets Hawaiian Telcom was purchasing from the Trustee (the "Transferred Assets"), which included both Paniolo's own assets and those it had acquired from SIC pursuant to the Marshal Sale Order, and in general covered the assets necessary for Hawaiian Telcom to continue the operations of Paniolo's cable network.  Bk. ECF No. 366 at 3-4, 14.

The 363 Sale Order found, among other things, that Hawaiian Telcom was a good-faith purchaser, that any objections or responses to the 363 Sale were overruled, and that any party who did not object was deemed to have consented to the 363 Sale under the terms of the Bankruptcy Code.  Bk. ECF No. 366 at 18-19, 23, 27–28.  SIC had filed a Statement of Concerns regarding the 363 Sale and the APA, Bk. ECF No. 328, but pursuant to the Settlement Agreement, Appellants could not object to or appeal the 363 Sale Order, Bk. ECF No. 271 at 9.

13

The 363 Sale Order confirmed that the assets sold to the Trustee in the Marshal Sale were "free and clear of any continuing right, title, lien or encumbrance on the part of SIC or anyone claiming by and through SIC."  Bk. ECF No. 366 at 2.  And the 363 Sale Order further confirmed that Paniolo owned "all right, title, and interest in the Transferred Assets" and declared that the Transferred Assets would be transferred "free and clear of all Interests or Claims . . . that existed prior to the Closing."  Bk. ECF No. 366 at 26, 30.

The 363 Sale Order also imposes certain obligations on SIC.  SIC was not a party to the APA, but the 363 Sale Order provides that it and the APA are binding on SIC.  Bk. ECF No. 366 at 29.  And it states that anyone in possession of Transferred Assets, including "SIC and SIC's affiliates or any person or entity claiming by or through SIC or SIC's Affiliates" were "directed to surrender possession of the Transferred Assets" to Hawaiian Telcom upon closing.  Bk. ECF No. 366 at 4.  The 363 Sale closed on August 31, 2021.

No party appealed the 363 Sale Order.

### 5.    Enforcement, Contempt, and Dismissal Orders

After closing, Hawaiian Telcom attempted to use the assets it purchased, including buildings and premises necessary to operate the "Paniolo Network," i.e., "a submerged marine fiber and terrestrial fiber telecommunications

cable network."  Bk. ECF No. 637-1 at 11 n.5.  According to Hawaiian Telcom, this was met with resistance from Appellants, whose employees and agents replaced locks and destroyed property, among other things.  *See, e.g.*, Bk. ECF No. 637-1.  Thus began a battle on at least three fronts:  in the main bankruptcy case and in two separate adversary proceedings.

On the *first front*, in the main bankruptcy case, Hawaiian Telcom filed motions asking the Bankruptcy Court to enforce its 363 Sale Order, which resulted in three enforcement orders from the Bankruptcy Court.

In the First Enforcement Order (entered in November 2021), the Bankruptcy Court had to address whether, pursuant to the terms of its 363 Sale Order, Hawaiian Telcom was entitled to (i) certain information from SIC; (ii) the removal of SIC's property from certain buildings and premises; and (iii) certain spare parts corresponding to or used for the Paniolo network.  Bk. ECF No. 537 at 5–6.  The Bankruptcy Court concluded the 363 Sale Order did not provide a definitive answer as to who owned the information or if Hawaiian Telcom had the exclusive right to occupy certain premises that it acquired where SIC's property was located.  Bk. ECF No. 537 at 5–10.  The Bankruptcy Court did grant the request as to the spare parts (which SIC had not opposed), stating these were undoubtedly "Transferred Assets" under the 363 Sale Order.  Bk. ECF No. 537 at 11.

In determining that it was unclear whether Hawaiian Telcom had acquired the exclusive right to occupy certain premises, the Bankruptcy Court pointed to the fact that Hawaiian Telcom decided *not* to acquire the MRA, yet SIC was claiming the Trustee was required to sell Paniolo's assets subject to the MRA.  Bk. ECF No. 537 at 10.  This reference was a nod to the *second front*:  SIC's adversary proceeding against the Trustee and Hawaiian Telcom, filed about a month before the Initial Enforcement Order was entered, and based on allegations that the Trustee breached the Settlement Agreement by permitting Hawaiian Telcom not to assume the Settlement Agreement and the MRA.  *See Sandwich Isles Commc'ns, Inc. v. Katzenstein, et al.*, Adv. Pro. 21-90017, ECF No. 1.[6]  This dispute was resolved quickly; within about four months, the Bankruptcy Court ruled, on summary judgment, that the Trustee's breach of the Settlement Agreement was excused by SIC's earlier, material breaches and that the Settlement Agreement could not be enforced against Hawaiian Telcom.  Settlement AP, ECF Nos. 57, 58, 59.  So by February 2022, that adversary proceeding was closed.  Nothing from it was appealed.

About a month later, in March 2022, the *third front* was opened:  SIC and Waimana filed another action against Hawaiian Telcom, this time in state court,

---

[6]  Going forward, the Court will denote filings from this proceeding as, e.g., "Settlement AP, ECF No. 1."

bringing state law claims for trespass, willful damage of property, and unfair methods of competition. *Waimana Enterprises, Inc., et al. v. Hawaiian Telcom Inc.*, Adv. Pro. 22-90008, ECF No. 1.[7]  The complaint was essentially premised on their belief that Hawaiian Telcom had not acquired any interest in License 372 in the 363 Sale Order.  *See id.*

Jumping back to the *first front*, in the main bankruptcy proceeding, at the end of March 2022, Hawaiian Telcom filed a motion for contempt because SIC still had not turned over certain spare reels (as ordered in the Initial Enforcement Order) and also filed its second motion to enforce related to the 363 Sale Order (what it terms the "Main Motion to Enforce").  Bk. ECF Nos. 634, 637.

In response, the Bankruptcy Court entered an order on April 22, 2022 ("Contempt Order"), finding SIC in contempt for failing to turn over the spare reels, ordering the turnover of those spare reels, and threatening sanctions for failing to comply by a certain date.  Bk. ECF No. 700.  In doing so, it rejected a new argument, raised by Clearcom, that it (not SIC) owned certain spare reels.  Bk. ECF No. 708 at 9–10, 25–26.  A few days later, Clearcom filed a notice indicating it had complied with the Contempt Order.  Bk. ECF No. 705.

---

[7]  Going forward, the Court will cite filings from this proceeding as, e.g., "Waimana AP, ECF No. 1."

Also on April 22, 2022, and also in the main bankruptcy case, the

Bankruptcy Court issued its next enforcement order (the "Interim Order") in

response to the Main Motion to Enforce.  Bk. ECF No. 696.  The Interim Order

compelled SIC (as well as Waimana, Pa Makani, Clearcom, and others) to stop

interfering with Hawaiian Telcom's security at or impeding Hawaiian Telcom's

access to the "Paniolo Buildings" and "Paniolo Premises," and to stop making false

police reports that Hawaiian Telcom was trespassing on the Paniolo Buildings and

Paniolo Premises.  Bk. ECF No. 696 at 3–4.  The "Paniolo Buildings" were

essentially defined as the central offices and terminal buildings (either already

owned by Paniolo or acquired by the Trustee in the Marshal Sale, and sold to

Hawaiian Telcom), including the structures and associated systems and

infrastructure and fences around the buildings, with the "Paniolo Premises" defined

as the easement areas surrounding those buildings.  Bk. ECF No. 637 at 4–5; Bk.

ECF No. 637-1 at 6 & n.3, 43–44 & n.20.  But again, this was interim relief; the

Bankruptcy Court set a final hearing on the relief Hawaiian Telcom was requesting

in the Main Motion to Enforce.  Bk. ECF No. 696 at 5.

SIC, Waimana, and Clearcom all objected to the Main Motion to Enforce.

Bk. ECF Nos. 668, 698, 699, 712, 715, 720.  After a hearing, the Bankruptcy Court

issued the Final Enforcement Order, concluding that final relief was necessary to

ensure compliance with the 363 Sale Order and related prior orders.  Bk. ECF Nos.

729, 739.  Relevant to the dispute here, it concluded:

> F. Through the Marshal Sale [] and the 363 Sale [], [Hawaiian Telcom, or "HTI"] has properly acquired the entirety of the Paniolo Buildings [], and thus now holds exclusive control and ownership over, as well as rights of access to, the entirety of the Paniolo Buildings.
>
> G. Through the Marshal Sale and the 363 Sale, HTI has properly acquired the assets that permit operation of the Paniolo Network [], including, without limitation, full rights of access to the Paniolo Premises, including those certain portions of the 372 License [] pertaining to the Paniolo Network and/or the Paniolo Premises that were formerly held by SIC. SIC, Waimana Enterprises, Inc., Pa Makani LLC, Clearcom, Inc., all affiliates thereof, as well as all members of the Hee family and all other individuals who have authority or de facto control over any of these entities (collectively, the "SIC Parties") are thus prohibited from charging HTI any fees for accessing or using any assets that permit operation of the Paniolo Network, including, without limitation, the Paniolo Buildings and Paniolo Premises, and HTI is not required to pay any such fees.
>
> H. Through the Marshal Sale and the 363 Sale, including HTI's acquisition of the perimeter fences surrounding the Paniolo Premises and its the acquisition of all keys relating to the Paniolo Buildings and Paniolo Premises, HTI has acquired the exclusive ability to control and maintain security for and over the entirety of the Paniolo Network, the Paniolo Buildings, and the Paniolo Premises.

Bk. ECF No. 729 at 3–4.

The Final Enforcement Order therefore ordered final relief in line with the

interim relief ordered above, e.g., ordering SIC (as well as Waimana, Pa Makani,

Clearcom, and others) to stop interfering with Hawaiian Telcom's security at or

impeding Hawaiian Telcom's access to the Paniolo Buildings and Paniolo Premises, and to stop making false police reports that Hawaiian Telcom was trespassing on the Paniolo Buildings and Paniolo Premises.  Bk. ECF No. 729 at 6–7.

The Bankruptcy Court entered the Final Enforcement Order in May 2022. Bk. ECF No. 729.  Waimana timely sought reconsideration, Bk. ECF No. 740, which the Bankruptcy Court denied after a hearing in August 2022 ("Reconsideration Order"), Bk ECF Nos. 782, 784.

While all that was happening in the main bankruptcy case, the state court action against Hawaiian Telcom (i.e., *the third front*) marched forward.  Hawaiian Telcom had removed that action to the Bankruptcy Court in April 2022 and successfully moved to dismiss the initial complaint based on the argument that the Bankruptcy Court's rulings in the Final Enforcement Order, related to what assets Hawaiian Telcom had acquired, foreclosed those state law claims.  Waimana AP, ECF Nos. 1, 6, 30.  The Bankruptcy Court permitted leave to amend, and deferred ruling on Waimana's motion to remand the action to state court.  Waimana AP, ECF Nos. 10, 30.  The First Amended Complaint ("FAC"), brought by Waimana, Clearcom, and Pa Makani (but no longer SIC) alleged claims for trespass, conversion, unfair competition, intentional interference of contract, and declaratory relief.  Waimana AP, ECF No. 28.  Upon Hawaiian Telcom's motion, the

20

Bankruptcy Court dismissed the FAC based on issue preclusion, concluding issues resolved in the Final Enforcement Order precluded all the claims in the FAC, and therefore denied the motion to remand as moot.  *Waimana AP*, ECF Nos. 65, 67, 70.

These appeals followed.

**B.    Procedural History**

In August 2022, SIC, Waimana, and Clearcom timely appealed the Final Enforcement Order and Reconsideration Order.  Bk. ECF Nos. 790, 801, 803. Clearcom also appealed the Contempt Order, but there is a dispute as to whether that appeal is timely.  Bk. ECF No. 803.  Hawaiian Telcom's motion to dismiss that portion of Clearcom's appeal is addressed below.  Together, these appeals comprise the Main Bankruptcy Appeals.  Appellants' central contention in the Main Bankruptcy Appeals is that the Final Enforcement Order was incorrect to conclude that Hawaiian Telcom acquired SIC's interest in License 372 because: that asset was not properly levied under Hawai'i law, meaning the Trustee never acquired it in the Marshal Sale; that asset could not have been sold to an entity like Hawaiian Telcom in the 363 Sale, in any event, because it is not owned or operated by a native Hawaiian; or, even setting aside those issues, because other orders and filings make clear the Trustee did not acquire it, and so could not have sold it.

Waimana, Pa Makani, and Clearcom timely appealed the orders dismissing the FAC in the adversary proceeding and denying remand, as well as the judgment in that adversary proceeding.  These appeals comprise the Adversary Proceeding Appeals, where the central focus is whether the Final Enforcement Order precluded these new state law claims against Hawaiian Telcom.

Initially only SIC's Main Bankruptcy Appeal was assigned to the undersigned; eventually, the other five appeals were as well. As mentioned above, Hawaiian Telcom's request to consolidate these appeals was initially denied, but is now granted.

On August 25, 2023, the Court held a combined oral argument on all six appeals.  After argument, the Court requested supplemental briefing on issues raised in the Adversary Proceeding Appeals.

## II.      STANDARDS OF REVIEW

### A.      Main Bankruptcy Appeals

The parties disagree about what standards of review apply to the issues raised in the Main Bankruptcy Appeals.  SIC claims the issues presented are questions of law reviewed de novo.  CV No. 22-426, ECF No. 32 at 7.  Waimana agrees that de novo review applies because the issues are questions of law and because the Final Enforcement Order is akin to an order on a motion for summary judgment, which is reviewed de novo.  CV No. 22-427, ECF No. 22 at 25–26.

Clearcom cites only the general standard that findings of fact are reviewed for clear error and questions of law are reviewed de novo, without offering how these standards apply to the orders on appeal.  CV No. 22-428, ECF No. 28 at 10.

In contrast, Hawaiian Telcom posits that the Court must review the Final Enforcement Order for abuse of discretion because it amounts to the Bankruptcy Court's interpretation of its own prior orders, and also review the Reconsideration Order for abuse of discretion.  *See, e.g.*, CV No. 22-426, ECF No. 35-3 at 12.  The Court tends to agree with Hawaiian Telcom.

Taking the easier standard first, a bankruptcy court's denial of a motion for reconsideration is reviewed for abuse of discretion.  *In re Weiner*, 161 F.3d 1216, 1217 (9th Cir. 1998).  A bankruptcy court abuses its discretion if it applies an incorrect legal rule or makes factual findings that are illogical, implausible, or not supported by the record.  *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc).

The Final Enforcement Order, and particularly its conclusion regarding the central issue here—License 372—was plainly based on an interpretation of the Marshal Sale Order and the 363 Sale Order (together, the "Sale Orders").  *See* Bk. ECF No. 729 at 2–4.  Persuasive authority in this Circuit states that a reviewing court should give substantial deference to the bankruptcy court's interpretation of its own orders.  *In re Calkins*, 2020 WL 3057803, at *5 n.6 (B.A.P. 9th Cir. June 4,

2020); *In re Wallace*, 490 B.R. 898, 906 (B.A.P. 9th Cir. 2013).  This includes §

363 sale orders.  *See In re Zuercher Tr. of 1999*, 2017 WL 1089488, at \*6 (B.A.P.

9th Cir. Mar. 22, 2017).

It is likely the Ninth Circuit would conclude the same given it affords

substantial deference to a district court's interpretation of its own orders—even

when that interpretation is technically reviewed de novo.  *See, e.g.*, *Nehmer v. U.S.*

*Dep't of Veterans Affs.*, 494 F.3d 846, 855 (9th Cir. 2007) (noting review of a

district court's interpretation of a consent decree is de novo but that it will "give

deference to the district court's interpretation based on the court's extensive

oversight of the decree from the commencement of the litigation [and] uphold a

district court's reasonable interpretation") (citation and internal quotation marks

omitted); *cf. Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 n.4 (2009)

("Numerous Courts of Appeals have held that a bankruptcy court's interpretation

of its own confirmation order is entitled to substantial deference." (citations

omitted)).  Regardless, the Court would reach the same result here on de novo

review with no deference afforded to the Bankruptcy Court.

Waimana has argued separately that the Bankruptcy Court erred by not

holding an evidentiary hearing or permitting discovery.  A bankruptcy court's

decision whether or not to hold an evidentiary hearing is reviewed for abuse of

discretion.  *In re Int'l Fibercom, Inc.*, 503 F.3d 933, 939–40 (9th Cir. 2007).  And

the Court "review[s] the bankruptcy court's refusal to grant a continuance to permit additional discovery for an abuse of discretion." *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008).

Finally, Clearcom also appeals the Contempt Order. To the extent the Contempt Order similarly rests on the Bankruptcy Court's interpretation of its prior orders, the reasoning above applies. Because Clearcom has also disputed factual findings within the Contempt Order, those are reviewed for clear error, reversing only if left with the definite and firm conviction that a mistake has been made. *See In re Marshall*, 600 F.3d 1037, 1049 (9th Cir. 2010).

## B.    Adversary Proceeding Appeals

At issue in the Adversary Proceeding Appeals are an order granting a motion to dismiss based on issue preclusion and the subsequent denial of a motion to remand as moot. Whether issue preclusion applies is a legal conclusion reviewed de novo. *See id*. "A bankruptcy court's denial of a motion to remand under 28 U.S.C. § 1452(b) is reviewed for abuse of discretion." *In re Skyline Ridge, LLC*, 2022 WL 884724, at *4 (B.A.P. 9th Cir. Mar. 23, 2022).

25

## III.   DISCUSSION

**A.    Main Bankruptcy Appeals**

**1.    Belated Attempts to Collaterally Attack the Sale Orders**

Hawaiian Telcom's first response to the Main Bankruptcy Appeals is that each claim of error is an impermissible collateral attack on the Marshal Sale Order or the 363 Sale Order, neither of which were timely appealed.  *See* CV No. 22-426, ECF No. 35-3 at 13–15.  For support, it cites examples where federal courts have rejected a party's belated attempt to object to the terms of a bankruptcy court's sale order other than by appealing that order.  *See In re Grantham Bros.*, 922 F.2d 1438, 1442 (9th Cir. 1991) ("The failure of the debtors to seek any review, reconsideration, or stay of the bankruptcy court's order precluded the collateral attack[.]") (citing *Lindsey v. Ipock*, 732 F.2d 619, 622 (8th Cir. 1984) ("[O]nce [he] was apprised of the bankruptcy court's sale order and failed to timely appeal, he was obligated to obey these orders *even if they were in error*.") (emphasis added))); *see also In re Besset*, 2012 WL 6554706, at *4 (B.A.P. 9th Cir. Dec. 14, 2012); *In re TE Holdcorp, LLC*, 2022 WL 951553, at *6 (D. Del. Mar. 30, 2022), *aff'd sub nom. In re TE Holdcorp LLC*, 2023 WL 418059 (3d Cir. Jan. 26, 2023); *In re Colarusso*, 280 B.R. 548, 557–58 (Bankr. D. Mass. 2002), *aff'd*, 295 B.R. 166 (B.A.P. 1st Cir. 2003), *aff'd*, 382 F.3d 51 (1st Cir. 2004); *In re Lehman Bros.*

*Holdings Inc.*, 526 B.R. 481, 494–95 (S.D.N.Y. 2014), *as corrected* (Dec. 29, 2014).

This argument echoes the Bankruptcy Court's own statements at the hearing on the Final Enforcement Order:

> Much of the arguments made by [Appellants] are really attacks on the prior orders, the sale order in particular. And that order is final. It was not appealed. It is no longer appealable and there's no basis on which to change or modify it. So I'm not going to consider any arguments that would say that the Court essentially shouldn't have approved the sale or didn't have the power to approve the sale in the first place, because that is a done deal, to put it in the vernacular.

Bk. ECF No. 739 at 15. The Bankruptcy Court reiterated these sentiments in the hearing on the Reconsideration Order:

> [T]he underlying argument is that there is an inconsistency, basically, between one set of orders in the main case, being the Rule 9019 settlement order approving the settlement between the Trustee and the SIC affiliates on the one hand, and the Marshal Sale order the preceded that, and on the other hand, the order approving the sale under Section 363 to Hawaiian Tel. I believe those arguments should have been made when the 363 sale was approved and before that order was entered.
>
> And if a party didn't like the way I addressed those arguments and thought my sale order was an error, that was the appropriate time to take an appeal, but no appeal was taken.

Bk. ECF No. 782 at 13–14. The Bankruptcy Court reiterated these sentiments in the

No Appellant offers a particularly convincing response to this argument. Some offered no response at all. *See, e.g.*, CV No. 22-426, ECF No. 37. In

general, the Court agrees that the attacks on the Final Enforcement Order and
Reconsideration Order attempt to undermine the Sale Orders, meaning the
Bankruptcy Court was correct to reject them and focus only on the plain terms of
the Sale Orders.

"[C]ollateral attacks on the judgments, orders, decrees or decisions of
federal courts are improper." *Mullis v. U.S. Bankr. Court for Dist. of Nevada*, 828
F.2d 1385, 1393 (9th Cir. 1987) (footnote and citations omitted).  The collateral
attack doctrine bars consideration of an issue when a court must "re-examine and
decide a question which has been finally determined by a court of competent
jurisdiction in earlier litigation between the parties." *City of Tacoma v. Taxpayers
of Tacoma*, 357 U.S. 320, 334 (1958).  To apply, the prior judgment or order must
actually address the specific issue and decide that issue. *See Rein v. Providian Fin.
Corp.*, 270 F.3d 895, 902 (9th Cir. 2001).  In other words, a party presents an
improper collateral attack where they can prevail "*only* by proving that the [prior
decision] was improper," and a court assesses if that is the case by asking if the
"pivotal issue has already been litigated and decided against" the party. *Gilbert v.
Ben-Asher*, 900 F.2d 1407, 1411 (9th Cir. 1990); *see also Pub. Util. Dist. No. 1 of
Grays Harbor Cnty. Wash. v. IDACORP Inc.*, 379 F.3d 641, 652 n.12 (9th Cir.
2004) (concluding doctrine did not apply, even though issue was argued in the

28

other proceeding, because the finding requested would not "contradict" or "call into question" any finding from that prior proceeding).

Where, as here, the order being called into question is a sale order issued by a bankruptcy court, the need for finality is underscored for the benefit of a third-party purchaser like Hawaiian Telcom. *See, e.g.*, *In re Colarusso*, 382 F.3d at 61–62 ("Under 11 U.S.C. § 363(m), a sale to a third-party purchaser acting in good faith may not be reversed on appeal unless the aggrieved party obtains a stay of the sale. Without the stay, this court has no power to fashion a remedy because we cannot undo the sale, even if we were to find that the authorization was erroneous." (citations and footnotes omitted)).

If the Court were to accept Appellants' arguments—that SIC's interest in License 372 was not properly levied or improperly transferred under Hawai'i law or that the Trustee never acquired it in the first place—this would contradict the plain terms of the Sale Orders that, as the Court will discuss in more detail below, state that SIC's interest in License 372 was an asset acquired by the Trustee pursuant to the Marshal Sale Order and then transferred to Hawaiian Telcom pursuant to the 363 Sale Order.

While Appellants note that they agreed not to object to or appeal the Sale Orders pursuant to the Settlement Agreement, they cite no authority that this permits them to raise arguments here that would have the effect of contradicting

those orders. *Cf. In re TE Holdcorp LLC*, 2023 WL 418059, at *3 ("Spitfire's decision to bind itself to filing no further pleadings or documents in accordance with the Stipulation did not relieve it of its obligation to object to the Sale Order's free-and-clear sale of Templar's assets.").

Nor is the Court convinced by the Appellant's scattered arguments about unforeseeable events that occurred after the Sale Orders, specifically:  Hawaiian Telcom not assuming the MRA; the Bankruptcy Court determining that the Trustee's breach and termination of the Settlement Agreement was excused; and its ruling that the Settlement Agreement could not be enforced against Hawaiian Telcom.  For one, no one has appealed those rulings.  Regardless, the Court agrees with Hawaiian Telcom's argument that, if assumption of the MRA or Settlement Agreement was crucial to Appellants preserving their rights, that could have been reflected in the Settlement Agreement.  In other words, beyond just saying that "[a]ny purchaser or assignee approved by the Court shall be bound by the terms of the Master Relationship Agreement," Bk. ECF No. 271 at 9—language held to have no effect—they could have retained the right to object or appeal in the event the purchaser *did not* assume the MRA.  *Cf. In re TE Holdcorp LLC*, 2023 WL 418059, at *3 (noting that a certain stipulation required a party to refrain from objecting to a sale order only if the successful bidder designated a particular contract for assumption, but that the party was not similarly bound if the successful

bidder designated that contract for rejection); *see also* Bk. ECF No. 366 at 27–28 (noting that any party who did not object or withdrew its objection "is deemed to have consented to the Sale under the terms of the APA pursuant to section 363(f)(2) or section 365 of the Bankruptcy Code").

In sum, Appellants have not pointed to any convincing legal authority saying the Bankruptcy Court was wrong to conclude that their arguments were too late.

Still, even if they were timely, the Court is not convinced that reversal is warranted. The Court therefore sets out to address the merits of Appellant's arguments—beginning first with the plain terms of the Sale Orders, before turning to Appellants' arguments that, in large part, ask the Court to ignore those plain terms.

### 2.   Interpreting the Sale Orders

The plain terms of the Bankruptcy Court's Sale Orders provide that SIC's interest in License 372 was first acquired by the Trustee and then sold to Hawaiian Telcom.

The Certificate of Execution lists which of SIC's real and personal property the U.S. Marshal executed upon. Trustee AP ECF No. 37. As noted above, listed under the "Schedule A.2 Assets" are:

> All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, *including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands*.

31

*Id.* at 15 (emphasis added).  The Trustee's motion to confirm the Marshal Sale then states that the Trustee acquired certain of SIC's personal property, identified as the "A.2. Assets," and again lists, under the A.2 Assets, SIC's interest in License 372 as part of the property sold to the Trustee.  Trustee AP ECF No. 57 at 2–3; *id.* ECF No. 57-3 at 12.  Finally, the Marshal Sale Order confirms that "certain personal property assets of [SIC] ('the <u>A.2. Assets</u>')" were sold to the Trustee.  Trustee AP ECF No. 65 at 2–3.

Pausing here for a moment, then, the plain terms of the Marshal Sale Order clearly state that the Trustee acquired SIC's interest in License 372.  Appellants ask the Court to conclude otherwise, and those arguments will be addressed below. But as far as the language of the Marshal Sale Order is concerned, it plainly says the Trustee acquired SIC's interest in License 372.

SIC's interest in License 372 is also mentioned explicitly as an asset Hawaiian Telcom acquired in the 363 Sale Order—albeit in a more roundabout way.  Regardless, it is evident that License 372 was included in the sale from the Trustee to Hawaiian Telcom because it was included in the Marshal Sale Order. To explain this conclusion, the Court begins by looking at the terminology the 363 Sale Order uses to summarize what the Trustee first acquired from SIC, for purposes of understanding what he then sold to Hawaiian Telcom.

32

The 363 Sale Order notes that, in connection with the Trustee Adversary

Proceeding,

> certain assets and rights of the Transferred Equipment and
> Property Rights were marshalled, sold and otherwise transferred
> from [SIC] to [the Trustee], free and clear of any continuing
> right, title, lien or encumbrance on the part of SIC or anyone
> claiming by and through SIC (the "<u>US Marshal Sale</u>") . . . which
> US Marshal Sale was confirmed by this Court on March 16,
> 2020.

Bk. ECF No. 366 at 2.

"Transferred Equipment and Property Rights" is a defined term, and the

APA attached to the 363 Sale Order points to the Settlement Agreement for its

definition.  *See* Bk. ECF No. 366-1 at 238.  The Settlement Agreement provides:

> "Transferred Equipment and Property Rights" *means the*
> *equipment and property rights, including those described in*
> *Schedule A.2 to Exhibit A attached hereto and those described in*
> *the Schedule A.2 Assets IRU*, and the Mililani Property, *to*
> *transferred [sic] by SIC in conjunction with the US Marshal*
> *Sale*, in partial consideration for entering into the Master
> Relationship Agreement, and generally consisting of all assets
> spanning from and including the points of presence (central
> offices) to the subsea cable connections (cable stations), which
> for the avoidance of doubt includes but is not limited to all
> buildings currently performing as cable landing stations, central
> offices, real estate (including easements, rights of way, licenses,
> the Licenses and Entitlements and the like, as are required for
> ingress, egress and access) conduits, manholes, handholes, rights
> of way, easements, fiber optic and telecommunication cables,
> fiber optic transmission, multiplexing, circuit switching, circuit
> transport equipment, IP routing & switching equipment, and
> related supporting assets such as towers, test equipment, power
> systems,   cooling   systems,   security   systems,   network
> management systems, cross connects and cross connect panels,

> vehicles, trailers and tools, including all relevant manuals, maintenance records, warranties and the like, as to be further specified by the Paniolo Trustee for a stand-alone commercial operation and use of the Paniolo Cable System.

Bk. ECF No. 271 at 8 (emphasis added).  While that lengthy definition includes various clarifications "for the avoidance of doubt," at bottom it includes the equipment and property rights "transferred by SIC in conjunction with the US Marshal Sale."  *Id.*  As excerpted above, the 363 Sale Order defines "US Marshal Sale" by incorporating the defined term of "Transferred Equipment and Property Rights" from the Settlement Agreement.[8]  But the Settlement Agreement itself provides a definition of "US Marshal Sale" as follows:

> the sale of the Transferred Equipment and Property Rights, including such other SIC assets as may be deemed appropriate by the Paniolo Trustee, under that certain Writ of Execution and related writs issued in enforcement of the Judgment.

Bk. ECF No. 271 at 8.  As discussed above, SIC's interest in License 372 was listed in the Certificate of Execution as personal property executed upon pursuant

---

[8]  For ease of reference, that excerpt from the 363 Sale Order again states:

> certain assets and rights of the Transferred Equipment and Property Rights were marshalled, sold and otherwise transferred from [SIC] to [the Trustee], free and clear of any continuing right, title, lien or encumbrance on the part of SIC or anyone claiming by and through SIC (the "US Marshal Sale") . . .  which US Marshal Sale was confirmed by this Court on March 16, 2020.

Bk. ECF No. 366 at 2.

to the Writ of Execution, and then listed as an interest transferred to the Trustee pursuant to the Marshal Sale.  Trustee AP ECF Nos. 37, 57, 65.  So broadly speaking, the 363 Sale Order defines the assets the Trustee acquired, i.e., the "Transferred Equipment and Property Rights," as including everything acquired pursuant to the Marshal Sale Order, and therefore (per the discussion above) SIC's interest in License 372.

Looking at the more specific clauses in the definition of "Transferred Equipment and Property Rights" underscores this conclusion.  That definition also includes the "equipment and property rights . . . described in the Schedule A.2 Assets IRU."  Bk. ECF No. 271 at 8.  In the context of defining the MRA, the Settlement Agreement defines the "Schedule A.2 Assets IRU" as:

> granting an Indefeasible Right of Use (IRU) of SIC equipment and property rights (including the Schedule A.2 assets) to the Paniolo Trustee or his designee (and their successors) (the "Schedule A.2 Assets IRU")

Bk. ECF No. 271 at 6.  Attached to the MRA as "Exhibit A IRU Assets" is a list of assets titled "Schedule A.2 Assets," CV No. 22-426, ECF No. 39 at 33, which again lists:

> All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, *including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands*.

*Id.* at 43 (emphasis added).

The definition of "Transferred Equipment and Property Rights" also explicitly includes "those described in Schedule A.2 to Exhibit A attached hereto." Bk. ECF No. 271 at 8.  At Oral Argument, Hawaiian Telcom clarified that clause refers to the Schedule A.2 Assets attached to the Certificate of Execution, which again lists SIC's interest in License 372.  *See* Trustee AP, ECF No. 37.[9]

Based on all of this, the plain language supports that the 363 Sale Order reaffirmed that SIC's interest in License 372 was among the assets the Trustee had acquired and could sell to Hawaiian Telcom.

Turning to what was sold to Hawaiian Telcom, the 363 Sale Order defines the "Transferred Assets" as

> the Schedule A.1 Assets, Schedule A.2 Assets, Assigned Claims, Assigned Contracts (each as defined in the APA and, collectively, the "Purchased Assets") and the transfer of the Incidental Rights, including the Assigned Rights and Assigned Permits (each as defined in the APA, and together with the Purchased Assets, the "Transferred Assets") . . .

Bk. ECF No. 366 at 3.  The APA attached to the 363 Sale Order then lists, under Schedule 2.1(a) Debtor Assets, "[t]he following assets and rights obtained by the Trustee from SIC in the Marshal Sale held March 6, 2020, free and clear of the

---

[9]  At Oral Argument, while counsel for Waimana challenged how the Settlement Agreement may have changed the nature of the assets listed in that document, he did not challenge what document this clause was referring to.

claims and liens of any other person ('Schedule A.2')."  Bk. ECF No. 366-1 at 238.

Immediately below that it states:

> 1. *The Transferred Equipment and Property Rights (as defined in the Settlement Agreement) transferred by SIC in conjunction with the US Marshal Sale*, and generally consisting of all assets spanning from and including the points of presence (central offices) to the subsea cable connections (cable stations), which for the avoidance of doubt includes but is not limited to all buildings currently performing as cable landing stations, central offices, real estate (*including easements, rights of way, licenses, the Licenses and Entitlements and the like, as are required for ingress, egress and access*) conduits, manholes, handholes, rights of way, easements, fiber optic and telecommunication cables, fiber optic transmission, multiplexing, circuit switching, circuit transport equipment, IP routing & switching equipment, and related supporting assets such as towers, test equipment, power systems, cooling systems, security systems, network management systems, cross connects and cross connect panels, vehicles, trailers and tools, including all relevant manuals, maintenance records, warranties and the like, but for the avoidance of doubt, excluding the Mililani Property (as defined in the Settlement Agreement) *for a stand-alone commercial operation and use of the Paniolo Cable System*.

*Id.* (emphases added).  And so again, based on all the cross-referenced definitions discussed above (in addressing what "Transferred Equipment and Property Rights" includes), it is plain that Hawaiian Telcom acquired SIC's interest in License 372.

The Court therefore finds no error in the Bankruptcy Court's conclusion across the Final Enforcement Order and the Reconsideration Order that Hawaiian Telcom acquired "those certain portions of the 372 License [] pertaining to the Paniolo Network and/or the Paniolo Premises that were formerly held by SIC."

Bk. ECF No. 729 at 4; *see also Travelers Indem. Co.*, 557 U.S. at 150–51 ("If it is black-letter law that the terms of an unambiguous private contract must be enforced irrespective of the parties' subjective intent, it is all the clearer that a court should enforce a court order, a public governmental act, according to its unambiguous terms." (citation and footnote omitted)).[10]

Appellants' arguments ask the Court to ignore this plain language for various reasons. But even assuming now is an appropriate time to address them, none justify reversal. The Court will address them in turn, endeavoring to group together similar arguments raised across the Main Bankruptcy Appeals for efficiency.

### 3.    Failure to Levy Property under Hawaiʻi Law

SIC and Clearcom argue the Bankruptcy Court erred because the Trustee never acquired SIC's interest in License 372 pursuant to the Marshal Sale Order given that the procedures for levying and executing on *real property* interests were not followed under Hawaiʻi law. *See* CV No. 22-426, ECF No. 32 at 14–15; CV No. 22-428 at 29–31. But SIC's interest in License 372 was identified as "personal property" in the Certificate of Execution and the Marshal Sale Order—not real property. *See* Trustee AP ECF No. 37 at 6, 15; Trustee AP ECF No. 65 at 2–3.

---

[10]  Based on this conclusion, the Bankruptcy Court acted within its jurisdiction because it "plainly had jurisdiction to interpret and enforce its own prior orders." *Travelers Indem. Co.*, 557 U.S. at 151 (citation omitted).

And as detailed above, there can be no doubt that SIC's interest in License 372 was "executed upon" by the U.S. Marshal and sold to the Trustee pursuant to the plain terms of the Marshal Sale Order. *See* Trustee AP ECF No. 37 at 2, 15; Trustee AP ECF No. 65 at 2–3. The Marshal Sale Order also made clear that SIC could no longer claim any interest in the property executed on and sold, i.e., its interest in License 372. Trustee AP ECF No. 65 at 2, 4. Even though SIC filed a motion seeking to quash the Writ of Execution, and in doing so claimed to hold a "real estate interest granted by [DHHL]" that was "either not transferrable at all" or "at best" could "only be transferred to a qualified beneficiary of the Hawaiian Homes Trust," Trustee AP ECF No. 33 at 35, and later argued, as it does here, that SIC's interest in License 372 had not been levied upon in accordance with Hawaiʻi law, *id.* ECF No. 42 at 3–4, the Bankruptcy Court denied that motion, Trustee AP ECF No. 45, and SIC did not appeal that denial. Nor, as discussed above, did SIC appeal the Marshal Sale Order. To accept SIC and Clearcom's arguments on this front—that the Trustee never acquired an interest in License 372 based on these alleged defects under state law—would plainly contradict the Marshal Sale Order.

On the merits, neither SIC nor Clearcom has cited a single case to support their claim that, under Hawaiʻi law, SIC's interest in License 372 was real property subject to those levying procedures. And neither respond to the authority Hawaiian Telcom cited in arguing that the levy here complied with Hawaiʻi law.

39

*See* CV No. 22-426, ECF No. 35-3 at 17 n.7 (citing *Murphy v. Hitchcock*, 22 Haw. 665, 669 (1915), which discusses how a leasehold interest is akin to a chattel and to levy it, the officer need not take actual possession of the property leased).

Hawaiian Telcom's position finds support in a decision from a state court action that Waimana, SIC, Pa Makani, and Clearcom filed against DHHL, among other defendants. *See Waimana Enterprises Inc., et al. v. Department of Hawaiian Home Lands, et al.*, CIVIL NO. 1CCV-22-0000617, ECF No. 75 (Nov. 3, 2022) ("DHHL Action"). In the DHHL Action, the state court concluded, in dismissing that complaint, that although "License 372 grants the Plaintiffs the right to use Hawaiian home lands to build, construct, repair, maintain, and operate a telecommunications infrastructure" it "does not grant Plaintiffs any possessory or ownership rights over any portions of Hawaiian home lands, much less the right to exclude others from said lands." *Id.* at 5 (¶¶ 7–8); *see also id.* at 6 (¶¶ 15–16) (concluding Appellants failed to sufficiently allege that "they hold any possessory right to any of the *real property* claimed" in their pleading or "that they hold *a conveyance of real property*") (emphasis added).

For all these reasons, reversal is not justified on this basis.

4.    **Section 2.3 of the MRA**

SIC, Waimana, and Clearcom next point to language in the MRA as proof

that the Trustee did not acquire SIC's interest in License 372.  That portion of the

MRA, in Schedule 2, states:

> 2.3 <u>Entitlements</u>.  The Parties acknowledge and agree that:  (that
> certain  Department  of  Hawaiian  Home  Lands  License
> Agreement No. 372 ("<u>DHHL License</u>"), together with (b) the
> easements, leases, license agreements, letters of approval, special
> area management permits, rights of way or rights of entry granted
> to SIC or an SIC Affiliate and identified on Exhibit B hereto (the
> "<u>Entitlements</u>") are necessary for the operation and maintenance
> of the Paniolo Network (or were necessary for the operation and
> maintenance of the Paniolo Network).  SIC hereby agrees to
> assign, transfer, or convey to Paniolo all Entitlements **(**other than
> the DHHL License**)** that may be their terms be so assigned or
> transferred  and  to  the  extent  such  assignment,  transfer,  or
> conveyance  would  not,  in  Paniolo's  reasonable  judgment,
> adversely affect service in the Hawaiian Home Lands. To the
> extent any Entitlement may not, by its terms, be so assigned or
> transferred, SIC shall (i) sublease or sublicense (as applicable)
> the Entitlements to Paniolo; or (ii) grant to Paniolo the broadest
> possible right to use the Entitlement.  *For the avoidance of doubt,*
> *the Parties acknowledge and agree that DHHL License will not*
> *be assigned by SIC to Paniolo, but that SIC shall, and hereby*
> *does, grant to Paniolo the full benefit and use of the DHHL*
> *License for the IRU Term.*

CV No. 22-426, ECF No. 39 at 29 (hereinafter "Section 2.3") (emphasis added).

According to Appellants, the Trustee never acquired an interest in License 372

because he said as much in Section 2.3 the MRA.  And if he never had it, their

logic goes, he could not have transferred it to Hawaiian Telcom.

41

The Court is not persuaded this language supports that contention.  For one, none of the Appellants have persuasively explained how, as a matter of law, this statement in an agreement between Appellants and the Trustee—which Hawaiian Telcom did *not* assume[11]—alters the Marshal Sale Order that plainly included SIC's interest in License 372 or the 363 Sale Order which plainly sold that interest to Hawaiian Telcom, particularly when the Marshal Sale Order makes clear that SIC could no longer claim an interest in that asset.

While the 363 Sale Order does refer to the Settlement Agreement and the MRA, and incorporates some of the Settlement Agreement's definitions related to the assets Hawaiian Telcom was acquiring, there is no plain provision in the 363 Sale Order adopting this language from the MRA as a limit on what was sold to the Trustee or eventually to Hawaiian Telcom.  The Court therefore disagrees with Waimana's argument that all of the MRA was essentially incorporated into the 363 Sale Order or that the 363 Sale Order was "expressly subject to" the MRA— meaning the Bankruptcy Court was required to look at all of the MRA in issuing the Final Enforcement Order.  CV No. 22-427, ECF No. 22 at 22 n.17, 25.  The 363 Sale Order acknowledges that the MRA exists.  *See* Bk. ECF No. 366 at 3 ("In

---

[11]  Again, by the time the Bankruptcy Court issued the Final Enforcement Order, it had also concluded that Hawaiian Telcom was *not* bound by the MRA and that the Trustee's breach and termination of the Settlement Agreement was excused by SIC's earlier material breaches.  *See* Settlement AP ECF Nos. 57, 59, 63, 67.  And again, those decisions were not appealed.

connection with the Settlement Agreement, Debtor and SIC entered into [the MRA] pursuant to which the Debtor and SIC rearranged their business affairs among themselves.").  But that says nothing about Hawaiian Telcom's role in the MRA—nor how the terms of the MRA might alter the Sale Orders.  Instead, as discussed in detail above, in defining what assets were part of both the Marshal Sale Order and then the 363 Sale Order, the 363 Sale Order and the APA incorporated a specific portion of the MRA that delineated SIC's interest in License 372 as going first to the Trustee and then to Hawaiian Telcom.  Both SIC and Waimana ignore this fact.  Clearcom acknowledges it, but only to say, without citation or further explanation, that SIC's interest in License 372 was "erroneously listed in Schedule A-2 of the MRA."  CV No. 22-428, ECF No. 28 at 26; *see also id.* at 27 ("The Trustee's acknowledgement came in the form of Section 2, section 2.3 of the MRA, in spite of the wording noted in Schedule A-2, which purports to transfer License 372.").

Waimana also points to this provision of the 363 Sale Order to argue it was "based on" the MRA:

> All persons or entities that are currently in possession of some or all of the Transferred Assets in contravention of the US Marshal Sale, the Settlement Agreement or MRA, including for the avoidance of doubt, SIC and SIC's Affiliates or any person or entity claiming by or through SIC or SIC's Affiliates, are hereby directed to surrender possession of the Transferred Assets except as Debtor and Buyer may otherwise agree.

43

CV No. 22-427, ECF No. 25 at 5 (quoting Bk. ECF No. 366 at 44).  Waimana

contends that is essentially incorporating the portion of the Settlement Agreement

saying that "[t]he SIC Parties expressly agree and covenant to provide all access to

the Transferred Assets and Equipment[.]"  *Id.* (quoting Bk. ECF No. 271 at 9).  But

again, "Transferred Assets and Equipment" is a defined term that plainly includes

SIC's interest in License 372.[12]

    Appellants' theory also makes little sense when considering the timing of

everything.  The Marshal Sale Order makes no mention of the MRA.  This mostly

makes sense.  The Marshal executed upon the assets on February 4, 2020; the

public sale occurred on March 6, 2020; and the Marshal Sale Order was entered on

March 16, 2020.  Trustee's AP ECF No. 37; *id.* ECF No. 57-1 at 4–5; *id.* ECF No.

65.  The Settlement Agreement may have been finalized sometime during all that

(it is dated effective March 6, 2020), but it was not presented for approval until

after all that, in April 2020, and not approved until June 2020.  Bk. ECF Nos. 252,

271.  So there seems no way around the fact that SIC's interest in License 372 was

executed upon and sold to the Trustee (assuming the Court rejects Appellants'

arguments regarding the invalidity of any transfer under Hawai'i law).

---

[12]  Moreover, and as already discussed, "Transferred Assets" is a defined term in
the 363 Sale Order that also plainly includes SIC's interest in License 372.

But Appellants' theory is not that the Trustee somehow transferred it back to SIC pursuant to the Settlement Agreement and MRA, and specifically Section 2.3. And that's also not what the language of Section 2.3 suggests (why would SIC say it is not assigning something it no longer owned). Instead, Waimana, for example, contends that the Trustee never acquired it in the first place, and the proof of that is Section 2.3. *See, e.g.*, CV No. 22-427, ECF No. 22 at 6–7, 10 & n.4, 14 n.7 ("Not assuming the Rule 9019 Settlement Agreement and the MRA does not address the fact that the Trustee cannot transfer what he does not have, and the Trustee agreed and acknowledged in the MRA that he did not acquire License 372 from the Marshal Sale."); *see also, e.g.*, CV No. 22-426, ECF No. 32 at 15 (SIC arguing "[t]he Trustee expressly confirmed in MRA that he never acquired SIC's license"). This Court will not say the Bankruptcy Court erred because it did not accept the Trustee's interpretation of what it acquired from the Marshal Sale when that interpretation contradicts the record and the plain language of its own orders based on that record. And it especially will not say that when, by the time the Bankruptcy Court was interpreting those orders for purposes of enforcing them, the MRA was effectively inapplicable to Hawaiian Telcom and the Trustee.

Hawaiian Telcom offers an interpretation of this provision that would avoid any potential inconsistency, namely: that the "the DHHL License" refers to the *entirety of* License 372, which SIC could not assign, and so does not necessarily

negate that SIC *did* relinquish what interest *it* had in License 372.  *See* CV No. 22-427, ECF No. 35-3 at 19.  But even assuming an irreconcilable inconsistency between the Sale Orders and the MRA, Appellants have not explained why the Bankruptcy Court was required to look outside the Sale Orders—and specifically to Section 2.3 of the MRA—to create this inconsistency when those Sale Orders were now final and did not contain a clear incorporation of Section 2.3.  *Cf. Church Joint Venture, L.P. v. Blasingame (In re Blasingame)*, 585 B.R. 850, 861 (B.A.P. 6th Cir. 2018) (noting that "extrinsic evidence (which, when appropriate, may be used to interpret an ambiguous contract) has no clear application" when a bankruptcy court is interpreting its own prior sale order).

In sum, the Court is not convinced that the language in Section 2.3 of the MRA justifies reversal.

### 5.    Waimana's Additional Arguments Regarding Section 2.3

Related to the language in Section 2.3 of the MRA, and raised only by Waimana, is the argument that the Bankruptcy Court also erred because it should have permitted discovery and held an evidentiary hearing to resolve the inconsistency allegedly created by Section 2.3.[13]

---

[13]  Frankly, the Court found it difficult to pin down Waimana's arguments.  The argument section of its opening brief and nearly all of its reply brief merely summarize the bankruptcy proceedings, with a few, mostly undeveloped arguments scattered throughout.  Nonetheless, the Court will attempt to address the issues Waimana appears to raise.

Taking the first issue first, "[a] bankruptcy court abuses its discretion in denying discovery only if the movant diligently pursued its previous discovery opportunities, and can demonstrate that allowing additional discovery would have precluded [the previous ruling]." *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1024 (9th Cir. 2012) (internal quotation marks and citation omitted).  Waimana fails to get this argument off the ground, though, because it has not pointed the Court to anywhere in the record where the Bankruptcy Court denied a specific request for discovery.  Nor was the apparent denial of discovery even included in Waimana's issues on appeal.  Bk. ECF No. 818; CV No. 22-427, ECF No. 22 at 6–7.  Based on this, the Court cannot conclude the Bankruptcy Court abused its discretion as to any issues related to discovery.

As to an evidentiary hearing, again, a bankruptcy court's decision whether or not to hold an evidentiary hearing is reviewed for abuse of discretion.  *In re Int'l Fibercom, Inc.*, 503 F.3d at 939–40.  Where a party fails to request an evidentiary hearing below, they waive the right to object to the lack of one on appeal.  *See In re Consol. Nevada Corp.*, 2017 WL 6553394, at *8 (B.A.P. 9th Cir. Dec. 21, 2017).  In response to Hawaiian Telcom's argument that Waimana has thus waived this issue here, Waimana contends that *SIC* requested an evidentiary hearing in briefing related to Hawaiian Telcom's *prior* motion to enforce.  *See* CV No. 22-427, ECF No. 25 at 6 (citing Bk. ECF No. 480).  But Waimana fails to explain why

47

that suffices to preserve the issue on *its* behalf for purposes of challenging the Final Enforcement Order issued in response to a *later* motion to enforce.  *See, e.g., In re LLS Am., LLC*, 2012 WL 2042503, at *9 (B.A.P. 9th Cir. June 5, 2012) (noting appellant "waived its right to complain about the lack of an evidentiary hearing" and could not "step into the shoes" of others who had requested one); *In re Livdahl*, 2019 WL 1615282, at *7 n. 4 (B.A.P. 9th Cir. Apr. 15, 2019) (suggesting that requesting an evidentiary hearing in one proceeding does not carry over into another proceeding).  No special circumstances justify excusing the waiver here.  *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010).  And requesting an evidentiary hearing after the fact, on a motion for reconsideration, is not sufficient to preserve the issue.  *See In re Reg'l Care Servs. Corp.*, 2017 WL 2871751, at *9 (B.A.P. 9th Cir. July 5, 2017).  Although here, Waimana does not even appear to contend that it requested an evidentiary hearing in moving for reconsideration.[14]

---

[14]  In its reply, Waimana cites certain parts of its motion for reconsideration where it referenced questions of fact or the need for a trial.  CV No. 22-427, ECF No. 25 at 8–9.  But Waimana does not clearly argue that this suffices to request an evidentiary hearing.  *See* ECF No. 25 at 13 (arguing failure to request an evidentiary hearing "is not fatal to the appeal").  Nor does it respond to Hawaiian Telcom's argument that such "generic comments" are insufficient to request a hearing and thus preserve the issue for appeal.  *See* CV No. 22-427, ECF No. 23-3 at 9 (citing *Reg'l Care Servs. Corp.*, 2017 WL 2871751, at *9; *In re Oasis at Wild Horse Ranch, LLC*, 2011 WL 4502102, at *7 (B.A.P. 9th Cir. Aug. 26, 2011)).

Nor would the Court be inclined to conclude that a failure to hold an evidentiary hearing amounts to an abuse of discretion.  As far as the Court can discern, Waimana argues an evidentiary hearing was necessary to resolve an ambiguity between the Sale Orders and the Settlement Agreement/MRA, arguing "an evidentiary hearing is required where the order or an agreement referenced in the order is based on an agreement that is ambiguous on the intent of the parties." ECF No. 22 at 26.  But based on the discussion above, the Court agrees with the Bankruptcy Court's reliance on the plain language of the Sale Orders.  And, as also discussed above, Waimana does not convincingly argue that the Bankruptcy Court was required to look outside those Sale Orders to Section 2.3 of the MRA to create an ambiguity within them and then accept evidence to resolve that ambiguity.

Importantly, Waimana does not even articulate the evidence it would have presented at any such evidentiary hearing.  And, in any event, the Bankruptcy Court based its rulings on the fact that the Sale Orders were not appealed and so were final—something no evidentiary hearing could change.  To support its claim that an evidentiary hearing was warranted, Waimana relies on the fact that the Bankruptcy Court did not grant Hawaiian Telcom all the relief it requested in its Initial Enforcement Order because of "gaps in the existing record," including the unresolved issues created by Hawaiian Telcom choosing not to acquire the MRA, and SIC claiming the Trustee was required to sell the assets subject to that

49

agreement.  *See* Bk. ECF No. 537 at 9–10.  But the issue before the Bankruptcy

Court at that time was not narrowed to the one the parties focus on here—whether

Hawaiian Telcom acquired SIC's interest in License 372.  And again, at that time,

the Bankruptcy Court had not yet resolved (i.e., rejected) Appellants' argument

that the Trustee and Hawaiian Telcom were bound by the Settlement Agreement.

In sum, even assuming an evidentiary hearing had been properly requested, the

Court would conclude the Bankruptcy Court had an adequate basis to issue the

Final Enforcement Order and deny reconsideration without the need to hold any

evidentiary hearing based on the record before it at that time.  *See Int'l Fibercom*,

503 F.3d at 946.

Finally, with regard to the Reconsideration Order specifically, Waimana

contends reconsideration was warranted to correct a clear error in law or fact, or

prevent manifest injustice.  CV No. 22-427, ECF No. 22 at 24; *see also Hansen v.*

*Moore (In re Hansen)*, 368 B.R. 868, 878 (B.A.P. 9th Cir. 2007) ("Reconsideration

under FRCP 59(e) . . . is appropriate only if the moving party demonstrates (1)

manifest error of fact; (2) manifest error of law; or (3) newly discovered evidence."

(citation omitted)).  But Waimana concedes its argument regarding the language in

the MRA had already been raised and rejected in connection with the Final

Enforcement Order.  CV No. 22-427, ECF No. 22 at 24.  Reconsideration is not

warranted based on mere disagreement with the Bankruptcy Court's prior ruling.

Waimana also faults the Bankruptcy Court for denying the motion for reconsideration when the Final Enforcement Order did not say anything explicitly about the effect of the MRA or Settlement Agreement on the Sale Orders.  *See* CV No. 22-427, ECF No. 22 at 24.  But the record is clear that the Bankruptcy Court viewed that argument as a belated attack on the Sale Orders and thus based the Final Enforcement Order on its interpretation of the Sale Orders as entered.  Bk. ECF No. 739 at 15; Bk. ECF No. 782 at 13–14.  Waimana appears to argue that a failure to appeal the 363 Sale Order should be excused because it bargained away its ability to object based on its understanding of how the MRA altered the plain terms of the Sale Orders.  *See* CV No. 22-427, ECF No. 22 at 25.  But as discussed above, an agreement not to object cannot justify a failure to appeal and therefore permit what amounts to an untimely collateral attack.

For these reasons, the Court rejects Waimana's claim that any of these issues warrant reversal.

### 6.   Conduct Inconsistent with Acquisition

To support their argument that neither the Trustee nor Hawaiian Telcom ever acquired an interest in License 372, Appellants also look to other parties' conduct—both in and outside of bankruptcy court proceedings.  But as noted above, the Appellants have not cited convincing authority that such extrinsic evidence—even further afield than the MRA—is relevant when a court is

51

interpreting its own orders (and then another court is, in turn, reviewing that interpretation). And accepting each argument, e.g., that Hawaiian Telcom did not acquire this asset because someone else said so in a filing, would plainly call into question the terms of the Bankruptcy Court's Sale Orders. Regardless, none of the evidence cited is particularly convincing.

SIC and Clearcom point to DHHL's statement in a filing related to the 363 Sale Order that the eventual buyer would need to acquire a new license for the use of HHL. Bk. ECF No. 341 at 2, 4–5. But they do not respond to Hawaiian Telcom's argument that DHHL's statement was based on its position that License 372 was in *default*—i.e., this was not a position on what was included in the sale, especially since in that same filing DHHL also said that the Marshal executed on SIC's assets, including "SIC's interest in License Agreement No. 372 issued by DHHL to build, construct, repair and maintain a telecommunications network on Hawaiian Home Lands." *Id.* at 4. And Appellants also fail to explain why the Bankruptcy Court should have relied only at DHHL's statement in that filing, and ignored later filings where the DHHL clearly stated that the Trustee *had* acquired SIC's interest in License 372. *See, e.g.*, Bk. ECF No. 669 at 9–10 ("The Marshal Sale also expressly divested SIC of 'Other Related Assets' that were detailed on Schedule A.2 including, 'SIC's interest in License Agreement No. 372.'").

Waimana points to License 372's limitation requiring DHHL to consent to any assignment in explaining *why* Section 2.3 of the MRA existed.  CV No. 22-427, ECF No. 22 at 11.  Hawaiian Telcom notes that there is no evidence DHHL has *not* consented to the assignment; still, it does concede that DHHL may still enforce the terms of License 372 absent such consent.  CV No. 22-427, ECF No. 23-3 at 21.  But Waimana fails to explain why that is a concern for the Court at this time.

SIC also points to Hawaiian Telcom's act of obtaining a Righty of Entry from DHHL to HHL they would have otherwise been able to access if they had actually acquired SIC's interest in License 372.  *See* CV No. 22-426, ECF No. 32 at 16.  But SIC does not respond to Hawaiian Telcom's argument that its Right of Entry covered more regions than SIC's interest in License 372.  ECF No. 35-3 at 20 & n.9 (citing Bk. ECF No. 639-24).

Waimana claims a statement in a filing from the United States on behalf of the RUS lends support to its arguments.  *See* CV No. 22-427, ECF No. 22 at 17 (citing RUS's statement that "any personal property of [SIC] not sold to [Hawaiian Telcom], including its rights under the 372 License, remains subject to RUS's lien").  Hawaiian Telcom argues the Court cannot consider that filing because it was not designated as part of the appellate record.  *See* CV No. 22-427, ECF No. 23-3 at 22 n.14.  Waimana does not respond to this contention, and makes no

53

further mention of this argument in its reply.  But again it is unclear why RUS's statement—which did not cite to anything—should override the plain terms of the Sale Orders.  In any event, that statement could be entirely consistent with the Sale Orders.  For example, in a filing related to the Final Enforcement Order, DHHL acknowledged both that the Marshal Sale Order divested SIC of its interest in License 372 *with regard to the "A.2 Assets"* but that "SIC's interest in License 372 for assets and premises *other than those at issue in this matter* remains intact, though it is entirely encumbered by RUS's prior execution and SIC has no equity therein."  Bk. ECF No. 669 at 9 & n.2 (emphasis added).

Overall, while these points may indicate a lack of clarity regarding the status of License 372 among the parties at various points during the bankruptcy proceedings, the Court has not been provided any authority that this confusion (going both ways) should override the plain language of the Sale Orders, and the Bankruptcy Court's reasonable interpretation of the language within them.

### 7.    Violation of the Hawaiian Homes Commission Act

In another point of error tied to Hawai'i law, SIC and Clearcom argue the Marshal could not have levied on SIC's interest in License 372 and the Bankruptcy Court could not then have transferred it to Hawaiian Telcom without violating the HHCA.  An admittedly abridged background of the HHCA places this argument in context:

Shortly after the establishment of the Territory [of Hawaiʻi], Congress "became concerned with the condition of the native Hawaiian people." *Rice v. Cayetano*, 528 U.S. 495, 507 (2000). Declaring its intent to "[e]stablish[ ] a permanent land base for the beneficial use of native Hawaiians," Congress enacted the Hawaiian Homes Commission Act, 1920.  Act of July 9, 1921, ch. 42, § 101(b)(1), 42 Stat. 108 ("HHCA").  The HHCA set aside 200,000 acres of lands previously ceded to the United States for the creation of loans and leases to benefit native Hawaiians.  These lands were to be leased exclusively, including by transfer, to native Hawaiians for a term of 99 years at a nominal rate of one dollar per year.  *Id.* § 208(1), (2) & (5). The HHCA defines "native Hawaiian" as "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778."  *Id.* § 201(a)(7).

In 1959, Hawaii became the 50th State in the union.  Under the Hawaii Statehood Admission Act, Congress required Hawaii to incorporate the HHCA into its state Constitution, with the United States retaining authority to approve any changes to the eligibility requirements for the HHCA leases. Act of March 18, 1959, Pub.L. No. 86–3, § 4, 73 Stat. 5 ("Admission Act").  *See* HAW. CONST. art. XII, §§ 1–3.  In return, the United States granted Hawaii title to all public lands within the state, save a small portion reserved for use of the Federal Government.  *Id.* § 5(b)-(d), 73 Stat. 5.  The Admission Act further declared that the lands, "together with the proceeds from the sale or other disposition of any such lands and the income therefrom, shall be held by [the State] as a public trust for the support of the public schools, ... the conditions of native Hawaiians" and other purposes.  *Id.* § 5(f), 73 Stat. 6.  The land granted to Hawaii included the 200,000 acres previously set aside under the HHCA and an additional 1.2 million acres.

The Hawaii Constitution expressly adopted the HHCA and declared that "the spirit of the [HHCA] looking to the continuance of the Hawaiian homes projects for the further rehabilitation of the Hawaiian race shall be faithfully carried out."  HAW. CONST. art. XII, § 2[.]

> The HHCA established a Department of Hawaiian Home Lands ("DHHL"), to be headed by an executive board known as the Hawaiian Homes Commission ("HHC").  Act of July 9, 1921, ch. 42, § 202(a), 42 Stat. 108.  By statute Hawaii created both the [DHHL] and the Hawaiian Homes Commission.  Together, DHHL/HHC administer the 200,000 acres set aside by the HHCA, and DHHL/HHC's beneficiaries are limited to "native Hawaiians," as defined in the Act.

*Arakaki*, 477 F.3d at 1054–55.

As already discussed above, SIC unsuccessfully raised this argument based on the HHCA in seeking to quash the Writ of Execution.  *See* Trustee AP ECF No. 33 at 35 (arguing that "SIC's license can only be transferred to a qualified beneficiary of the Hawaiian Homes Trust").  And, as noted, SIC failed to appeal the denial of that motion or the Marshal Sale Order.

To say that an interest in License 372 could not be levied upon and could only be transferred to a beneficiary of the HHCA would again call into question the Sale Orders, which permitted that interest to be levied upon and then transferred it to a non-beneficiary.  Through this argument, then, SIC and Clearcom can only be asking the Court to declare the portion of the Sale Orders transferring the interest in License 372 *void ab initio* based on the HHCA— something it cannot do based on the actual orders appealed.  *See Bush v. Watson*, 81 Hawai'i 474, 487, 918 P.2d 1130, 1143 (1996) (voiding agreements between lessees and non-beneficiaries because they violated Section 208(5) of the HHCA).

Even considering the merits, the Court disagrees that the Sale Orders violate the HHCA.  In interpreting the HHCA, the Court's "foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  And where the language of the statute is plain and unambiguous, [its] only duty is to give effect to its plain and obvious meaning."  *Bush*, 81 Hawaiʻi at 478, 918 P.2d at 1134 (interpreting the HHCA) (citation omitted).  Appellants' argument relies in large part on SIC's interest in License 372 being considered a "lease" under the HHCA; however, they fail to demonstrate that is the case.

Appellants point to Section 207 of the HHCA, which sets forth (under subsections (a) and (b)) certain conditions on "*leas[ing]* to native Hawaiians the right to the use and occupancy of a tract or tracts of Hawaiian home lands," and then separately provides (under subsection (c)) that DHHL may grant certain *licenses*.  HHCA § 207 (emphasis added).  Specifically, Appellants cite the following provisions under subsection (c):

> (c)(1)   The department is authorized to grant licenses as easements for railroads, telephone lines, electric power and light lines, gas mains, and the like.  The department is also authorized to grant licenses for lots within a district in which lands are leased under the provisions of this section, for:
> . . .
>
> (B)   Theaters, garages, service stations, markets, stores, and other mercantile establishments (all of which shall be

> owned by native Hawaiians or by organizations formed and controlled by native Hawaiians).
>
> (2)  The department is also authorized to grant licenses to the United States for reservations, roads, and other rights-of-way, water storage and distribution facilities, and practice target ranges.

*Id.*  Appellants then rely on Section 208 of the HHCA, entitled "Conditions of *leases,*" which makes no mention of "licenses," but instead states:

> Each *lease* made under the authority granted the department by section 207 of this Act, and the tract in respect to which the lease is made, shall be deemed subject to the following conditions, whether or not stipulated in the *lease*: . . .

HHCA § 208 (emphasis added).  Relevant here, the conditions that follow limit transfer of any interest in a tract of land to other native Hawaiians and provide that "[s]uch interest [in the tract] shall not . . . be subject to attachment, levy, or sale upon court process."  HHCA § 208(5).

Appellants contend that such limits on a *lease* in Section 208 should be interpreted to apply equally to a *license* issued pursuant to Section 207, making Hawaiian Telcom's acquisition of an interest in License 372 a violation of the HHCA both because it was levied on and sold through court process, and transferred to an entity that is not native Hawaiian owned or controlled.  To support this interpretation, Appellants point to other portions of the HHCA.

First, they point to Section 212, which references leasing HHL to public utilities, in connection with stating that a nominal rent may be charged for such

leases when DHHL returns control of certain HHL not leased pursuant to Section 207 to the Board of Land and Natural Resources (BLNR), and the BLNR then leases the land "to a public utility or other governmental agency, where such use directly benefits [DHHL] or the homestead lessees."  HHCA § 212.

Next, they point to some of the "principal purposes" of the HHCA set forth in Section 101(b):

> (1)  Establishing a permanent land base for the benefit and use of native Hawaiians, upon which they may live, farm, ranch, and otherwise engage in commercial or industrial or any other activities as authorized in this Act;
>
> (2)  Placing native Hawaiians on the lands set aside under this Act in a prompt and efficient manner and assuring long-term tenancy to beneficiaries of this Act and their successors;
>
> (3)  Preventing alienation of the fee title to the lands set aside under this Act so that these lands will always be held in trust for continued use by native Hawaiians in perpetuity[.]

HHCA § 101(b).

Finally, SIC makes passing reference to Section 204(2), which states that DHHL may give preferential treatment in the "disposition" of HHL to "a native Hawaiian, or organization or association owned or controlled by native Hawaiians, for commercial, industrial, or other business purposes[.]"  HHCA § 204(2).

The Court agrees with Hawaiian Telcom that Appellants' arguments do not find support in the text of the HHCA or other authority interpreting it.  First, the

Court notes that, when presented with an issue of state law,[15] a federal court's task is to follow the decisions of the state's highest court and, if none exist, to predict how the state supreme court would decide the issue, guided by other authority, including lower state court decisions.  *See Ariz. Elec. Power Co-op. v. Berkeley*, 59 F.3d 988, 991 (9th Cir. 1995); *see also Gen. Motors Corp. v. Doupnik*, 1 F.3d 862, 865 n.4 (9th Cir. 1993) ("Lower state court decisions may provide guidance as to the direction of the State Supreme Court's probable decisionmaking." (citation omitted)).

To the extent Appellants concede that License 372 is, in fact, merely a license,[16] their argument seems implicitly foreclosed by the Hawaiʻi Supreme Court's decision in *Bush v. Watson*, 81 Hawaiʻi 474, 918 P.2d 1130 (1996).  *Bush*, which was briefly cited above, addressed third-party agreements between beneficiary lessees and non-beneficiaries that "provide[d] a right of entry [] allowing non-Hawaiian third parties to cultivate crops and raise livestock on homestead lands."  *Id.* at 487, 918 P.2d at 1143 (footnote omitted).  The Hawaiʻi Supreme Court rejected the argument that these agreements were "'mere licenses,'

---

[15]  *See Han v. U.S. Dep't of Just.*, 45 F.3d 333, 339 (9th Cir. 1995) ("Claims under the [HHCA], which has been expressly incorporated in the Hawaii Constitution, arise exclusively under state law." (citation omitted))

[16]  *See* CV No. 22-426, ECF No. 32 at 18 ("The use of the word 'lease' in Section 208 was not intended to exclude licenses."); CV No. 22-428, ECF No. 28 at 28 (same).

which d[id] not create property interests in the land." *Id.* at 482–83, 918 P.2d at 1138–39 (footnotes omitted). *Bush* distinguished between leases and licenses under the law, generally. *See id.* at 482–87 & n.11, 918 P.2d at 1138–43 & n.11. It went on to analyze the third-party agreements at issue, citing authority that a court should look beyond the name the parties give to determine its true nature. *See id.* (citing authority that a right to occupy a distinct part of the premises may constitute a sublease despite the parties naming it a license and authority that a right to use land for a definite term for a specific purpose creates an interest in the land rather than a revocable license). *Bush* noted that the agreements "address[ed] specific parcels of property"; were "arguably for fixed terms because they require[d] fixed notification periods for revocation" and, "[a]lthough they purport[ed] to be terminable at will and preserve[d] concurrent use by the lessees and the third parties, . . . transfer[red] at least a portion of the lessees' extant interests in their homesteads." *Id.* at 487, 918 P.2d at 1143 (footnote omitted). These agreements thus "provide[d] a right of entry . . . repugnant to HHCA § 208(5)" and its limitations on transfer to non-beneficiaries. *Id.* (footnote omitted). Implicit in *Bush*, then, is the notion that a mere license *would not* be subject to the limitations in Section 208(5) of the HHCA.

Even if Appellants are arguing that License 372 is akin to a lease, though, such that Section 208(5) would apply, there is persuasive authority to the contrary.

A state trial court has concluded—in an action Appellants brought against DHHL (identified above as the "DHHL Action")—that License 372 is *not* a lease under Hawai'i law in the context of claims related to "the nature of License 372 and whether said license grants [Appellants] a possessory interest in 'premises' as defined and used in License 372." DHHL Action, ECF No. 75 at 5. Although a federal court is not bound by an unreported state trial court decision, it "may rely on it to the extent its reasoning is persuasive." *Spinner Corp. v. Princeville Dev. Corp.*, 849 F.2d 388, 390 n.2 (9th Cir. 1988) (citation omitted). Appellants offer no reason why the Court should not look to the decision in the DHHL Action as persuasive authority here.

The Court finds that decision's reasoning to be persuasive. In seeking to categorize what License 372 was, and ultimately deciding it was not a "lease," the state court in the DHHL Action recounted the "general factors for determining whether an instrument is a lease" under Hawai'i law: "(1) whether the grantee has the right to occupy a definite parcel; (2) whether the grantee's right to possession is assignable; and (3) whether the agreement is for a fixed term." DHHL Action, ECF No. 75 at 5–6 (citing *Kiehm v. Adams*, 109 Hawai'i 296, 303, 126 P.3d 339, 346 (2005), *as corrected* (Feb. 3, 2006)). Applying those factors, it concluded "License 372 is neither a conveyance of a fee simple interest nor a lease" because:

License 372 does not grant possessory rights over definite parcels or "premises" as defined in License 372.[17]

[] License 372 is not for a fixed term, but rather, an indefinite period that is dependent on the nature of the licensee's use of Hawaiian home lands.

[And] DHHL is not authorized to encumber its lands with a lease in perpetuity and may not sell or dispose of Hawaiian home lands except as authorized under HHCA § 205.

*Id.* at 5–6. This analysis follows Hawai'i Supreme Court authority regarding how to determine whether an agreement is a lease or a license, *see, e.g.*, *Kiehm*, 109 Hawai'i at 302–03 & n.16, 126 P.3d at 345–46 & n.16, including when the agreement relates specifically to use of HHL, *see Bush*, 81 Hawai'i at 487, 918 P.2d at 1143.[18]

Even aside from this authority, the Court agrees the HHCA plainly delineates between leases and licenses, undercutting Appellants' argument that the reference to "lease" in Section 208 should be read to also mean "license." That SIC can point to Section 212, referencing leases granted to public utilities, is

---

[17] At Oral Argument, counsel for SIC pointed to the addenda to License 372, which sets out certain easements to specific property identified, e.g., in metes and bounds and by Tax Map Keys. *See, e.g.*, Bk. ECF No. 639-8. But those addenda still recognize that License 372 granted rights and privileges "throughout all lands under the administration and jurisdiction of [DHHL] . . in perpetuity[.]" *Id.* at 2–3.

[18] This discussion alone underscores that these attacks are too late, as the Bankruptcy Court reiterated it only had jurisdiction to interpret its own orders for the purpose of enforcing them, i.e., it did not have jurisdiction to interpret License 372. *See* Bk. ECF No. 708 at 8; Bk. ECF No. 739 at 16.

irrelevant.  Simply pointing to one section of the HHCA that envisions land being leased to a public utility in circumstances *not at issue here* does not undercut the plain terms of Section 207, under which License 372 *was issued here*, which distinguishes between leases and licenses.  *See also* Bk. ECF 639-1 (License 372, referencing HHCA § 207(c)(1)(A) and Hawai'i Administrative Rules ("HAR") §§ 10-4-21 and 10-4-22); *see also* HAR § 10-4-22 (addressing general provisions for issuance of licenses on HHL, with no mention of leases); HAR § 10-4-22 (providing for "[l]icenses as easements" on HHL, including for, e.g., "telephone lines," with no mention of leases).  The Court is thus not persuaded that Section 212 supports reading Section 208(5), forbidding levy and execution on *leases* or limiting the transfer of *leases*, as applicable to the *license* at issue here.

With regard to limitations on *licenses*, the Court is similarly not persuaded that the HHCA forbids Hawaiian Telcom from acquiring an interest in License 372.  The HHCA does provide that *certain* licenses must be owned by native Hawaiians or organizations formed and controlled by native Hawaiians (e.g., service stations, markets, stores).  HHCA § 207(c)(1)(B).  But those types of licenses are addressed separately from licenses granted to public utilities like License 372, which do not have these same limitations, and pursuant to which License 372 was actually issued.  *See* HHCA § 207(c)(1)(A); HAR § 10-4-22.

64

Finally, the Court is not convinced that Section 204(2), the stated purpose of the HHCA, or the legislative history discussing that purpose warrant reversal. Appellants have not convincingly demonstrated how permitting Hawaiian Telcom to have a utility license for the purpose of providing telecommunication services is contrary to the purposes detailed above emphasizing long term tenancy by native Hawaiians, anti-alienation of HHL, and the advancement of native Hawaiian-owned businesses.  SIC relies on language from License 372 itself—that DHHL "believes and intends that the issuance of this Exclusive 'Benefit' LICENSE will also fulfill the purpose of advancing the rehabilitation and welfare of native Hawaiians," CV No. 22-426, ECF No. 32 at 17 (quoting Bk. ECF No. 639-1 at 3). But SIC fails to explain how that language necessarily amounts to proof that the Bankruptcy Court erred here, i.e., SIC does not explain why that language could not be interpreted as advancing native Hawaiian interests based on the telecommunications services to be provided, regardless of what entity is the provider.  And SIC's commentary that DHHL's position in the bankruptcy proceedings amounts to a breach of fiduciary duty provides the Court with no assistance in the task at hand, i.e., determining if the Bankruptcy Court was wrong to conclude its orders already made clear Hawaiian Telcom acquired SIC's interest in License 372.

Based on the foregoing, the Court cannot conclude that reversal is warranted based on the HHCA.[19]

**8.      Remaining Arguments Regarding License 372**

This section addresses the various arguments that appear to challenge the *effect* of the Bankruptcy Court's conclusion regarding who acquired SIC's interest in License 372.  In other words, Appellants seem to take issue with the practical reality left in place by the Bankruptcy Court's Final Enforcement Order.  Admittedly, the Court feels a bit "at sea" with regard to these arguments because they raise fact-dependent issues related to telecommunications infrastructure that have neither been clearly explained nor well developed in the briefing.

Take, for example, SIC's argument that it is left with the "burdens" of License 372.  *See* CV No. 22-426, ECF No. 37 at 15.  The Court is left to guess at the basis for this contention or, more importantly, why this Court—tasked only with reviewing the Bankruptcy Court's orders—is an appropriate place to litigate what DHHL may or may not enforce as to Hawaiian Telcom (or anyone else) with

---

[19]  For the first time in its reply brief, SIC asks the Court to certify this issue to the Hawai'i Supreme Court.  *See* CIV No. 22-426, ECF No. 37 at 16.  Based on the foregoing, the Court would not exercise its discretion to do so, even if it had been timely requested.  *See Riordan v. State Farm Mut. Auto. Ins. Co.*, 589 F.3d 999, 1009 (9th Cir. 2009); Haw. R. App. P. 13(a).

regard to any burdens associated with the interests acquired in License 372.  As the

Bankruptcy Court itself noted,

> As far as slicing up and dicing License 372, I think paragraph G
> at page 4 of the proposed order explains that about as well as it
> can be explained and that is that HTI has acquired those portions
> of the 372 license pertaining to the Paniolo Network or the
> Paniolo premises that were formerly held by SIC.
>
> So Sandwich Isles had a right granted by its affiliates to use at
> least portions of the property covered by the 372 license and the
> portions of those portions that the Trustee sold to Hawaiian Tel
> are further described in Exhibit A-2 or in Schedule A-2, I think
> it is, to the sale order, and that is the identified central offices and
> the access rights to those.
>
> Now I have no doubt that there will be more disputes about what
> exactly that means and how it is to be sliced and diced.  All I'm
> doing -- all I'm prepared to do -- I think all I have jurisdiction to
> do is to simply interpret and enforce my order.  If collateral
> problems arise from my order, which is final and can't be
> changed, then those problems likely have to be resolved in other
> proceedings and perhaps in other forums.  Maybe State Court,
> maybe Federal District Court, I don't know.  But I'm not
> prepared to go any further than simply interpreting and applying
> my order based on what it says.

Bk. ECF No. 739 at 15–16.

Potentially related, Waimana also claims that an issue on appeal is whether

"SIC's interest in License 372 [is] only applicable to telephone communications,

and not to wireless or broadband, as set forth in Waimana's assignments to SIC, Pa

Makan[i] and Clearcom[.]"  CV No. 22-427, ECF No. 22 at 7.  The Court

addresses this argument more below, in relation to the Adversary Proceeding

Appeals.  For now, the Court notes that the Final Enforcement Order says only that Hawaiian Telcom acquired "those certain portions of the 372 License . . . pertaining to the Paniolo Network and/or the Paniolo Premises that were formerly held by SIC."  Bk. ECF No. 729 at 4.  And Hawaiian Telcom states that it "has never taken the position that it purchased the entirety of License 372."  CV No. 22-426, ECF No. 35-3 at 17.

In what appears to be a related argument, Clearcom seems to contend the Final Enforcement Order and Reconsideration Order amount to an unconstitutional taking with respect to License 372.[20]  In its opening brief, Clearcom argues those orders "allow [Hawaiian Telcom] to use the acquired property for all types of services [which] constitutes an unjust taking of Clearcom's license and property rights for data."  CV No. 22-428, ECF No. 28 at 25.  On reply, though, Clearcom appears to abandon that portion of its takings argument, claiming only that "giving SIC's property to [Hawaiian Telcom] 'free and clear of encumbrances'" was a taking and that Clearcom suffered a taking only with regard to the spare reels issue.  CV No. 22-428, ECF No. 33 at 7–9.  Even if it had not abandoned it, the Court reiterates that it does not interpret either the Final Enforcement Order or the

---

[20]  The argument regarding an unconstitutional taking as to Clearcom and the "spare reels" is discussed below.

Reconsideration Order as confirming the conveyance of anything other than SIC's interest in License 372.

Clearcom's claim that an issue on appeal is whether Waimana, Pa Makani, and Clearcom's commitments in the Settlement Agreement could be enforced by Hawaiian Telcom seems equally misplaced here. *See* CV No. 22-428, ECF No. 28 at 31–33. According to Hawaiian Telcom, it "has never sought to enforce any commitments in the Settlement Agreement against the SIC Parties"—and so this may not even be an actual collateral problem. *See* CV No. 22-428, ECF No. 31-3 at 24–25. But even if it were, the Court agrees that the continued application of any portions of the Settlement Agreement is not before the Court here.

In its reply brief, SIC appears to argue that the Bankruptcy Court erred in the Final Enforcement Order by reading the Marshal Sale Order impermissibly broadly. *See* CV No. 22-426, ECF No. 37 at 7–9. So while the Marshal Sale Order specifically delineated that only rights in License 372 related to the "A2 Assets," i.e., those acquired from SIC, were being transferred, the Final Enforcement Order purported to award Hawaiian Telcom rights in License 372 related to the "A1 Assets," i.e., Paniolo's pre-bankruptcy assets. In short, even if Hawaiian Telcom acquired SIC's interest in License 372 and could maintain *SIC's* former assets (the A.2 Assets) on HHL, it still had no right to maintain any of *Paniolo's* former assets (the A.1 Assets) on HHL. Because this appears to be a

69

new argument, and thus one that is wholly undeveloped, the Court will disregard it. *See In re Rains*, 428 F.3d 893, 902 (9th Cir. 2005).

In sum, as far as the Court can understand any of these arguments, none justify reversal.

### 9.     Contempt Order and Spare Reels

Among the Main Bankruptcy Appeals, Clearcom's is the only one seeking review of the Contempt Order.  *See* CV No. 22-428, ECF No. 28.  Hawaiian Telcom initially moved to dismiss this portion of the appeal for lack of jurisdiction. CV No. 22-428, ECF No. 6.[21]  The parties dispute whether the Contempt Order, issued on April 22, 2022, was a final appealable order such that Clearcom's appeal of it, filed on August 31, 2022, must be dismissed as untimely because it was not filed "within 14 days after entry of the judgment, order, or decree being appealed." Fed. R. Bankr. P. 8002(a)(1); *see also In re Ozenne*, 841 F.3d 810, 814 (9th Cir. 2016) (noting the deadline to file an appeal is mandatory and jurisdictional). Because this question of finality arises in the context of bankruptcy proceedings, the answer was not clear to the Court based on the parties' initial briefing on that

---

[21]  In that motion, Hawaiian Telcom also objected that Clearcom's notice of appeal violates Local Bankruptcy Rule 8001-1(a), which requires "a separate notice of appeal for each judgment or order being appealed."  CIV No. 22-428, ECF No. 6 at 4.  Because it is clear which orders Clearcom has challenged, and Hawaiian Telcom has not been prejudiced by any violation of this rule, the Court excuses any violation.

motion, and so it directed the parties to provide supplemental briefing on the issue, and to brief the merits of the appeal in the event the Court did have jurisdiction to review the Contempt Order.  CV No. 22-428, ECF No. 23.  Upon review of that briefing, the answer is still not entirely clear to the Court.  Ultimately, the Court concludes the Contempt Order was not final, that the appeal therefore was timely, and affirms.

### a.    Finality

Generally, a civil contempt order issued against a party during the course of a proceeding is *not* a final, appealable order.  *See, e.g.*, *Hughes v. Sharp*, 476 F.2d 975, 975 (9th Cir. 1973); *Oliner v. Kontrabecki*, 305 B.R. 510, 521 (N.D. Cal. 2004) (citing cases); *see also* 15B Fed. Prac. & Proc. Juris. § 3917 (2d ed.) ("The rule that a party must await final judgment to appeal an adjudication of civil contempt made in the course of a continuing proceeding remains well entrenched.").  There is no dispute that the order at issue here was a civil contempt order issued during the course of the bankruptcy proceedings and that SIC and Clearcom would be considered parties to the proceeding.  *See* CV No. 22-428, ECF No. 18 at 11 n.4.

Also generally speaking, a contempt order is not final prior to the *imposition* of sanctions.  *See, e.g.*, *Blalock Eddy Ranch v. MCI Telecommunications Corp.*, 982 F.2d 371, 374 (9th Cir. 1992); *Weyerhaeuser Co. v. Int'l Longshoremen's &*

*Warehousemen's Union, Loc. 21*, 733 F.2d 645, 645–46 (9th Cir. 1984).  While the Contempt Order here found SIC in contempt and indicated that daily monetary sanctions for a certain amount would be imposed if SIC did not comply with the First Enforcement Order, it also stated that "[t]he award of any monetary sanction *is subject to further order of the Court*."  Bk. ECF No. 700 at 5 (emphasis added). Without any actual imposition of sanctions, then, the Contempt Order was arguably not final—even if it did threaten the imposition of sanctions in the event of continued non-compliance.  *See Donovan v. Mazzola*, 761 F.2d 1411, 1416–17 (9th Cir. 1985); *see also Munson v. Gradient Res., Inc.*, 2014 WL 2041819, at *3 (D. Or. Apr. 29, 2014) ("That future sanctions were threatened is not enough to render the finding of contempt . . . final and appealable.") (citing *Hoffman v. Beer Drivers & Salesmen's Loc. Union No. 888, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 536 F.2d 1268, 1272, 1273 (9th Cir. 1976)); *In re Wicheff*, 215 B.R. 839, 843 (B.A.P. 6th Cir. 1998).  This is underscored by the fact that the Contempt Order states that the bankruptcy court was retaining jurisdiction "to award [Hawaiian Telcom] all further appropriate legal and equitable relief in connection with enforcement of this Contempt Order [and] with respect to all matters arising from or related to the implementation and/or interpretation of this Contempt Order."  Bk. ECF No. 700 at 5.

Still, notwithstanding these general rules regarding the finality of a civil contempt order, Hawaiian Telcom correctly notes that the concept of finality is more flexible in bankruptcy proceedings—i.e., finality in this context need not always follow the rigid rules that apply in ordinary civil proceedings or under 28 U.S.C. § 1291.  *See Bullard v. Blue Hills Bank*, 575 U.S. 496, 501 (2015).  As summarized by the Supreme Court in *Bullard*:

> The rules are different in bankruptcy.  A bankruptcy case involves an aggregation of individual controversies, many of which would exist as stand-alone lawsuits but for the bankrupt status of the debtor.  Accordingly, Congress has long provided that orders in bankruptcy cases may be immediately appealed if they finally dispose of discrete disputes within the larger case.  The current bankruptcy appeals statute reflects this approach:  It authorizes appeals as of right not only from final judgments in cases but from "final judgments, orders, and decrees . . . in cases and proceedings."

*Id.* at 501–02 (internal quotation marks and citations omitted).  In *Bullard*, for example, the Supreme Court concluded that an order ending a proceeding in a bankruptcy case is immediately appealable if the order "alters the status quo and fixes the rights and obligations of the parties," or "alters the legal relationships among the parties."  *Id.* at 502, 506.  The Supreme Court has reiterated this flexible finality rule more recently in *Ritzen Group, Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586–87 (2020), noting that it is "common for bankruptcy courts to resolve discrete controversies definitively while the umbrella bankruptcy case remains pending," identifying the "judicial unit for analyzing finality . . . in bankruptcy [as]

73

often the proceeding," and therefore underscoring the importance of the "[c]orrect delineation of the dimensions of a bankruptcy 'proceeding.'" *Id.* at 586–87 (citation and alteration omitted) (concluding, under that framework, that an order denying relief from the automatic stay was a final order).

In line with *Bullard*, the Ninth Circuit has recognized that technically interlocutory orders may nonetheless be considered final and appealable. *See In re Gugliuzza*, 852 F.3d 884, 894 (9th Cir. 2017). When a district court affirms or reverses a decision of the bankruptcy court, the Ninth Circuit assesses finality based on "whether the bankruptcy court's decision: 1) resolves and seriously affects substantive rights and 2) finally determines the discrete issue to which it is addressed." *Id.* (citation and internal quotation marks omitted). When a district court instead remands the case for further proceedings in the bankruptcy court, the Ninth Circuit applies a different four-factor test to assess finality: "(1) the need to avoid piecemeal litigation; (2) judicial efficiency; (3) the systemic interest in preserving the bankruptcy court's role as the finder of fact; and (4) whether delaying review would cause either party irreparable harm." *Id.* (citation omitted).

Hawaiian Telcom argues that the former test—regarding resolving substantive rights and finally determining the discrete issue to which it is addressed—applies to the Court's assessment of finality here. *See* CV No. 22-428, ECF No. 6 at 12. Hawaiian Telcom further argues that, because the Contempt Order wholly

determined the question of ownership and transfer of the spare reels, that test for finality is met, such that Clearcom's appeal is untimely.  *See id.* at 12–13. Clearcom's initial response—in opposing the motion to dismiss—did not engage with this Ninth Circuit authority, citing instead to Second Circuit authority that largely relies on the general rules, stated above, regarding civil contempt orders and their lack of finality.  *See* CV No. 22-428, ECF No. 17 at 4–6.  In reply, Hawaiian Telcom offered more authority that it claims supports the contention that, notwithstanding those general rules, a bankruptcy court's civil contempt order is treated as a final, appealable order in the Ninth Circuit if the above test for finality is met.  *See* CV No. 22-428, ECF No. 18 at 12–13.

For example, Hawaiian Telcom cites *In re Stasz*, 387 B.R. 271, 274–76 (B.A.P. 9th Cir. 2008), where the Bankruptcy Appellate Panel ("BAP") concluded that the bankruptcy court's order finding a debtor in contempt of a prior order to appear at an examination and imposing sanctions was a final, appealable order. There, though, the BAP did not apply the test for finality that Hawaiian Telcom asks the Court to apply here.  *See id.*  Instead, the BAP noted the general rule that civil contempt orders entered during the course of a pending civil action are not appealable, but relied on two Ninth Circuit non-bankruptcy cases that "allowed immediate appeals of sanctions orders that dispose of the only issue before the court," both of which involved orders of contempt *post-judgment*.  *See id.* at 275

75

(citing *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1145 (9th Cir. 1983) and *Hilao v. Estate of Marcos*, 103 F.3d 762, 764 (9th Cir. 1996)).  Because "the contested matter alleging [the debtor's] contempt was the only matter before the [bankruptcy] court," the BAP in *Stasz* thus determined the "award of sanctions was a final order that ended the particular contested matter" and "[b]ecause the sanctions order stands alone and requires no further action by the bankruptcy court," it was a final order.  *Id.* at 275–76.

The Court is not persuaded that *Stasz* provides a clear answer here.  For one, sanctions were actually imposed in *Stasz*; they were not here and the Contempt Order itself indicated that further action *was required* by the Bankruptcy Court.  And second, *Stasz* appears to stand for the proposition that, where contempt proceedings are the only matter before the bankruptcy court, a departure from the general rule regarding civil contempt orders is warranted.  *See also In re Mack*, 2007 WL 7545163, at *3 (B.A.P. 9th Cir. Mar. 28, 2007) (noting that a contempt motion in the main bankruptcy case pertaining to a violation of the confirmation order was a "self-contained and self-standing contested matter" and that the order denying the motion was final because it "ended the only pending litigation between the parties on the merits and left nothing for the court to do").  Granted, here the plan had been confirmed a few months prior to the Contempt Order; still, Hawaiian

76

Telcom's request to enforce other aspects of the 363 Sale Order—aside from the spare reels—remained ongoing, *see* Bk. ECF Nos. 696, 729.

On the first point, regarding the issue that a contempt order is only final once sanctions have been imposed (not merely threatened), courts reviewing bankruptcy court decisions have declined to find contempt orders final when no sanction was imposed, even after *Stasz. See Munson*, 2014 WL 2041819, at *2–3 (citing *U.S. Abatement Corp. v. Mobil Exploration & Producing U.S., Inc.*, 39 F.3d 563 (5th Cir. 1994)); *In re H Granados Commc'ns, Inc.*, 503 B.R. 726, 731, 732 (B.A.P. 9th Cir. 2013) ("The Contempt Order was an interlocutory order that became final and appealable once the bankruptcy court awarded sanctions."); *In re Marciano*, 2013 WL 180057, at *2–3 (C.D. Cal. Jan. 17, 2013) ("This court has jurisdiction to review a bankruptcy court contempt order *only if it results in a sanction*.") (citing *Stasz*, 387 B.R. at 274) (emphasis added); *see also In re Szanto*, 2021 WL 5991785, at *1–2 (D. Or. Feb. 24, 2021) (distinguishing *Munson* because the bankruptcy court's contempt order *did* impose sanctions, and did not require any further order from the bankruptcy court, making it a final appealable order).

Now, the Court is aware that more recent Ninth Circuit authority might cast doubt on the suggestion that a lack of sanctions negates finality. *See In re Perl*, 811 F.3d 1120, 1125–27 (9th Cir. 2016). In *Perl*, the Ninth Circuit determined that a bankruptcy court order finding that a creditor had violated the automatic stay was

final, even though the bankruptcy court deferred ruling on damages. *See id.*

Because the BAP affirmed the bankruptcy court's ruling, the Ninth Circuit applied

the two-part test for finality stated above—asking whether the bankruptcy court's

decision (1) resolved and seriously affected substantive rights; and (2) finally

determined the discrete issue to which it was addressed. *See id.* at 1126. The

Ninth Circuit determined those factors were met, even though no penalty or

sanction had yet been assessed against the creditor, because the determination that

the creditor violated the stay was "a substantive ruling with real effects, including

money damages that could be sought by [the debtor] indefinitely." *Id.* at 1126–27

(citation omitted). In *Perl*, the case was dismissed after the contempt order

because the debtor failed to appear; however, the creditor was still subject to

damages that could be sought by the debtor indefinitely despite the dismissal. *See*

*id.* at 1125–27. In determining that finality existed, then, the Ninth Circuit focused

not only on the indefinite risk of future damages, but also the fact that the violation

of the stay was "the only issue litigated in the bankruptcy proceedings and before

the BAP" and "[a]s a practical matter, resolution of the [stay violation] issue

resolved the entire case[.]" *Id.* at 1127 (citation omitted). Based on *that*

procedural posture, the Court cannot find that *Perl* provides a clear answer here—

where there was no similar indefinite risk of future sanctions (because

SIC/Clearcom complied) and where the Contempt Order was not the only issue

litigated in the bankruptcy proceeding and did not resolve the entire case.  *See In re Heartwise, Inc.*, 2022 WL 18213523, at *8 (C.D. Cal. Dec. 5, 2022) (distinguishing *Perl* on similar grounds).

Nor is the Court persuaded that other authority Hawaiian Telcom cites, which relied on both *Perl* and *Stasz*, mandates a determination that the Contempt Order was final here.  *See* CV No. 22-429, ECF No. 18 at 12–13 (citing *In re SoCal Sleep Centers, LLC*, 2016 WL 4198534 (B.A.P. 9th Cir. Aug. 8, 2016)).  In *SoCal Sleep Centers*, the BAP determined that the bankruptcy court's order sanctioning a debtor's attorney for misrepresentations pursuant to its inherent power was a final order, which meant the appeal of that order was untimely.  *See* 2016 WL 4198534, at *7–8.  Unlike the Contempt Order here, the bankruptcy court in *SoCal Sleep Centers* determined both liability for sanctions and the amount of sanctions.  *See id.*  And although *SoCal Sleep Centers* seems to take a more expansive approach than *Perl* and *Stasz*—because it does not appear that the sanctions issue was the *only* matter before the bankruptcy court or all that remained before the bankruptcy court—it did still emphasize that "[i]t ended the litigation regarding private sanctions against [the attorney] and left the court with nothing to do but execute the order," meaning "there was no further litigation that would preclude finality" of that order.  *Id.* at *8.

Hawaiian Telcom certainly attempts to argue that cases like *SoCal Sleep Centers*, *Perl*, and *Stasz* control here because there was no further litigation regarding the *spare parts* or Hawaiian Telcom's rights to them. But this argument, at least to some extent, fails to take into account how the spare parts issue is connected to other issues that remained unresolved before the Bankruptcy Court. As summarized above, Hawaiian Telcom's motion to enforce the 363 Sale Order resulted in the First Enforcement Order, where the bankruptcy court resolved certain disputes, but deferred resolution of other issues. Bk. ECF No. 537. As Hawaiian Telcom concedes, underlying the Contempt Order was the Bankruptcy Court's determination "that the Spare Reels had belonged to SIC, and not Clearcom" and "confirm[ation] that the Spare Reels constituted Transferred Assets under the 363 Sale." CV No. 22-428, ECF No. 31-3 at 11. The Court has just spent many pages addressing issues related to what "constituted Transferred Assets under the 363 Sale." Granted, that discussion relates to a separate asset—the interest in License 372. And further proceedings regarding "Transferred Assets," i.e., the Final Enforcement Order and Reconsideration Order, ultimately did not affect the scope of the Contempt Order. Still, this Court sees the value in having these related issues make a *single* "climb up the appellate ladder." *Bullard*, 575 U.S. at 504; *cf. In re SK Foods, L.P.*, 676 F.3d 798, 802 (9th Cir. 2012) (concluding order permitting continued possession of documents already in the

possession of the trustee was not final because "[r]eviewing the order on appeal now would not finally determine the issue whether the trustee could use the documents, because the issue of possession and use of the records could arise again in further proceedings").

The Court agrees with Hawaiian Telcom that the Contempt Order altered the status quo and fixed the rights and obligations of the parties with regard to the *rightful owner* of the spare reels pursuant to the 363 Sale Order.  And thus that it did resolve and seriously affect substantive rights and finally determine the discrete issue to which it is addressed—again at least as to *ownership* of the spare reels under the 363 Sale Order.  Nor is that determination akin to a dispute "over minor details about how a bankruptcy case will unfold." *Ritzen*, 140 S. Ct. at 590.  And all of this points to a conclusion that the Contempt Order may have been final.

Yet, when considering the entire context of the issues before it now, the Court has concerns that deeming the Contempt Order final risks slicing the case too thin, *see id.*, if only because efficiency does not seem to be served by permitting multiple appeals related to the Bankruptcy Court's interpretation of the 363 Sale Order—even if related to different assets transferred pursuant to that order. *See In re Gugliuzza*, 852 F.3d at 899 ("Efficiency is best served by our review of the district court's resolution of the dispute between the parties as a whole . . . not our review of the individual elements of a dispute.").  When

81

combined with the authority above suggesting that the lack of imposition of sanctions is material for purposes of finality, even in the bankruptcy context, the Court is inclined to conclude that the appropriate procedural unit is, *at the least*, the entirety of the contempt proceeding including the imposition of sanctions (although potentially even beyond that to include the culmination of all the enforcement proceedings).

The Court appreciates Hawaiian Telcom's argument that, if sanctions are never imposed because compliance occurs first (as was the case here), there should be some meaningful limit on the time to appeal, especially when considering the "distinctive character of bankruptcy litigation." *Ritzen*, 140 S. Ct. at 586. But permitting appeal absent sanctions undoubtedly risks "delays and inefficiencies." *Id.* at 591 (quoting *Bullard*, 575 U.S. at 504). And starting the clock on the date of a contempt order alone seems equally prone to uncertainty, especially for a party like SIC/Clearcom who may wish to appeal but does not know if sanctions may be imposed because they are arguably outside of its control. *See In re Tech. Knockout Graphics, Inc.*, 833 F.2d 797, 800 (9th Cir. 1987) (noting that order is not final if "further proceedings in the bankruptcy court will affect the scope of the order") (citation omitted); *cf. Amara v. CIGNA Corp.*, 53 F.4th 241, 252 (2d Cir. 2022) ("If we considered the contempt finding alone, any sanction imposed could then be

challenged on appeal as an abuse of discretion." (citation and internal quotation marks omitted)).

Based on this, the Court concludes that the Contempt Order was not final, that it therefore has jurisdiction to review it, and that Hawaiian Telcom's motion to dismiss based on lack of jurisdiction must be denied.

### b. Mootness

Before turning to the merits, though, the Court must address one final jurisdictional issue. In its answering brief, Hawaiian Telcom also now appears to challenge the Court's jurisdiction to hear an appeal of the Contempt Order based on mootness, citing the general rule that no live case or controversy remains once a civil contempt order has been purged, and arguing that rule applies here given SIC/Clearcom turned over the Spare Reels and no sanctions were issued. *See* CV No. 22-428, ECF No. 31-3 at 13. But that "doctrine stems from the fact that in most instances the court has no remedy to afford the party contesting the now purged contempt." *Thomassen v. United States*, 835 F.2d 727, 731 (9th Cir. 1987). Where the party appealing seeks the return of property he was forced to part with in order to comply with a contempt order, the court is "presented with a live controversy which is inextricably intertwined with the contempt issue and [it is] capable of providing relief." *Id.* at 731–32 (citation omitted); *see also Davies v. Grossmont Union High School Dist.*, 930 F.2d 1390, 1394 (9th Cir. 1991). Here,

Clearcom seeks the return of spare reels it claims to own and that it contends SIC was wrongly required to turn over to Hawaiian Telcom.  So the Court is not convinced this matter is moot.

### c.    Merits

Concluding the Court has jurisdiction to review the Contempt Order,[22] it affirms.  The Bankruptcy Court did not exceed its authority because it ordered SIC—not Clearcom—to turn over the spare reels.  Bk. ECF No. 700 at 2.  Notably, Clearcom does not claim the Bankruptcy Court erred when it stated, in the First Enforcement Order, that

> SIC did not respond to Hawaiian Tel[com]'s request for turnover of spare parts and equipment associated with the submarine system.  These items are undoubtedly "Transferred Assets" under the Sale Order.  Accordingly, I will grant that portion of Hawaiian Tel[com]'s request.

Bk. ECF No. 537 at 11.  Determining that the spare reels were part of the "Transferred Assets," i.e., conveyed to Hawaiian Telcom in the 363 Sale Order, *see* Bk. ECF No. 366 at 3, confirms the Bankruptcy Court acted within its powers to enforce that order through contempt, *see, e.g.*, *In re Franklin*, 802 F.2d 324, 326 (9th Cir. 1986) ("Simply put, bankruptcy courts must retain jurisdiction to construe

---

[22]  Comparing the lengthy jurisdictional analysis to the short discussion on the merits might make one lament the demise of "hypothetical jurisdiction."  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998).

their own orders if they are to be capable of monitoring whether those orders are ultimately executed in the intended manner.")

And in response to the new argument, raised in the context of that request for contempt, that *Clearcom* owned certain spare reels, the Bankruptcy Court did not err when noting that it could not consider a declaration that was not signed under penalty of perjury.  Bk. ECF No. 708 at 25–26; Bk. ECF No. 671-1 at 5 (relevant declaration signed only "based on my knowledge and to the best of my belief"); *see also* 28 U.S.C. § 1746(2) (requiring declarations in federal proceedings to be made under penalty of perjury).  And there was no clear error in the Bankruptcy Court's finding, based on evidence such as a shipping record listing SIC under the "Bill To," "Sold To," and "Ship To" fields, that they were indeed owned by SIC.  *See* Bk. ECF No. 708 at 25–26; Bk. ECF No. 679 at 13 – 14.  Clearcom's argument that the Bankruptcy Court effected an unconstitutional taking with regard to the Spare Reels is thus without merit.

In conclusion, and based on the discussion above regarding the issues raised in the Main Bankruptcy Appeals, the Court AFFIRMS the Final Enforcement Order, the Reconsideration Order, and the Contempt Order.

## B.    Adversary Proceeding Appeals

Finally, the Court turns to the next three appeals, which contend the Bankruptcy Court erred by dismissing Appellants' FAC with prejudice and

denying a request to remand that action to state court.[23]  As previewed above,

Waimana, Pa Makani, and Clearcom brought state law claims for trespass (Count

I); conversion (Count II); unfair competition (Count III); intentional interference of

contract (Count IV); and seeking declaratory relief (Count V) based in large part

on the contention—now discussed ad nauseum—that Hawaiian Telcom did not

acquire SIC's interest in License 372.  Waimana AP, ECF No. 28.  The

Bankruptcy Court dismissed the FAC with prejudice based on issue preclusion, in

reliance on the Final Enforcement Order, and therefore denied the motion to

remand as moot.  Waimana AP, ECF No. 65 at 20–21.

### 1.    Dismissal of FAC

"The preclusive effect of a federal-court judgment is determined by federal

common law."  *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) (citation omitted).

Issue preclusion applies when "(1) the issue necessarily decided at the previous

proceeding is identical to the one which is sought to be relitigated; (2) the first

proceeding ended with a final judgment on the merits; and (3) the party against

whom issue preclusion is asserted was a party or in privity with a party at the first

proceeding."  *Paulo v. Holder*, 669 F.3d 911, 917 (9th Cir. 2011) (citation and

---

[23]  Appellants Waimana, Pa Makani, and Clearcom have appealed the dismissal
order (CV No. 22-435) and the order denying remand (CV No. 22-441).  While
they have also separately appealed the judgment (CV No. 22-434), that briefing
basically says nothing of substance, merely incorporating the arguments from the
other appeals.

alteration omitted).  Appellants concede that, if the Court affirms the Final

Enforcement and Reconsideration Orders, i.e., agreeing that Hawaiian Telcom

acquired SIC's interest in License 372, then the Bankruptcy Court correctly

concluded that Counts I (trespass), II (conversion), III (unfair competition), and

paragraph 66 of Count V were precluded.  CV No. 22-435, ECF No. 23 at 4.[24]

Based on the conclusions above, the Court therefore AFFIRMS the dismissal of

those claims.  So all that remain are Count IV (intentional interference of contract)

and paragraphs 67 and 68 of Count V (seeking declaratory relief).

As to those claims, Appellants contend dismissal based on issue preclusion

was improper because each is premised on *their* rights and obligations associated

with License 372 pursuant to Waimana's separate assignments to them.[25]  For

example, Count IV, alleging interference with a contract, rests on the following

allegations:

> The elements of tortious interference with contractual relations
> include:  1) a contract between the plaintiff and a third party; 2)
> the defendant's knowledge of the contract; 3) the defendant's
> intentional inducement of the third party to breach the contract;
> 4) the absence of justification on the defendant's part ; 5) the
> subsequent breach of the contract by the third party; and 6)
> damages to the plaintiff.  []

---

[24]  In doing so, Appellants necessarily concede the privity element is met.
Although they also conceded as much by not objecting to Hawaiian Telcom's
argument that privity was satisfied.  *See* CV No. 22-435, ECF No. 21-3 at 13.

[25]  The Court requested more briefing on this issue, ECF No. 26, and both
Hawaiian Telcom and Appellants filed supplemental briefs, ECF Nos. 27, 30.

> Here, 1) Plaintiffs have License 372 agreements with DHHL; 2)
> HTI knew of them; 3) HTI intentionally enticed, encouraged and
> induced DHHL to breach these agreements with Plaintiffs; 4) For
> numerous reasons HTI had no justification for doing so,
> including but not limited to rejecting the MRA and 9019
> Settlement Agreement and over reaching by using Plaintiffs'
> License 372 rights that clearly were never transferred to HTI,
> particularly for data (non-voice) telecommunications; 5)
> encouraged and induced DHHL to breach its obligations to
> Plaintiffs under License 372 by entering into the Limited Right-
> of Entry, making filings in this Court and potentially negotiating
> a new license with HTI that violate Plaintiffs rights under
> License 372 and Partial Assignments to Pa Makani and
> Clearcom; and 6) which damaged Plaintiffs' business on HHL.

Waimana AP, ECF No. 28 ¶¶ 63–64 (citation omitted).  The relevant portions of

Count V, seeking declaratory relief, allege that

> 67. Plaintiffs are entitled to a declaratory relief determination that
> the SIC Partial Assignment only provided SIC with the right to
> provide voice only service on HHL and no other
> telecommunications services throughout Hawaii, including
> wireless that was assigned to Pa Makani and broadband that was
> assigned to Clearcom.

> 68. Plaintiffs are entitled to a declaratory relief determination that
> the SIC Partial Assignment did not include Plaintiffs' License
> 372 Easement areas.

*Id.* ¶¶ 67–68.

Appellants' concession that Counts I , II, III, and paragraph 66 of Count V

were properly dismissed would appear to concede that the remainder of the

claims—similarly dependent on Appellants' alleged exclusive rights to certain

easements and to carry non-voice telecommunications—were also properly

dismissed.  *See, e.g.*, *id.* ¶¶ 49–51 (basing Count I for trespass on Hawaiian Telcom

preventing Appellants' "exclusive unimpeded use and occupancy of their License

372 Easement areas"); *see also id.* ¶¶ 53–54 (basing Count II for conversion on

Hawaiian Telcom using Appellants' "License 372 Easement areas" and their rights

for "all telecommunications services on HHL except voice only services").  But

even if the Court were to consider the specific portions of the FAC that Appellants

have not *explicitly* conceded were properly dismissed, none would warrant

reversal.

As to the claimed "voice only" limitation in paragraph 67, the Bankruptcy

Court correctly concluded its prior orders precluded the Appellants from

attempting to limit the Paniolo Network to "voice only" services.  The record is

clear that this claimed "voice only" limitation was an issue frequently raised in the

bankruptcy proceedings, but never successfully.  *See, e.g.*, Trustee AP, ECF No. 33

at 35 & n.2 (claiming, in moving to quash the Writ of Execution, that SIC's

interest in License 372, "which is the only basis for any Paniolo asset to be on

[HHL], **allows only voice communications**"); *see also* Bk. ECF No. 215 at 10

(SIC objecting to the bid and auction procedures, arguing that SIC's interest in

License 372 "which is the only basis for any Paniolo asset to be on [HHL] **allows**

**only voice communications**.").  And although it was again raised in the context of

the Main Motion to Enforce, *see, e.g.*, Bk. ECF No. 680 at 13–15 (Hawaiian

Telcom responding to this argument); tellingly, it was not raised as a formal objection to the 363 Sale Order.  This was so even though the record indicates that all parties involved seemed to agree that the Paniolo Network was able to function as it did on HHL—i.e., as a middle-mile provider of telecommunication transmissions—because of *SIC's interest* in License 372.  *See* Trustee AP, ECF No. 33 at 35 & n.2; Bk. ECF No. 215 at 10; CV No. 22-435, ECF No. 27 at 4 & nn. 8–11.  In the Court's view, the renewed "voice only" argument in the FAC is incompatible with what occurred during the bankruptcy proceedings—when there was a proper time to assert such limitations—and incompatible with how SIC itself treated its rights in License 372.  The Bankruptcy Court recognized as much and confirmed, in the Final Enforcement Order, that Hawaiian Telcom had "acquired the assets that permit operation of the Paniolo Network . . . , including those certain portions of the 372 License . . . pertaining to the Paniolo Network and/or the Paniolo Premises that were formerly held by SIC."  Bk. ECF No. 729 at 4; *see also* Bk. ECF No. 708 at 26–27 (noting the prior orders clearly provided for the transfer of *SIC's interests* to Hawaiian Telcom and that it was for DHHL to address whether that caused any problem under the license); Bk. ECF No. 739 at 9–10 (indicating it was for DHHL to address breach of any license).  The Court thus finds no error in the conclusion that this aspect of Count V was precluded.

The Court similarly agrees that the assertions in paragraph 68, regarding Appellants' "License 372 Easement areas," were precluded by the Final Enforcement Order.  Again, that order confirmed that, through the Sale Orders, Hawaiian Telcom acquired "exclusive control and ownership over, as well as rights of access to, the entirety of the Paniolo Buildings," and as noted above, "the assets that permit operation of the Paniolo Network, including, without limitation, *full rights of access to the Paniolo Premises*, *including those certain portions of the 372 License pertaining* to the Paniolo Network and/or the *Paniolo Premises that were formerly held by SIC*."  Bk. ECF No. 729 at 3–4 (emphases added). Again, the "Paniolo Premises" were defined as the "easement areas surrounding the Paniolo Buildings," and include physical metes-and-bounds easements granted from DHHL to *SIC* as addenda to *SIC's interest* in License 372.  *See, e.g.*, Bk. ECF No. 637 at 5; Bk. ECF No. 637-1 at 6 n.3, 43–44 n.20; Bk. ECF No. 637-5; Bk. ECF No. 637-6.  So again, the time to raise a claim to *exclusive* possession of License 372 Easement areas and contend Hawaiian Telcom would be liable if it used certain property and premises, *see, e.g.*, Waimana AP, ECF No. 28 ¶¶ 45, 47, was before the Sale Orders.  *See, e.g.*, Bk. ECF No. 366-1 at 238 (APA's broad definition of all assets acquired pursuant to the 363 Sale, including an interest in License 372 specifically and easement rights more generally "for a stand-alone commercial operation and use of the Paniolo Cable System").  This issue was

therefore resolved against Appellants in the Final Enforcement Order.  *See, e.g.*, Bk. ECF No. 729 at 4 ("HTI has acquired the exclusive ability to control and maintain security for and over the entirety of the Paniolo Network, the Paniolo Buildings, and the Paniolo Premises").  In other words, because the Bankruptcy Court concluded Hawaiian Telcom had a right to use and access the property and premises it was using in the Final Enforcement Order, and enjoined *Appellants* from impeding Hawaiian Telcom's access to those buildings and premises, *see* Bk. ECF No. 729 at 6, it correctly concluded this portion of Count V was also precluded.  *Compare, e.g.*, Waimana AP, ECF No. 28 ¶ 46 (alleging that "HTI is using [Appellants]' License 372 Easement and non-exclusive post FCC Order License 372 Service Right for non-voice only telecommunications services on HHL without authorization or paying for such use"); *with* Bk. ECF No. 729 at 4 (prohibiting Appellants "from charging HTI any fees for accessing or using any assets that permit operation of the Paniolo Network, including, without limitation, the Paniolo Buildings and Paniolo Premises, and HTI is not required to pay any such fees").

Based on these conclusions, the Court agrees that Count IV (alleging interference with Appellants' License 372 agreements with DHHL) was also properly dismissed, given it alleged in part that Hawaiian Telcom's conduct was not justified because it was not limited to "voice only" telecommunications.  *See*

Waimana AP, ECF No. 28 ¶ 64.  Appellants' other theory for why Hawaiian Telcom's conduct was not justified—regarding its conduct in not assuming the Settlement Agreement/MRA—had similarly already been resolved against Appellants, with any belated attempts to undermine those orders being rejected by the Bankruptcy Court in issuing the Final Enforcement Order and denying reconsideration.

In sum, the Bankruptcy Court correctly recognized it had already resolved the issues central to Appellants' theories of liability in Hawaiian Telcom's favor when it resolved the enforcement dispute about where Hawaiian Telcom had a right to go and what it had a right to do pursuant to the assets it acquired "free and clear" in the Sale Orders for the purpose of maintaining and operating the Paniolo Network.  For these reasons, the Court AFFIRMS the dismissal of the FAC.

### 2.    Denial of Remand

In light of this, the Court also AFFIRMS the denial of remand.  Appellants do not seem to be arguing that the Bankruptcy Court erred by considering the motion to dismiss first and then, after granting that motion, denying the motion to remand as moot.  *See, e.g.*, CV 22-441, ECF No. 23 at 4; *cf. In re Skyline Ridge, LLC*, 2022 WL 884724, at *4 (concluding no abuse of discretion in implicit denial of motion to remand where events mooted claims in removed action and there was thus "no case or controversy to remand").  Nor do they appear to argue that the

Bankruptcy Court lacked jurisdiction over the adversary proceeding.  Even if they had, the Court would reject that argument given Appellants concede most of the claims turned on whether the Bankruptcy Court's own orders conveyed SIC's interest in License 372 to Hawaiian Telcom.  *See, e.g.*, *Travelers Indem. Co.*, 557 U.S. at 151; *In re McGhan*, 288 F.3d 1172, 1182 (9th Cir. 2002) (noting the bankruptcy court was required to reopen a proceeding to "protect its exclusive jurisdiction over the enforcement of its own orders."); Bk. ECF No. 729 at 8 ("This Court retains jurisdiction to enforce, implement, and interpret the 363 Sale Order and this Final [Enforcement] Order.").  In sum, the Court finds no error in the Bankruptcy Court determining the motion to remand the adversary proceeding was moot because it dismissed that action.

## IV.    CONCLUSION

For the reasons stated above, the Court DENIES Hawaiian Telcom's motion to dismiss Clearcom's appeal of the Contempt Order, CV No. 22-428, ECF No. 6. The Court AFFIRMS the Bankruptcy Court's Final Enforcement Order, Reconsideration Order, and Contempt Order in the Main Bankruptcy Appeals.  The Court also AFFIRMS the dismissal of the FAC and the denial of the motion to remand as moot in the Adversary Proceeding Appeals.

IT IS SO ORDERED.

DATED:    Honolulu, Hawaiʻi, September 29, 2023.

Jill A. Otake
United States District Judge

CIV. NO. 22-00426 JAO-KJM, *Sandwich Isles Communications, Inc. v. Hawaiian Telcom, Inc.*; ORDER DENYING MOTION TO DISMISS AND AFFIRMING ORDERS OF THE BANKRUPTCY COURT